# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRIKA MEDLOCK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TACO BELL CORP., et al.,<br><br>Defendants. | Case No. 1:07-cv-01314-SAB<br><br>ORDER DENYING DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT REPORT AND TESTIMONY OF DR. DANNA MOORE<br><br>ECF No. 546 |

On October 19, 2015, Defendants Taco Bell Corp. and Taco Bell of America, Inc. ("Defendants") filed a motion to exclude Plaintiffs' expert reports and testimony of Dr. Danna Moore. (ECF No. 546).

The hearing on Defendants' motion to exclude Plaintiffs' expert reports and testimony of Dr. Danna Moore took place on December 2, 2015. Matthew Theriault and Andrew Sokolowski appeared in person and Monica Balderrama, Jerusalem Beligan, and Patrick Clifford appeared by telephone on behalf of Plaintiffs. Tracy Kennedy, Morgan Forsey, Nora Stiles, and John Makarewich appeared in person and Jason Overett appeared by telephone on behalf of Defendants. For the reasons set forth below, the Court denies Defendants' motions to exclude Plaintiffs' expert report and testimony of Dr. Danna Moore.

## I.

## LEGAL STANDARD

Expert witnesses in federal litigation are governed by Rules 702 to 705 of the Federal

1

Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

An expert may testify regarding scientific, technical or other specialized knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786 (1993).

> The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds. . . But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation- i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability."

Id. at 589-590 (citations omitted). The Supreme Court has suggested in dicta that Daubert should be applied to expert testimony at the class certification stage. See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2553-2554 (2011) ("The District Court concluded that Daubert did not apply to expert testimony at the certification stage of class- action proceedings. We doubt that is so …." (citation omitted)). Supreme Court dicta is accorded "appropriate deference" and "may be followed if sufficiently persuasive" but "ought not to control the judgment in a subsequent suit." United States v. Montero-Camargo, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000). This Court agrees that Daubert applies in this case as Daubert analysis was centered an application of the Federal Rules of Evidence. See also Kumho Tire Co., Ltd. V. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 1171, 143 L.Ed.2d 238 (1999) (expanding the holding of Daubert to testimony

1 based on 'technical" and "other specialized" knowledge); see also Fed. R. Evid. 101 and 1101.

2 The Ninth Circuit has held that "In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind [the rule's] broad parameters of reliability, relevancy, and assistance to the trier of fact." Sementilli v. Trinidad Corp., 155 F.3d 1130, 1134 (9th Cir. 1998).

6 A survey is admissible provided it is "conducted according to accepted principles" and "relevant" to the issues in the case. Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1036 (9th Cir. 2010). In Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001), the Ninth Circuit held that:

> Treatment of surveys is a two-step process. First, is the survey admissible? That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge. Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility. These are issues for a jury, or in a bench trial, the judge.

15 Accordingly, the Court analyzes Defendants' motion by applying general principles of admissibility within the confines of Fed. R. Evid 104.

## II.

## DISCUSSION

19 Defendants argue that Dr. Danna Moore's report and testimony should be excluded because it is unreliable and unfairly prejudicial and that the survey she designed and conducted was not done in conformity with applicable and recognized standards for conducting surveys. Defendants seek to exclude Dr. Danna Moore as an expert, and the introduction into evidence of her reports, the underlying survey and her opinions based on that survey. In support of their request, Defendants filed a request for judicial notice of the Reference Manual on Scientific Evidence, Reference Guide on Survey Research, Shari Seidman Diamond, Federal Judicial Center (3 ed. 2011), available at http://www.fjc.gov/public/pdf.nsf/lookup/SciMan3D09.pdf/$file/SciMan3D0.pdf ("Reference Manual"), concurrently with the motion to exclude Dr. Moore. The Court takes judicial notice of the Reference Manual on Scientific Evidence,

Reference Guide on Survey Research.

In both oral argument and their objections to Plaintiffs' evidence offered in support of Plaintiffs' opposition to the motion to exclude Dr. Moore, which was filed concurrently with Defendants' reply to the motion, Defendants object to Dr. Moore's November 18, 2015 declaration as an untimely new expert report. (ECF No. 565-9.) The Court considers Dr. Moore's November 18, 2015 declaration as rebuttal to Defendants' arguments in the motion to exclude her survey.

### A. Dr. Moore's Qualifications as a Survey Expert

Although Defendants do not specifically argue that Dr. Moore should not be qualified as a survey expert, Defendants contend that Dr. Moore has only conducted three surveys related to wage and hour cases. However, Defendants do concede that Moore has conducted "many surveys."

Dr. Moore received her Ph.D. in 1988. (Theriault Decl, Ex. C "Moore CV," at 2.) Since 1991, she has been employed by the Social and Economic Sciences Research Center (SESRC) at Washington State University conducting surveys since 1991, and currently serves as SESRC's Senior Research Fellow. (Id. at 1.) She has worked on or developed hundreds of surveys. (Id. at 3-14.) She has published on over 70 occasions on survey-related topics. (Id. at 15-26.) Therefore, the Court finds that Dr. Moore is qualified as a survey expert.

### B. Testing of the Validity of the Survey

Defendants contend that the survey that Dr. Moore conducted is unreliable because she did not test the validity of her survey and has blocked Defendants from accessing the information it needs to conduct the validity testing Dr. Moore neglected to perform.

Defendants cite to their expert, Robert Crandall for information on the purpose of validating surveys and how surveys should be validated. Mr. Crandall states that there are several ways to validate a survey and he provides that one way to validate a survey is to "examine the internal consistency of what was reported. Under this approach, researchers construct surveys with multiple questions that touch upon the same topic and test whether two questions that should be correlated indeed are." (Kennedy Decl., ¶ 6, Ex. E (Crandall Report), ¶

1  15, 11:19-21.)

2  In Dr. Moore's declaration, she states that, "In this survey we are able to do this first test 3 of reliability and validity by comparing survey respondents to the population and the initial 4 sample to evaluate nonresponse error on a key characteristic measure, rest break and mail break 5 counts, for the survey since the external source of Taco Bell employee records are available." 6 (See Moore Decl., ¶ 15.)  Further, Dr. Moore states, "The results of this comparison are shown in 7 Table 1 and Table 2 in 19. We also present the results of post survey testing comparing the 8 consistency of answers in a series of questions to related questions in the same interview and this 9 is shown in 22."  (See Moore Decl., ¶ 15.)

10  Therefore, it is clear that Dr. Moore actually did validate the survey results by examining 11 the internal consistencies of what the respondents were reporting, which was a manner that Mr. 12 Crandall stated was appropriate for survey researchers.  Furthermore, Defendants can argue to 13 the factfinder that the survey should be given less weight due to issues with the validation. 14 Therefore, the Court will not exclude Dr. Moore's survey and report because of the fact that she 15 has not turned over the identities of the survey respondents connected to their answers.

16  **C. Due Process Concerns**

17  Related to Defendants' argument on the testing of the validity of the survey, Defendants 18 also argue that their due process rights are violated if they do not receive the identities of the 19 survey participants tied to their survey responses.

20  Defendants sent a subpoena to Dr. Moore requesting her entire file, including the identity 21 of the survey respondents that are tied to their survey responses.  (Kennedy Decl, ¶ 8, Ex. G.) 22 Plaintiffs' counsel objected on behalf of Dr. Moore to producing the identities of the individuals 23 with their response or Dr. Moore's entire file, including the surveys she relied on as well as her 24 notes. (Kennedy Decl, ¶ 8, Ex. G.)  Plaintiffs, pursuant to Court order, have produced a file that 25 lists the names of those respondents who were selected as part of Dr. Moore's random sample 26 and an assigned identifier.

27  Defendants argue that the separation between the names of those who responded and 28 their answers has barred Defendants from validating responses in any manner, including

1 comparing class member responses to records, and cross examination.  Defendants argue that if
2 the Respondents' names were linked to a survey response, Defendants could access whether the
3 respondents are class members, whether the survey responses are consistent with their
4 timekeeping data and other personnel data, and whether the respondents also may have worked
5 at a franchised location, at a Taco Bell location in a state other than California, or at multiple
6 corporately-owned restaurants.  Defendants also want the names linked to survey responses so
7 that Taco Bell can run consistency checks by comparing the responses of survey respondents
8 who worked at the same store to see if respondents who worked in the same store had consistent
9 answers.  Defendants argue that inconsistent answers from employees who worked at the same
10 store could indicate that policies at a given restaurant changed over time, there was a problem
11 with the respondent's recall, and/or that the question did not provide a valid and reliable measure
12 for the meal and rest break practices at the store.

13 The Court does not find that Defendants due process rights have been violated.  As the
14 Court stated in its September 3, 2015 order re informal discovery dispute, Defendants can argue
15 to the factfinder that the survey should be given less weight due to issues of reliability.
16 Defendants also had the opportunity to retain their own expert to challenge the veracity of Dr.
17 Moore's survey methodology, and Defendants have retained Mr. Crandall.  Therefore, the Court
18 does not find that Defendants due process rights have been violated by Defendants not receiving
19 the identities of the survey respondents tied to their answers.

20 **D.  The Fit of Questions to the Issues**

21 Defendants allege that Dr. Moore's survey is unreliable because the questions are biased
22 and fail to fit the issues to be decided by the jury.  Defendants argue that the questions were
23 improper and biased because Dr. Moore repeatedly used biased qualifiers in all capital letters
24 such as, "ALWAYS" and ""EVER."

25 Plaintiffs contend that the survey's purpose is to rebut several of Defendant's assertions
26 raised in its opposition to Plaintiff's Motion for Summary Judgment that Plaintiffs anticipate will
27 be raised during trial. Plaintiffs argue that Defendants arguments concerning reliability are based
28 on speculation rather than actual evidence and that these arguments go to weight of the evidence,

1 and not the admissibility of the evidence.

2 Plaintiffs contend that the survey was designed to address whether the "2-2-2" scheduling 3 mnemonic was implemented throughout California and that it constituted Defendants' 4 scheduling policy. The survey also asked questions concerning the wallet card and Meal and 5 Rest Break Matrix. This certainly is a relevant issue as the parties must present evidence as to 6 whether Defendants had a uniform policy that was consistently applied for meal breaks and rest 7 breaks. Defendants contend that the "2-2-2" scheduling mnemonic was implemented instead of 8 the wallet card and Meal and Rest Break matrix, so answers from class members about how 9 breaks were scheduled are relevant to the issues in the case.

10 The Court finds that clearly the questions that were asked by Dr. Moore as part of the 11 survey are relevant to the claims alleged in this case, and therefore Dr. Moore's testimony about 12 the survey results will assist the trier of fact in making a liability determination. The Court finds 13 that Defendants' criticisms of Dr. Moore's survey design and reliability go to the weight of the 14 evidence, and its admissibility under FRE 104.  See Wendt v. Host Int'l, Inc., 125 F.3d 806, 814 15 (9th Cir. 1997); Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1143 n. 8 (9th Cir. 16 1997).

17 **E. Respondents Forced to Adopt Disputed Facts**

18 Defendants argue that the survey questions ensured that the respondents adopted 19 Plaintiffs' preferred survey outcome. Defendants argue that the following questions are 20 problematic:

21 QB5: Did Taco Bell give you a Wallet Card and Rest Break
22 Matrix that displayed Taco Bell's meal and rest break policy?

23 QB1: While working at Taco Bell, did you hear of a 2-2-2 schedule?

24 QG2: Did Taco Bell train you on the 2-2-2 schedule?

25 QD3: Did you ever work more than 5 hours before you took your
26 meal break?

27 The Defendants argue that the survey respondents were told that the Wallet Card and
28 Rest Break Matrix were Taco Bell's meal and rest break policy, which is Plaintiffs' theory.

7

1  Defendants' theory is that the Wallet Card and Rest Break Matrix were not Taco Bell's meal and
2  rest break policy, and that the 2-2-2 scheduling mnemonic was actually Taco Bell's meal and rest
3  break policy.  Defendants also argue that the question asking if the respondent ever worked more
4  than 5 hours before taking a meal break does not account for Defendants' actual legal obligation
5  for meal breaks and that the answer to this question does not provide any information about
6  whether a respondent suffered a meal period violation.

7  Here, there is no evidence in the record that the use of "ALWAYS" and "EVER" in the
8  questions caused a bias which would result in an unreliability assessment for purposes of
9  admission under a Daubert analysis.  As stated above, answers from class members about how
10 breaks were scheduled are relevant to the issues in the case.  The Court agrees that Dr. Moore
11 could have more narrowly tailored her question asking if respondents worked more than 5 hours
12 before taking their meal break by inquiring whether respondents were provided with the
13 opportunity to take a meal break instead of whether the respondents actually took a meal break.
14 However, Dr. Moore did ask both open-ended and closed questions about why respondents were
15 not able to take timely meal breaks.  Respondents were also asked whether they worked through
16 meal periods despite having punched out for the meal period, the number of times they were
17 pressured to work through meal period, and they could provide open-ended comments describing
18 the pressure.  (Kennedy Decl., ¶ 4, Ex. C. (Moore Report), p. 15.)   The Court finds that
19 Defendants' criticisms of Dr. Moore's wording of the questions goes to the weight of the
20 evidence, and not the admissibility of the survey.  See Wendt, 125 F.3d at 814; Southland Sod
21 Farms, 108 F.3d at 1143 n. 8.

**F. Survey Population Includes Individuals Who Did Not Work at Corporately-Owned Taco Bell Stores During the Class Period**

24 Defendants argue that the survey population was not properly defined.  Defendants
25 contend that Dr. Moore did not ask any questions to ascertain if survey respondents worked at a
26 franchisee-owned store or whether they worked at multiple store locations and did not confirm
27 with Class Counsel as to the proper survey audience.  Defendants also argue that at least 60
28 employees who responded to Dr. Moore's survey worked at franchisee-owned locations in

1  addition to a corporately owned location during the class period. Plaintiffs contend that the
2  survey population was properly defined from the universe of Class Members and that there is no
3  evidence that 60 surveyed employees worked for franchisee-owned stores.

4  Dr. Moore selected 4,000 individuals randomly using a statistical program from the files
5  that Dr. Moore received from Plaintiffs' counsel and which had originally come from the
6  employee records provided by Taco Bell. (Theriault Decl, Ex. A (Moore Dep.) 12:15-16:17).
7  Therefore, the population for the survey is appropriate. It appears that whether 60 surveyed class
8  members worked at Taco Bell locations that were separately owned under a franchise agreement
9  is a disputed fact. Defendants cite to the Crandall Report to support this contention, but Mr.
10 Crandall does not provide any facts to support his statement. There is no evidence before the
11 Court that 60 surveyed class members worked for franchised Taco Bell locations. Moreover,
12 Defendants can further explore these issues on cross examination or through their own expert
13 and these issues go to the weight of the survey. See Wendt, 125 F.3d at 814; Southland Sod
14 Farms, 108 F.3d at 1143 n. 8.

**G.  Recall Bias and Different Experiences During the Class Period**

16 Defendants contend that because Dr. Moore's survey sought to cover an eleven-year
17 period, from September 7, 2003 through December 23, 2014, there were recall issues by
18 respondents and she does not account for differences in practices across the time period.
19 Plaintiffs argue that employees do remember their employment experiences, even after an
20 extended period of time, and the survey respondents were able to recall with great specificity
21 their meal and rest break experiences. The Court notes that Defendants have not cited any
22 scientific support for their argument that recall bias infected the responses. Upon a review of the
23 survey responses, the Court notes that many respondents were able to recall their employment
24 experiences. Furthermore, the Court finds that any issues of recall bias and different experiences
25 of respondents during the class period are appropriate questions for cross examination or their
26 own evidence and go to the weight to be ascribed to the survey.

**H.  Self-Interest Bias**

28 Defendants argue that self-interest bias permeates Dr. Moore's survey because of

9

1 potential financial gain. Defendants contend that the survey respondents were told multiple times 2 that they are members of a class action lawsuit and that the survey concerns a class action 3 lawsuit. Although the survey respondents were told that this survey related to the class action 4 lawsuit, the Court does not find that the potential self-interest bias in this case causes such a 5 significant error in the reliability of Dr. Moore's survey to render the survey inadmissible. The 6 Court finds that Defendants' arguments about self-interest bias may be addressed on cross 7 examination or through their own expert and go to the weight of the evidence being presented.

8 **I. Nonresponse Bias**

9 Defendants argue that the survey's response rate was less than 17%, so the potential for 10 nonresponse bias is considerable. Defendants contend that Dr. Moore failed to analyze the 11 nonresponse bias and that she testified at her deposition that she has no way of knowing whether 12 issues like nonresponse bias and selection bias affected the representative nature of her survey. 13 (Kennedy Decl, ¶ 2, Ex. A (Moore Depo.) at 168:8-25.) Defendants argue that there may be a 14 nonresponse bias because individuals who believe they can recover monetary damages for meal 15 periods and rest breaks were more likely to participate in the survey than individuals who had no 16 issues with their breaks.

17 A survey that "begins with a random sample," but does not "take measures to assure that 18 nonresponses are random and provide analysis of the reasons of nonresponse," is not "the 19 product of reliable principles and methods." Marlo v. United Parcel Service, Inc., 251 F.R.D. 20 476, 485 (C.D.Cal.2008) (citations and internal quotation marks omitted), aff'd, 639 F.3d 942 21 (9th Cir.2011). The Reference Manual does provide that "It is incumbent on the expert 22 presenting the survey results to analyze the level and sources of nonresponse, and to assess how 23 that nonresponse is likely to have affected the results." (See Reference Manual at 383.) Here, it 24 is clear that less than 17% of the selected individuals responded.

25 Plaintiffs do not specifically address this argument in their opposition to the motion. 26 However, Dr. Moore does address this issue in her November 18, 2015 declaration. Dr. Moore 27 states that respondents were able to respond to both web and telephone questionnaires in English 28 and Spanish which helped reduce non-response bias. (See Moore Decl., ¶ 37.) Dr. Moore also

states that:

> Respondents to the survey, like the population, vary on the number of job positions held and on the number of Taco Bell cost centers they worked for during the relevant time period. These two characteristics could be used for post survey weighting adjustments, however the assignment of weights to these characteristics will add variability and can add distortions if not done carefully and fairly. Some members of the population held multiple job codes, worked at multiple cost centers, and some had multiple job codes at multiple cost centers. For job codes an assignment for weighting needs to consider and select either the most relevant job code for employees with more than one job code or some combination—should it be the longest held position, the most recent position, or weighting criteria using duration in each job in the relevant time period? Some employees also worked for multiple cost centers, and this characteristic would also need the same consideration for developing weights if used.

(See Moore Decl., ¶ 36.)

The Court notes that a lower response rate does not necessarily mean that the survey is invalid, but a lower response rate "generally requires an analysis of the determinants of nonresponse." It is the survey proponent's burden to assure that the nonresponses are random. However, in this case, Dr. Moore has not provided any analysis of whether the nonresponses in her survey are random. In Dr. Moore's September 15, 2015 deposition, she testified that she did not do any bias testing and that she didn't have beliefs about that. (Kennedy Decl, ¶ 2, Ex. A (Moore Depo.) at 251:13-20.) Dr. Moore stated in her deposition that she "looked at the preliminary data and then we looked at the final data, and you know, we just – we trust the responses come in reflective of a population because of our sample selection and the methods to get people to respond to the survey and that those apply to people across the board." (Kennedy Decl, ¶ 2, Ex. A (Moore Depo.) at 248:20-249:7.) In Dr. Moore's November 18, 2015 declaration, she identifies weighting adjustments that could be done for the survey results, but she does not present the results of any weighting in her declaration. The fact that Dr. Moore does not specifically identify the numerical values when weighting adjustments may go toward the weight of the survey and report. The Court finds that Defendants' arguments concerning nonresponse bias do not amount to a fatal flaw as to render the survey inadmissible in this case.

Based upon the evidence in the record and considering Defendants' arguments, the Court

does not find that Dr. Moore's survey was undermined by some fatal flaw as to deem it inadmissible. See Clicks Billiards, 251 F.3d at 1263. The Court finds that the survey is relevant and that it was conducted according to accepted principles. See Id. The arguments that Defendants raise in this motion are more appropriate for the weight of Dr. Moore's survey and report. Thus, the Court finds that Dr. Moore's survey should not be excluded, but Plaintiff must still lay the necessary foundation and qualify the expert at trial as this order merely addresses Defendant's exclusion request.

### III.

### ORDER

Accordingly, it is HEREBY ORDERD that Defendants' motion to exclude Plaintiffs' expert report and testimony of Dr. Danna Moore is DENIED.

IT IS SO ORDERED.

Dated:   **December 9, 2015**

UNITED STATES MAGISTRATE JUDGE