# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRIKA MEDLOCK, et al., | Case No. 1:07-cv-01314-SAB |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT REPORT AND TESTIMONY OF MICHAEL O'BRIEN |
| v. | |
| TACO BELL CORP., et al., | |
| Defendants. | ECF No. 551 |

On October 19, 2015, Defendants Taco Bell Corp. and Taco Bell of America, Inc. ("Defendants") filed a motion to exclude Plaintiffs' expert report and testimony of Michael O'Brien. (ECF No. 551).

A hearing on Defendants' motion took place on December 2, 2015. Matthew Theriault and Andrew Sokolowski appeared in person and Monica Balderrama, Jerusalem Beligan, and Patrick Clifford appeared by telephone on behalf of Plaintiffs. Tracy Kennedy, Morgan Forsey, Nora Stiles, and John Makarewich appeared in person and Jason Overett appeared by telephone on behalf of Defendants. At the hearing on December 2, 2015, the Court determined that a Daubert hearing was appropriate as to Plaintiffs' expert witness Michael O'Brien and set a Daubert hearing for December 9, 2015. A Daubert evidentiary hearing as to Plaintiffs' expert witness Michael O'Brien took place on December 9, 2015. Andrew Sokolowski appeared on

behalf of Plaintiffs.  Tracy Kennedy and Nora Stiles appeared on behalf of Defendants.

For the reasons set forth below, the Court grants in part and denies in part Defendants' motion to exclude the report and testimony of Plaintiffs' expert Michael O'Brien.

# I.

# LEGAL STANDARD

Expert witnesses in federal litigation are governed by Rules 702 to 705 of the Federal Rules of Evidence.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

An expert may testify regarding scientific, technical or other specialized knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786 (1993).

> The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds. . . But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation- i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability."

Id. at 589-590 (citations omitted).

When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony.  Primiano v. Cook, 598 F.3d 558, 564–65 (9th Cir.2010) (citing United States v. SandovalMendoza, 472 F.3d

1  645, 654 (9th Cir.2006)). The inquiry into whether an expert opinion is admissible is a "flexible
2  one" where shaky "but admissible evidence is to be attacked by cross examination, contrary
3  evidence, and attention to the burden of proof, not exclusion." Primiano, 598 F.3d at 564 (citing
4  Daubert, 509 U.S. at 592-96). The Supreme Court has held that "Rule 702 grants the district
5  judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the
6  particular facts and circumstances of the particular case." Kumho Tire Co., Ltd. V. Carmichael,
7  526 U.S. 137, 158, 119 S. Ct. 1167, 1179, 143 L.Ed.2d 238 (1999).

8        The Supreme Court has suggested in dicta that Daubert should be applied to expert
9  testimony at the class certification stage. See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541,
10 2553-2554 (2011) ("The District Court concluded that Daubert did not apply to expert testimony
11 at the certification stage of class- action proceedings. We doubt that is so …." (citation omitted)).
12 Supreme Court dicta is accorded "appropriate deference" and "may be followed if sufficiently
13 persuasive" but "ought not to control the judgment in a subsequent suit." United States v.
14 Montero-Camargo, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000). This Court agrees as Daubert
15 analyzed this application of Federal Rules of Evidence. See also Kumho Tire Co., 526 U.S. at
16 141 (expanding the holding of Daubert to testimony based on 'technical" and "other specialized"
17 knowledge). Therefore, Daubert is equally applicable to class action case since the rules of
18 evidence apply. See Fed. R. Evid. 101 and 1101.

### II.

### DISCUSSION

21    Defendants argue that Michael O'Brien's report and testimony should be excluded
22 because he is not an expert on the opinions he rendered and his opinion and report are flawed and
23 unreliable.

24    **A. Qualifications to Testify as Expert**

25    Defendants argue that Mr. O'Brien is not an economist qualified to opine on Defendants'
26 alleged liability or damages. Defendants point to the fact that Mr. O'Brien has little more than a
27 high school education and has no training in economics, economic analysis, or computer
28 forensics. (Kennedy Decl., ¶ 2, Ex. A (O'Brien Depo. III) at 165:15-166:2; 167:24-168:3).

Plaintiffs argue that Mr. O'Brien's testimony is only as an expert on damages, and not liability. (ECF No. 562 at 7.) Plaintiffs argue that Mr. O'Brien has experience collecting raw time card report, payroll records, and related information and processing it to reveal computations for unpaid wages, unrecognized overtime, off-the-clock wages, waiting time penalties, meal break violations, and associated interest on these amounts. (Theriault Decl., Ex. D (O'Brien Report), at 1).

As Rule 702 provides, an expert may be qualified by "knowledge, skill, experience, training, or education. Fed. R. Evid. 702. The Ninth Circuit has recognized that "the advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert." Thomas v. Newton Int'l Enterprises, 42 F.3d 1266, 1269 (9th Cir. 1994).

Although Mr. O'Brien does not have a college degree,[1] he does have specialized knowledge and experience in this field. In Mr. O'Brien's testimony, he stated that he had approximately 20 years of experience at Setec Investigations, which specializes in the discovery, collection, investigation, and production of electronic information. Mr. O'Brien has led over 350 computer forensic investigations and database discovery efforts and participated in more than 700 additional investigations in order to facilitate the finding of relevant electronic information and database records in support of internal investigations, civil litigation and criminal matters. (December 9, 2015 Hearing Defendants' Exhibit A at 18-6). He states that he is "frequently provided with or directly collect electronic information in the form of raw timecard reports, payroll records, accounting data, and human resources modules from workstations, servers, and other media devices acting as a repository of such relevant electronic information." Id. He further states that after he is "provided with or collect such information, [he] is able to process the records they contain to clearly depict relevant figures on a per shift, per pay period, or per year basis, as well as other time frames." Id.

---

[1] The Court notes that whether one has a college degree or not is not always dispositive of expert qualification. Some experts would require such secondary education while others do not. Mr. O'Brien's area of expertise is not one where a college or formal education is required but can be acquired through work or other experience.

4

Clearly, this lays at least the minimal foundation of knowledge, skill, and experience required in order to give an expert opinion for processing and providing calculations on raw time punch data in order to extract information from that raw data.

### B. Opinion Based on Sufficient Facts or Data

Defendants argue that Mr. O'Brien's time punch testimony must be excluded pursuant to Daubert because Mr. O'Brien's methodology for calculating alleged meal period and rest break violations is flawed, he did not take into account employees' individualized circumstances, he failed to utilize quality control protocols, and he failed to account for data entry errors. Furthermore, Defendants contend that Mr. O'Brien's damages analysis is flawed because it stems from his time punch analysis, the calculation of the average rate of pay has no factual basis and is biased against Defendants, it fails to take into account the paid meal period premiums during the class period, and it merely rubberstamps Plaintiffs' counsel's prior damages analysis.

#### 1. Methodology for Calculating Alleged Meal Period and Rest Break Violations

Defendants take issue with Mr. O'Brien's methodology for calculating alleged meal period and rest break violations. Defendants argue that Mr. O'Brien did not base his opinion on sufficient facts or data, because he only used Defendants' raw punch data for the class period instead of Paycheck Verification Reports ("PVRs") and the raw punch data does not specify shifts worked. Defendants take issue with the fact that Mr. O'Brien based his shift calculations on the fact that "[a] punch was considered to be part of the same shift if the in-time of the punch occurred less than seven hours after the out-time of the immediately preceding punch." (Kennedy Decl., ¶ 5, Ex. D (O'Brien Report), at 3). Defendants also argue that Mr. O'Brien failed to show how he interpreted the time punches, because he produced unintelligible notes with "just things jotted down."

If the basis for an expert's opinion is clearly unreliable, it may be disregarded. Munoz v. Orr, 200 F.3d 291, 301 (5th Cir. 2000); Smith v. Pac. Bell Tel. Co., 662 F. Supp. 2d 1199, 1226 (E.D. Cal. 2009). Dr. Walker states that Mr. O'Brien's use of requiring seven hours or more to elapse between shifts is completely arbitrary. (Kennedy Decl., ¶ 7, Ex. F (Walker Supplemental Report), at ¶ 17). Defendants cite to Dr. Walker's report for the proposition that there is no basis

1 in economics to assume that work shifts must be seven hours apart and employees' shifts at
2 Defendants' stores were not always seven hours or more apart.  However, Dr. Walker does not
3 cite to any sources in his report and Defendants do not cite to any sources to support their
4 position that a seven-hour gap between a time out and time in punch is not a reliable method for
5 opining shifts.

6       Mr. O'Brien provided support that his method of using a seven-hour gap between a time
7 out and time in punch to determine a new shift was a reliable method.  Mr. O'Brien testified that
8 the decision to use a seven-hour gap between a time out and time in punch to determine a new
9 shift was determined in a discussion with Plaintiffs' counsel.  However, Mr. O'Brien also
10 testified that other experts in the industry use a seven-hour gap between a time out and time in
11 punch to signify a new shift.  Mr. O'Brien testified that Setec has used a seven-hour gap between
12 punches to signify a new shift in approximately twenty-five to thirty cases.  Mr. O'Brien testified
13 that there was not a great statistical difference between using a seven-hour gap and a two-hour
14 gap between time out and time in punches to signify a new shift.

15       Dr. Walker's report clearly disagrees with the methodology that Mr. O'Brien used and
16 the conclusions that he formed.  However, Dr. Walker's report in this case creates a "battle of the
17 experts" situation that goes to the weight of the evidence in this case.  Therefore, the Court finds
18 that the basis for Mr. O'Brien's use of a seven-hour gap between time out and time in punches to
19 constitute a shift does not fall below the level required in the field of processing and providing
20 calculations on raw time punch data in order to extract information from that raw data.  The
21 Court finds that Defendants arguments are more appropriately directed at the weight, rather than
22 the admissibility, of Mr. O'Brien's testimony.  Defendants can attack Mr. O'Brien's testimony
23 through cross examination or through their own expert.

24       2. <u>Employees' Individualized Circumstances</u>

25       Defendants argue that Mr. O'Brien's report only addresses raw punch data and does not
26 account for the individualized circumstances that applied to each employee.  Defendants contend
27 that Mr. O'Brien's report does not account for whether the employees were offered a meal
28 period, whether Defendants failed to authorize and permit the rest break class member to take

1 two ten-minute rest breaks, whether meal periods or rest breaks were actually taken, and whether
2 an employee signed an on-duty meal period agreement.  Plaintiffs argue that any challenges that
3 Mr. O'Brien did not consider sufficient information or the correct information go to the weight
4 of the evidence, and not admissibility.  The Court notes that Plaintiffs have stated that Mr.
5 O'Brien is only an expert on damages and not liability.  Mr. O'Brien's testimony is based only
6 on the raw punch data and his calculations of the number of violative shifts based on the raw
7 punch data for purposes of damages.  The Court finds that Defendants arguments are more
8 appropriately directed at the weight, rather than the admissibility, of Mr. O'Brien's testimony.
9 Defendants can attack Mr. O'Brien's testimony through cross examination or through their own
10 expert.

11        3.  Quality Control Procedures

12        Defendants argue that Mr. O'Brien's report is unreliable because he did not employ any
13 quality control procedures.  Defendants point out that Mr. O'Brien's prior coding error that
14 overstated the unpaid meal premium class by 19% was discovered by chance and not as part of
15 any routine or ordinary quality control procedures.  Defendants also contend that Mr. O'Brien
16 had miscalculated the number of shifts during the class period by over 20%, because he had
17 originally calculated 6,012,994 shifts during the class period, but when he re-ran the data with
18 additional punch data, the number of shifts fell to 4,935,591.  Defendants rely on Dr. Walker's
19 report as evidence that Mr. O'Brien's calculations were off for the number of shifts between six
20 and seven hours without at least two ten-minute rest breaks during the shift.

21        Plaintiffs argue that the level of quality control measures only go to the weight of the
22 testimony, and not to admissibility.  Plaintiffs argue that when Mr. O'Brien received the new
23 data in 2015 from Defendants, he revised his calculations, and that the revision of his
24 calculations is not proof of any quality control problems.

25        Here, Mr. O'Brien testified that he actually did employ quality control procedures.  Mr.
26 O'Brien testified that he applied a "modulo query" to the data and determined if the data fell
27 within an expected range.  As Mr. O'Brien has provided testimony that he did employ quality
28 control procedures, the Court does not find his testimony unreliable as to deem it inadmissible.

1 Dr. Walker's contradictory opinions provide for a "battle of the experts" that is for the trier of
2 fact to determine. Defendants can attack Mr. O'Brien's quality control procedures through cross
3 examination of Mr. O'Brien or by presenting their own evidence. Therefore, Defendants'
4 arguments are more appropriate for the weight of the evidence, and not its admissibility.

### 4. Data Entry Errors

Defendants argue that Mr. O'Brien's report does not take into account any data entry errors from employees' erroneous punches. Defendants point to Dr. Walker's analysis that filtered out 77,143 punches that appeared to be affected by a data entry error. Defendants contend that Mr. O'Brien's report does not discuss whether the shifts he calculated had characteristics that show that they were affected by a data entry error and whether he took into account the data entry errors or broken shifts.

Plaintiffs argue that Mr. O'Brien did account for broken shifts and that broken shifts could result from data entry or data transfer error. Mr. O'Brien testified that he excluded approximately 11,000 "broken shifts" from his analysis. Plaintiffs argue that any data entry error arguments go to the weight of his testimony.

Here, based upon Mr. O'Brien's testimony that he did exclude broken shifts, the Court does not find that Mr. O'Brien's methodology is inadmissible. Any arguments as to his decisions to exclude or not to exclude certain "broken shifts" go to the weight of the evidence, and Defendants may attack the opinion on cross examination or through their own evidence. Therefore, the Court finds that Mr. O'Brien's report and testimony as to the number of meal and rest break violations reflected in Defendants' electronic records for purposes of damages calculations and the calculations of PAGA violations is reliable and should not be excluded under Daubert.

### 5. Damages Analysis

Defendants contend that Mr. O'Brien's damages analysis is flawed because it stems from his time punch analysis, the calculation of the average rate of pay has no factual basis and is biased against Defendants, it fails to take into account the paid meal period premiums during the class period, and it merely rubberstamps Plaintiffs' counsel's prior damages analysis.

1	Plaintiffs argue that Mr. O'Brien calculated the median regular rate of pay, which creates a weighted midpoint based on the number of people earning each pay rate over a period of time. Plaintiffs argue that the $12 high-end cut-off was conservative and actually benefits Defendants because class members did work shifts at pay rates above $12 per hour. Plaintiffs argue that this challenge goes to weight.

The Court finds that Mr. O'Brien's aggregate damages figures for the unpaid meal period and rest break premiums are flawed. The methodology that Mr. O'Brien used for calculating the aggregate damages figures is flawed because he used an average rate of pay for the class that he then multiplied by the number of violative shifts to calculate aggregate damages. Mr. O'Brien has not provided any support from his industry for why he used an average rate of pay instead of the actual rates of pay when calculating the amount of damages.

In this case, California Labor Code Section 226.7(c) provides, in relevant part, that:

> If an employer fails to provide an employee a meal or rest or recovery period in accordance with a state law, including but not limited to, an applicable statute or applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided.

Plaintiffs have not provided any case law or support for their proposition that an average rate of pay should be used to calculate damages. Where experts may reasonably differ as to the proper calculation of damages or harm, "[v]igorous cross-examination" and "presentation of contrary evidence" are the "traditional and appropriate means" of attacking their opinions. Daubert, 509 U.S. at 596. However, Mr. O'Brien's decision to calculate the aggregate damages using an average rate of pay for class members is one that falls "outside the range where experts might reasonably differ." See Kumho, 526 U.S. at 153 (quoting Daubert, 509 U.S. at 596). It is clear that the appropriate amount of damages for a violation of the meal or rest period laws is "one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided."

9

Based on Mr. O'Brien's testimony, there were some shifts in the raw time punch data that had pay rates that he felt were erroneous, because they were as high as $100. It appears that Mr. O'Brien was concerned about shifts that had erroneous pay rates or no pay information, so he used the average rate of all shifts. However, Mr. O'Brien applied the average pay rate that he calculated to all shifts and not only the shifts with erroneous or no pay information.[2] Again, there is no explanation before the Court as to why Mr. O'Brien did not just calculate the damages figures based on the actual rates of pay for any violations that were reflected in the raw punch data. There is no explanation before the Court as to why using an average rate of pay for all of the violative shifts is an appropriate method of calculating the damages for violative shifts in this case. Therefore, the Court finds that the methodology underlying Mr. O'Brien's damages analysis does not meet the reliability threshold set forth in FRE 702 and <u>Daubert</u>.[3]

Therefore, Mr. O'Brien's dollar figures of his aggregate damages analysis for the rest break premiums, meal period premiums, and underpaid meal premium classes for damages pursuant to California Labor Code Section 226.7 must be excluded.

Defendants also argue that the calculations of the PAGA penalties by Mr. O'Brien are flawed because he does not provide a basis for his calculations. Plaintiffs argue that the PAGA penalties are proscribed by statute and based on the number of pay periods in which a violation occurs. California Labor Code Section 2699(f)(2) provides that:

> If, at the time of the alleged violation, the person employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.

---

[2] It may have been appropriate to use an average rate of pay to calculate damages for shifts with missing or erroneous pay rate information, but here, Mr. O'Brien used average rate of pay to calculate damages for all shifts, and has not provided any support for his methodology.

[3] Furthermore, the Court notes that there is a flaw in the parameters that Mr. O'Brien used to calculate his average rate of pay. Mr. O'Brien used parameters of $6.75 per an hour and $12 per an hour. Mr. O'Brien testified that he decided to use $12 as the upper parameter for his calculation of the average rate of pay because that number was provided by counsel. Mr. O'Brien also testified that the $12 upper parameter was chosen because it was a number that was a couple numbers below the highest number represented. Mr. O'Brien did not testify that this was an industry standard or accepted practice for calculating an upper parameter in his industry. Therefore, Plaintiffs have not shown that Mr. O'Brien's parameters used for his calculations for the average rate of pay meet the reliability threshold set forth in FRE 702 and <u>Daubert</u>.

10

Plaintiffs argue that Mr. O'Brien applied the lesser $100 penalty to all first violations and the greater $200 penalty to subsequent violations. Mr. O'Brien testified that he calculated the PAGA penalties by using $100 for the first pay period with a violation and then $200 per pay period for subsequent violations. Mr. O'Brien's testimony for his PAGA penalty calculations appear to be in accordance with California Labor Code Section 2699(f)(2). Therefore, the Court finds that Mr. O'Brien's PAGA damages calculations is the product of reliable principles and methods and that Mr. O'Brien has applied the principles and methods reliably to the facts of this case, such that his PAGA damages calculations are not inadmissible under <u>Daubert</u>. Defendants' arguments that the PAGA calculations are flawed because Mr. O'Brien used flawed analysis of the raw time punch data go to the weight of the evidence. Defendants may attack Mr. O'Brien's opinion through cross examination or presentation of Defendants' own evidence.

## III.

## CONCLUSION AND ORDER

Based upon the foregoing, the Court partially grants Defendants' motions to exclude Plaintiffs' expert report and testimony of Michael O'Brien. The Court excludes Michael O'Brien's report and testimony as to dollar figures of his aggregate damages analysis for the rest break premiums, meal period premiums, and underpaid meal premium classes for damages pursuant to California Labor Code Section 226.7. The Court does not exclude Michael O'Brien's report and testimony as to the number of meal and rest break violations reflected in Defendants' electronic records for purposes of damages calculations and the calculations of PAGA violations.

Accordingly, it is HEREBY ORDERD that Defendants' motion to exclude Plaintiffs' expert report and testimony of Michael O'Brien is GRANTED IN PART, DENIED IN PART. The Court excludes Michael O'Brien's report and testimony as to dollar figures of his aggregate damages analysis for the rest break premiums, meal period premiums, and underpaid meal premium classes for damages pursuant to California Labor Code Section 226.7. The Court does not exclude Michael O'Brien's report and testimony as to the number of meal and rest break violations reflected in Defendants' electronic records for purposes of damages calculations and

the calculations of PAGA violations pursuant to California Labor Code Section 2699(f)(2).

IT IS SO ORDERED.

Dated:     **December 11, 2015**                              _____
                                                              UNITED STATES MAGISTRATE JUDGE