UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. STANLEY A. BOONE, MAGISTRATE JUDGE


IN RE TACO BELL WAGE AND    )   No. 07-CV-1314-SAB
HOUR ACTIONS,               )
                            )       TRIAL TESTIMONY
_____)     OF JONATHAN WALKER


Fresno, California          Monday, February 29, 2016
                            Tuesday, March 1, 2016 (No Jury)
                            Wednesday, March 2, 2016


REPORTER'S TRANSCRIPT OF PROCEEDINGS


KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

```
APPEARANCES OF COUNSEL:

For the Plaintiffs:          Capstone Law APC
                             BY:  MATTHEW THERIAULT
                             and  ANDREW SOKOLOWSKI
                             1840 Century Park East
                             Suite 450
                             Los Angeles, California 90067

                             STUART R. CHANDLER
                             Attorney at Law
                             761 East Locust Avenue
                             Suite 101
                             Fresno, California 93720

                             Initiative Legal Group
                             BY:  MONICA BALDERRAMA
                             1801 Century Park East
                             Suite 2500
                             Los Angeles, California 90067

For the Defendants:          Sheppard, Mullin,
                             Richter & Hampton
                             BY:  TRACEY A. KENNEDY
                             and  NORA K. STILES
                             333 South Hope Street
                             43rd Floor
                             Los Angeles, California 90071

                             Sheppard, Mullin,
                             Richter & Hampton
                             BY:  MORGAN P. FORSEY
                             Four Embarcadero Center
                             17th Floor
                             San Francisco, California 94111

                             JOHN A. MAKAREWICH
                             Taco Bell
```

3

1                           __INDEX__

2    __PLAINTIFFS' WITNESSES__:

3     **JONATHAN WALKER (2-29-16)**                              4
      DIRECT EXAMINATION BY MR. THERIAULT                      4
4     **JONATHAN WALKER (3-1-16 - NO JURY)**                   69
      VOIR DIRE EXAMINATION BY MS. KENNEDY                    70
5     VOIR DIRE EXAMINATION BY MR. THERIAULT                  88
      FURTHER VOIR DIRE EXAMINATION BY MS. KENNEDY           114
6     **JONATHAN WALKER (3-2-16)**                            121
      CONTINUED DIRECT EXAMINATION BY MR. THERIAULT          122
7     CROSS-EXAMINATION BY MS. KENNEDY                        141
      REDIRECT EXAMINATION BY MR. THERIAULT                  239
8     RECROSS-EXAMINATION BY MS. KENNEDY                      264

9

10                            * * * * *

11

12

13                           **EXHIBITS**

14   No Exhibits Marked for Identification or Received in Evidence

15                            * * * * *

16

17

18

19

20

21

22

23

24

25

Walker - D

4

1   Monday, February 29, 2016                    Fresno, California

2   2:28 p.m.

3              THE COURT:  Thank you.  Call your next witness,

4   please.

5              MR. THERIAULT:  Jonathan Walker, please.

6                        **JONATHAN WALKER**,

7   called as a witness on behalf of the Plaintiffs, having been

8   first duly sworn, testified as follows:

9              THE CLERK:  Please state your full name for the

10  record and spell your last name.

11             THE WITNESS:  Jonathan Walker, W-A-L-K-E-R.

12             THE CLERK:  Please have a seat.

13             THE COURT:  Mr. Theriault, you may proceed.

14             MR. THERIAULT:  Thank you.

15                     DIRECT EXAMINATION

16  BY MR. THERIAULT:

17  Q.  Good afternoon, Dr. Walker.

18  A.  Good afternoon, Mr. Theriault.

19  Q.  Okay.  Let's start from the beginning.  Who are you

20  employed by?

21  A.  Economists Incorporated.

22  Q.  And tell me about Economists Incorporated.

23  A.  Economists Incorporated is an economic consulting firm

24  with offices in Washington D.C., San Francisco and Florida.

25  We have approximately 70 employees.  We have approximately 40

1  economists working for us, most of them have Ph.D.s in

2  economics from top universities.  The firm has been in

3  existence since 1981.

4        We work on projects that involve litigation, such as

5  here, but we also work on regulatory issues.  We consult with

6  private businesses on strategic issues.  We consult with

7  private businesses on compliance with wage hour laws.  We

8  consult with businesses and also non-profits on a variety of

9  other issues, including auction strategy.  We help bidders for

10  high valued assets to devise the strategies they're going to

11  use in participating in auctions.

12        We consult with government agencies on how to devise

13  regulations for businesses.  We consult with government

14  agencies regarding how to devise auctions in order to maximize

15  revenues when they sell spectrum, for example.  Those are a

16  few of the things that come to me off the top of my head.  I

17  think that's a pretty good summary of what Economists

18  Incorporated does.

19  Q.  If you think of something later, let us know.

20  A.  Okay.

21  Q.  Your position in the company?

22  A.  I'm the president of Economists Incorporated.

23  Q.  How long have you been the president?

24  A.  Since 2003.

25  Q.  Is that when it was formed?

1  A.  No, Economists Incorporated was formed in 1981.

2  Q.  Would you provide us with a summary of your own

3  background, specifically related to your going through college

4  and obtaining your Ph.D.

5  A.  Sure.  I went to the University of California at Berkeley

6  and got a bachelors in economics.  Then I went to the

7  Massachusetts Institute of Technology, where I got a Ph.D. in

8  economics.  While I was there, that was funded by a National

9  Science Fellowship and an American Econ Association

10  Fellowship.

11      After graduate school, I went to work at the Federal

12  Reserve Bank of Boston for a year.  That was before getting my

13  degree, but after taking classes.  There I participated in the

14  antitrust regulation of banks.

15      After the Boston Fed, I thought I was done with my

16  dissertation, my advisors subsequently told me I wasn't.  But

17  I took a job at a consulting firm, strategy consulting firm

18  called Monitor Company.  I worked there for two years.

19      I left Monitor Company in 1990 and went to work at

20  Economists Incorporated.  There I was hired as a senior

21  economist.  I was ultimately later promoted to vice-president.

22  I was promoted again to senior vice-president in 2001.

23      I was asked to come out and open an office for

24  Economists Incorporated in San Francisco.  At that time I

25  became part of management.  Two years later, I was asked to

1    assume the position of the chief executive officer of the

2    company.

3    Q.  Very good.  And you are, by education and training, an

4    economist?

5    A.  Yes, that's correct.

6    Q.  All right.  And briefly, tell us, what does an economist

7    do?

8    A.  Well, there are lots of different types of economists.

9    Q.  How about the one that you specialize in, that you do.

10   A.  I consult with -- well, one of the things I do is I spend

11   half of my time managing Economists Incorporated and

12   overseeing all of the projects, at least at a high level, that

13   Economists Incorporated is involved in.

14        I spend roughly half of my time consulting with

15   clients as one of Economists Incorporated's economic

16   consultants.  And the topic areas I've been asked to advise

17   about include whether or not pension fund trustees are

18   managing pension fund assets to the benefit of their -- of the

19   beneficiaries.  That was work on behalf of the Department of

20   Labor.

21        I've worked with litigants, such as here, on damages

22   issues, on antitrust issues, on a variety of economic topics

23   that come up in the context of litigation.  On statistics,

24   statistical analysis in the context of litigation.

25        And I've also consulted with private entities,

1    individuals, non-profit associations, professional sports

2    leagues about whether or not they are complying with antitrust

3    laws or whether or not they are the victims of other parties

4    not complying with antitrust laws.

5    Q.  You've been retained by Taco Bell in this case; correct?

6    A.  Yes, that's right.

7            MR. THERIAULT:  Your Honor, permission to ask

8    questions under Rule 611(c).

9            THE COURT:  Any objection?

10           MS. KENNEDY:  No objection, Your Honor.

11           THE COURT:  All right.  That will be allowed.

12   BY MR. THERIAULT:

13   Q.  Okay.  Taco Bell gave you an assignment in this case;

14   correct?

15   A.  Yes, they did.

16   Q.  Can you tell us generally what your assignment was?

17   A.  There were four.  One assignment was to determine whether,

18   in my opinion, given my background, estimating damages and

19   working litigation, the raw punch data in this case could be

20   used to draw reliable, accurate assessment of the number of

21   instances in which employees working at Taco Bell

22   corporate-owned restaurants in California, from approximately

23   2003 through 2014 originally, and then it was scaled back to

24   2013, who worked shifts that were longer than six hours, were

25   offered meal periods prior to the commencement of the -- or

1   the completion of the fifth hour of work.

2          And similarly, whether those raw punch data could be

3   used to draw reliable and accurate counts of the numbers of

4   persons working at corporate-owned Taco Bell restaurants from

5   roughly September of 2003 through December 2014, who worked

6   shifts lasting from six to seven hours, were offered only ten

7   minutes of rest.

8          I was also asked, within that group, whether they

9   were only offered -- I'm sorry.  Less than 20 minutes of rest

10  was the question that was originally asked.  And then it was

11  also asked whether they were given two 10-minute rest periods.

12  So I was asked to address that one in two different ways.

13         The second -- that's sort of one -- is what -- how

14  valuable or how useful or whether you can draw reliable

15  conclusions about these counts based upon the raw punch data,

16  about the times people were offered rest breaks or meal

17  periods within these parameters.

18         The second was whether or not the raw punch data were

19  consistent with a uniform Taco Bell policy, applying to all

20  such employees, to offer meal breaks only after the completion

21  of the fifth hour of work.

22         The third was to develop an opinion about whether the

23  raw punch data were consistent with a uniform Taco Bell policy

24  only allowing ten minutes of rest for shifts that lasted

25  between six and seven hours.

1    And then my final assignment was to determine whether
2 or not the counts Mr. O'Brien had put together were reliable
3 counts of the number of late meal breaks or -- where employees
4 were not offered timely meal breaks and whether they were
5 reliable counts of the numbers of times when employees were
6 not offered more than ten minutes of rest on shifts that
7 lasted six to seven hours.
8 Q.  All right.  Were you also asked to -- and I don't know if
9 you mentioned it and if you did, I want to make it clear.  You
10 were asked to assess how much the late meal period class
11 members would be owed damages if liability were found in
12 plaintiffs' favor; correct?
13 A.  Yes.  I was also asked to assume that it were the case
14 that every instance of an unrecorded meal period or
15 unrecord -- I'm sorry, late recorded or unrecorded meal period
16 for those meal period classes, assume that every one of those
17 constitutes a violation.  And under those assumptions, what
18 would damages be.
19    And then secondly -- for meal periods.  And then
20 secondly for rest breaks.  If you assume that every instance
21 in which there is no -- there's either less than 20 minutes of
22 recorded rest or -- secondly, I did it with only one 10-minute
23 rest period.  If you were to assume that every time that
24 happens in the raw punch data, that those are violations, what
25 would damages be.

1  Q.  Right.  And I don't want to put words in your mouth.  You

2  didn't -- in your report and in your deposition testimony, you

3  weren't saying that liability should be found on behalf of the

4  plaintiffs.  Rather, you were saying if liability were found

5  on behalf of the plaintiffs, this is what you would assess the

6  damage to be?

7  A.  Well, if -- yeah, if the plaintiffs' liability theory is

8  correct and if certain other factual assumptions are correct.

9  Q.  Okay.

10  A.  What would the damages numbers be.

11  Q.  Okay.  You submitted two written reports in this matter;

12  correct?

13  A.  Yes, I did.

14  Q.  And you performed a variety of analyses related to the

15  meal and rest break claims alleged in this case?

16  A.  Yes.

17  Q.  I want to get a little background so we're all talking

18  about the same thing.  So you mentioned raw punch data;

19  correct?

20  A.  Yes.

21  Q.  What was your understanding of what the raw punch data

22  was, so we all know we're talking about the same thing?

23  A.  It's my understanding that these were raw data that were

24  generated at the point of sale at Taco Bell restaurants over

25  the course of the damages period, class period, as Taco Bell

Walker, D.

1  employees punched in and out to take breaks or to commence

2  work or to go home or occasionally to take vacations.

3  Q.  All right.  And we've been using the term "raw punch

4  data," but did you understand that this was the data that was

5  used to pay people?

6  A.  No.

7  Q.  And you understood that there was a process where this

8  data could have been edited and that paychecks were generated

9  based on the edited final, quote unquote, punches?

10 A.  It's my understanding that the raw punch data was the

11 first input into the generation of the paycheck verification

12 reports.

13 Q.  Right.  And that initial data was recording an actual

14 break or an actual punch in or punch out time, whether it was

15 a break or beginning of the shift or the end of the shift, but

16 at the actual time that the punch was being made?

17 A.  It records the actual time a punch was made at a point of

18 sale, yes.

19 Q.  And that's the data that you looked at?

20 A.  Yes.

21 Q.  And who provided you with that data?

22 A.  Sheppard Mullin.

23 Q.  And do you recall when you were first retained to do these

24 analyses?

25 A.  Sometimes in early 2014.  I don't remember the exact date

13

1    or the month.

2    Q.   Now, did you have an understanding about the -- you talked

3    about the raw punch data.  Do you have an understanding about

4    the subsequent time punches that were contained on what's been

5    called PVRs?

6    A.   I'm sorry, could you repeat your question?

7    Q.   Sure.  Do you know what PVRs are?

8    A.   Payroll verification -- paycheck verification reports.

9    Q.   Okay.  And what -- have you had an occasion to review the

10   PVRs in this case?

11   A.   Well, it's the word "the."  I have reviewed paycheck

12   verification reports.  I don't know whether I've reviewed

13   every paycheck verification report that's been submitted in

14   this case.

15   Q.   No.  But you've reviewed some?

16   A.   Yes.

17   Q.   And what form did they come in?

18   A.   I've seen paper.  I've seen PDFs and I've seen paper.

19   Q.   And did you make any attempt to analyze those?

20   A.   Well, the "you" would be -- I should point out that I work

21   with a team of people.

22   Q.   And that's who I'm referring to too, you and your team.

23   A.   Yes, we did.

24   Q.   Did you review those?

25   A.   Yes.  We reviewed payroll verification reports.

Walker, R.

14

1   Q.  Did you submit any report in connection with your review

2   of those?

3   A.  Well, I discussed it in my expert report in this case,

4   yes.  In my first report I did discuss having looked at

5   payroll verification reports, paycheck verification reports.

6   Q.  But you did it for approximately four individuals?

7   A.  Yes.

8   Q.  You didn't do it for the -- you understand this is a class

9   action.

10  A.  Yes.

11  Q.  And you understand basically what a class action is,

12  right?  A group of people bringing a lawsuit.  Correct?

13  A.  Yes.

14  Q.  And in this case, it's non-exempt employees from Taco Bell

15  from approximately 2003 through 2013 or 2014.  Correct?

16  A.  Yes.

17  Q.  All right.  And you didn't review the entire -- you didn't

18  review all PVRs related to the class members, you just

19  reviewed four specific individuals.

20  A.  Yes, that's correct.

21  Q.  Why didn't you review the PVRs for the entire class?

22  A.  Well, that had nothing to do with my assignment.  One was

23  to determine, you know, whether the raw punch data were a

24  reliable basis for coming up with accurate counts of the

25  members of each of the classes that were offered either rest

1    breaks or meal periods in a timely fashion.

2            Second of my assignments was to determine whether the

3    raw punch data were consistent with the policies as alleged by

4    you.  And then the third was the same for the rest breaks.

5    The fourth was to look at what Mr. O'Brien had done.  And it

6    wasn't necessary for me to look at all the payroll

7    verification reports to do any of those things.

8    Q.  Okay.

9    A.  And then, finally, it was also the estimate of what

10   damages would be under certain assumptions that you -- if

11   liability was correct and certain other facts were correct.

12   Q.  Correct.

13   A.  And it wasn't necessary for any of those things.

14   Q.  Okay.  Very good.  Now, you mentioned that -- did you

15   initially -- can I call it the meal break class, the late meal

16   break class?  And if I say that, do you know which class I'm

17   referring to?

18   A.  Yes.

19   Q.  You understand there's three separate classes; correct?

20   A.  Yes.

21   Q.  There's the meal break class, there's the rest break

22   class, and then there's the underpaid premiums class.  And you

23   understand the distinction between the three?

24   A.  Yes, I do.

25   Q.  Okay.  Let's talk about the meal break class, the late

1 meal break class it's been called.  You analyzed the raw punch

2 data to come up with some calculations in a variety of

3 analyses; correct?

4 A.  I did.

5 Q.  All right.  Can you give us an explanation of what you did

6 to -- I don't want to use "process" -- but process the data,

7 your initial steps in order to make the data manageable?

8 A.  Yes.  Well, the data arrived.  I don't remember the exact

9 format in which we received it.  It was quite a while ago,

10 almost two years.  The data, as we heard earlier today, are

11 not shifts.  They're punches.  Each punch has with it a whole

12 array of information.

13       So one record would have what type of punch it is.

14 So there could be a time in, a time out, a BK for break.  And

15 then it would have a whole lot of other information.  The time

16 of the transection.  It would have information about the

17 person making the punch.  It would have information about

18 what's called process center, which is the store at which the

19 person worked.  And it's just a whole bunch of punches and

20 it's not divided up into shifts.

21       And so the first thing that we had to do, since this

22 case is about shifts and shifts that have characteristics to

23 the breaks, was to try to organize the data in such a way that

24 you could try to infer what shifts are.

25       And so we ordered all -- well, we also looked

1   for anomalies.  One of the first things you always do when you

2   get data are to look for oddities in the data that suggest

3   that this is wrong.  So there's a lot of cleaning, there's

4   always a lot of cleaning of the data that goes on.  I don't

5   remember specifically what we did at the time, but we went

6   through to look for oddities which suggested the data was not

7   usable.

8           After having cleaned the data, we would have sorted

9   it in order to allow us to try to infer shifts.  So we sorted

10  it based on time and person so that one record represents when

11  some person timed in and then the next record is whatever the

12  next punch for that person was, the next record was the next

13  punch for that person.  And so on.

14          Having done that, we then attempted to group all the

15  records into shifts.  So you talked about, you know, what did

16  you do with the data.  But part of the using the data is

17  understanding the context of the case.

18          So I've done a lot of research, along with the rest

19  of my team, about how does Taco Bell define shifts.  Also we

20  tried to look outside of Taco Bell, are there any -- we tried

21  to find out are there any -- we tried to find any law to

22  define what a shift is.  We looked for any economics article,

23  any economics journal talking about exactly how long of a

24  break do you have to have before two different work intervals

25  means two different shifts.

Walker, D.

18

1          We ultimately found Taco Bell records indicating that

2    a shift is a work interval separated by an hour or more from

3    another work interval.  So we defined shifts based upon one

4    hour break.

5          We also looked at different definitions, because

6    ultimately the goal here, as I said, was to see whether the

7    data were consistent with these allegations.  And I wanted to

8    ensure that the reason that our results were whatever they

9    were wasn't exclusively to this one hour definition.

10          So we also looked at many other definitions.  And I

11   don't remember all of them now.  But we looked at two hours,

12   looked at eight hours.  And my recollection is looked at 12

13   hours.  I don't remember all of them.  We looked at lots of

14   different definitions of a shift that would apply to try to

15   infer from these punch data how many shifts there were and how

16   long they were.  So that's how we began working with the data.

17   Q.  All right.  And when you measured the shift by, I think

18   you said two, three.  I know you couldn't remember

19   specifically.  But you used other time periods.

20   A.  Yes.

21   Q.  Did you match those results against the results that ended

22   up in your report?

23   A.  What do you mean by "match"?

24   Q.  Well, in other words, would the numbers have changed based

25   on a two hour gap or three hour gap or four hour gap in terms

Case 1:07-cv-01314-SAB   Document 911-1   Filed 03/14/16   Page 19 of 265
Walker, D.

19

1    of definition of the time between a time out and a time in?

2    A.   Yeah.  Yeah.  I mean, that's one of the reasons that, you

3    know, I don't think that -- well, yes, we did.

4    Q.   All right.

5    A.   And the numbers do change.  It does not affect any of the

6    conclusions that I drew regarding the consistency of the raw

7    punch data with your allegations.

8         Regardless of how you sort the data, whether you use

9    one hour, two hours, six hours, eight hours, 16 hours, what

10   you find is that in the vast majority of cases, shifts that

11   last more than six hours include a timely meal period, meaning

12   a meal period that begins prior to the commencement of the

13   fifth hour of work.

14        And it wasn't driven by whether you define shifts by

15   one hour, two hour, three hour.  The exact number of shifts

16   will vary.  Consequently, any sorts of counts that are going

17   to be used for damages purposes or identifying who it is that

18   had a late shift, those will all be affected by whether you

19   use one hour, two hour, whatever.  The exact number will be

20   different.  But the percentages were always of the same order.

21        It was always the case, regardless of those sorts of

22   differences, that when you look at shifts that are six hours

23   or longer, the vast majority of them have a meal period which

24   began prior to the completion of the fifth hour of work.

25        And the same was true with rest periods.  Regardless

Case 1:07-cv-01314-SAB   Document 711   Filed 03/14/16   Page 20 of 265
Walker - D.

20

1    of whether you defined the shifts based on a one hour gap or a

2    two hour gap or whatever the other kinds of gaps we looked at,

3    regardless it was always the case the majority of shifts by

4    such a definition that last from six to seven hours, the

5    majority of them had -- and gone both ways, either 20 minutes

6    or more of paid rest or, if you define the relevant standard

7    as having two 10-minute rest periods, it would have two rest

8    periods of ten minutes or more.

9    Q.   Okay.  Very good.  And I want -- we're going to go through

10   each one of those in some exacting detail.  But thank you.

11              So now, you understood, based on the testimony today

12   or in previous days, that that meal break class was pared down

13   to July of 2013; correct?

14   A.   Yes.

15   Q.   I recognize in your written report, it goes through

16   December of 2014 for that analysis.  Correct?

17   A.   Yes.

18   Q.   All right.  Now, have you -- since learning about the

19   paring down of the class period, have you recalculated numbers

20   for that year, 2013, in order to get an accurate assessment of

21   2013?

22   A.   Yes.

23   Q.   Okay.  And another thing, so how much has Taco Bell paid

24   you to date for your services performed in this case?

25   A.   I don't know the absolute number.

1   Q.   Approximately.

2   A.   I don't.  I don't know.  I mean, I know that in your

3   deposition of me, at that time, I'd estimated that Economists

4   Incorporated had billed $600,000, at least.  And we've been

5   paid all that we billed.  And since then, I'm sure that

6   Economists Incorporated has billed at least 64,000 more.  So

7   Economists Incorporated has paid 664,000.

8   Q.   And the bill is approaching 700,000?

9   A.   Well, 664,000 at least.

10  Q.   Okay.

11          THE COURT:  Mr. Theriault, just tell me when you're

12  at a natural break.

13          MR. THERIAULT:  This is as good a time as any.

14          THE COURT:  All right.  Ladies and gentlemen of the

15  jury, we're going to take our afternoon recess at this time.

16  And we will come back at 3:15.  So have a good break.  Do not

17  discuss this case.  Do not form an opinion.  We'll see you

18  back at 3:15.

19          (The jury left the courtroom.)

20          THE COURT:  All right.  We're outside the presence of

21  the jury.  I notice that -- sit down everyone.  I notice that

22  the stipulation that I asked for on the motion to quash was

23  not filed by noon today.  So I'm taking it, do I grant the

24  motion to quash?

25          MS. BALDERRAMA:  We sent it for review.  Mr.

1   Sokolowski sent it for review to defense counsel yesterday.

2            THE COURT:  Okay.

3            MS. FORSEY:  And we returned it.  We have some

4   questions and we haven't heard back.  So --

5            THE COURT:  Okay.  So do I need to set a new

6   deadline?

7            MS. BALDERRAMA:  We would prefer that, Your Honor.

8            THE COURT:  All right.  By 8:30 tomorrow then.  That

9   will be the new deadline.  You need to tell me beforehand.

10  Because I almost denied it.  I mean, I granted it, I almost

11  granted it.  But I thought I'd ask.

12           MS. BALDERRAMA:  I appreciate it, Your Honor.  I

13  thought it was complete, but it must have been the other

14  filing --

15           THE COURT:  Okay.  Fair.  And then tomorrow by 8:30,

16  the plaintiff is going to provide any authority, additional

17  authority for their motion that they filed over the weekend.

18  And hope that it will be focused on the Court's questions and

19  specifically in terms of what the complaint said at the time

20  and what it was seeking in terms of the class at the time.

21  So -- and that will address that.

22           And then depending upon the response, I will ask the

23  defendants tomorrow how much time they need in which to

24  respond.  It will be a short period.  But you'll still have an

25  opportunity.  Recognize you will be in trial all day tomorrow.

1   Okay.  I think that's it.  Anything before we break?

2              MR. THERIAULT:  The final thing, Your Honor, you

3   asked me some questions specifically how to identify the

4   particular dates in the printout.

5              THE COURT:  Oh, yes.

6              MR. THERIAULT:  As well as the Excel spreadsheet.

7   And the answer is I don't know yet.

8              THE COURT:  Okay.

9              MR. THERIAULT:  Mr. O'Brien is back and I haven't had

10  an opportunity to talk to him about what the status is.  But I

11  think he's going to be able to help me talk you through it.

12             THE COURT:  Well, I should be able to see it somewhat

13  on my own.  If you give me what you provided to me and I've

14  identified this whole document as Court Exhibit Number 2, you

15  gave me 96, which was provided last week.

16             MR. THERIAULT:  Right.

17             THE COURT:  And we were laying the foundation.

18             MR. THERIAULT:  Right.  I think the problem is is

19  that we were laying the foundation last week, the exhibit that

20  we provided you, which is a printout of the raw punch data,

21  was just a couple of pages.  It didn't have the last punch

22  date in it.  So the exhibit that you have, you're not going to

23  be able to see a last punch date for that person because there

24  isn't a last punch date in that exhibit raw punch data.

25             THE COURT:  Okay.

Walker, D.

24

1      MR. THERIAULT:  So I may have to move to admit a more

2   complete version for one person so that way we could see from

3   that data what the last punch date is.  In other words, what

4   you have now, you wouldn't be able to do it because it doesn't

5   have the last punch date.

6      THE COURT:  All right.  So whatever you provide me,

7   you will provide so that they match.  In other words, then I

8   can understand it and know that it's a summary.

9      MR. THERIAULT:  Right.

10     THE COURT:  So I can make that determination.

11  Nothing's in evidence yet other than 33, subject to

12  remembering you have a deadline on that too.  So don't blow

13  that deadline or it's not coming in.  Okay?

14     MR. THERIAULT:  30 --

15     THE COURT:  33 is the other disk that had all the

16  stuff in that nobody could see.

17     MR. THERIAULT:  36?

18     THE COURT:  36.  Yeah.  36.  Sorry.

19     MR. THERIAULT:  Yeah.

20     THE COURT:  All right.

21     MR. THERIAULT:  Thank you.

22     THE COURT:  Good.  Thank you.

23     MS. KENNEDY:  Your Honor, one thing on Court Exhibit

24  2.  Whatever gets added to that, may we get a copy as well?

25     MR. THERIAULT:  Yes.

Walker - D.

25

1        THE COURT:  You should always get a copy.  Both sides

2   should always get a copy before I see it.

3        MS. KENNEDY:  Good.  Thank you.

4        THE COURT:  That's the rule.  But keep in mind that

5   timely would be nice on the other side.  Thank you.  We're in

6   recess.

7        (Recess.)

8        (The jury entered the courtroom.)

9        THE COURT:  All right.  The record will reflect the

10  jury has returned.  Mr. Theriault, you may continue.

11       MR. THERIAULT:  Thank you.

12  Q.  Dr. Walker, one of your assignments was to review Mr.

13  O'Brien's report; correct?

14  A.  Yes.

15  Q.  And you did that?

16  A.  Yes.

17  Q.  And you performed an analyses of the punch data that you

18  received --

19  A.  Yes.

20  Q.  -- in order to determine the accuracy, et cetera, of Mr.

21  O'Brien's report; correct?

22  A.  I don't know about the "and then."  There were multiple

23  assignments.  Mr. O'Brien had a couple of reports.  I had done

24  lots of analyses prior to receiving Mr. O'Brien's reports.  So

25  I don't know about the "and then" part of your question.  But

Walker - D

26

1  I did do lots of analyses of the raw punch data and they did

2  have some bearing on Mr. O'Brien's reports in my opinion.

3  Q.  All right.  Were you able to corroborate the fact that you

4  and Mr. O'Brien were reviewing the same punch data?

5  A.  No.  It's my understanding that they are the same, but I

6  don't know that for a fact.

7  Q.  Okay.  We were talking about late meal periods.  So now,

8  in your report, I know you identified the number of -- first

9  of all, let's back up.

10       So what was your understanding of the class

11  definition as it relates to the meal period class?

12  A.  I don't -- I don't remember.  I -- I think it's everyone

13  who worked at a corporate-owned Taco Bell restaurant from some

14  specific date, and I think September 7th, 2003 through some

15  other date.  And then I think that the definition actually

16  relates to whether or not they received or didn't receive

17  timely meals given that they had worked those shifts.  But I

18  don't recall, sitting here, the exact language that defines

19  the class.

20  Q.  Would a copy of your report refresh your recollection?

21  A.  It might.

22  Q.  Please look at Defense Exhibit 55, please.  It's 2055.

23  I'm sorry.

24  A.  That's it.

25       THE COURT:  What Exhibit?

1          MR. THERIAULT:  Did I say 55?

2          THE COURT:  You did.

3    BY MR. THERIAULT:

4    Q.  How about 2051?

5          THE COURT:  2051.

6          MR. THERIAULT:  Defendants' 2051.

7          THE WITNESS:  Got it.  Yeah.  There we go.

8          MR. THERIAULT:  I misspoke.  I'm sorry.

9    Q.  All right.  And I think the question was:  Did you know

10   how the class was defined?  Is there anything in your report

11   that would help you refresh your recollection as to how the

12   class was defined?

13   A.  My guess is that somewhere in here I talk about the class

14   definition as I understood it.  I can sort of start paging

15   through to see if I find where that is.

16   Q.  Right.  I'll just counsel you not to read from your

17   report, but to read it.  Once your recollection is refreshed,

18   then you can tell us.

19   A.  All right.

20   Q.  Okay.  What was your understanding of the class

21   definition?

22   A.  All persons who worked at corporate-owned Taco Bell

23   restaurants from September -- I'll have to look back again,

24   the date's already gone -- from September 7th, 2003 to the

25   present, who worked shifts lasting longer than six hours as

Walker, R.

28

1  reflected in Taco Bell's time records.

2  Q.  Okay.  Now, at the time that you prepared this report,

3  you, I think, indicated before that you did an analysis --

4  A.  I'm sorry.  That wasn't the complete.  Who worked more

5  than six hours and then also worked more than five hours

6  without a timely meal -- without a meal period as reflected in

7  Taco Bell's time records.

8  Q.  Okay.  Now, your report goes through -- you did a

9  calculation through December of 2014 for that class; right?

10  A.  Yes, I did.

11  Q.  And I think that you indicated that you had -- did you

12  recalculate the numbers that were in your report with respect

13  to the late meal -- to the meal period class, modifying the

14  dates through July of 2013?

15  A.  I did many recalculations related to the modified class,

16  yes.  When you say "the numbers," I did lots of analyses in

17  my -- that are reported in this report.  And no, I didn't go

18  back and revise all of them.  But I did revise many of them.

19  Q.  All right.  Now, in your report, you identified

20  approximately 9.3 million shifts that were worked by

21  non-exempt employees at corporate-owned Taco Bell restaurants

22  between September 16, 2003 and December 24th, 2014 as

23  reflected in the punch data that you reviewed.

24  A.  Subject to a number of assumptions, yes.

25  Q.  Subject to a number of assumptions.  Now, do you recall or

1   not whether or not you modified that number to have a cut-off

2   of July 2013?

3   A.  I think that I did, yes.

4   Q.  All right.  And do you recall what that number is?

5   A.  I don't.

6   Q.  Okay.  Less than 9.3 million?

7   A.  Yes.

8   Q.  All right.  Do you have -- can you give us an estimate of

9   the number of shifts that your total number, 9.311, was

10  reduced by?

11  A.  You mean the -- as a result of the re-definition of the

12  class?

13  Q.  Yes.

14  A.  I don't remember the number.

15  Q.  Did you write them down anywhere?

16  A.  Yes.

17  Q.  Did you write them down in your report?

18  A.  No.  There was no report.  But I prepared revised exhibits

19  and gave those to counsel.

20  Q.  Defense counsel?

21  A.  Yes.

22  Q.  Okay.  All right.  Well, in your report you identified how

23  many shifts, based on the full period that you looked at,

24  where the timing of the shifts was greater than six hours?

25  A.  Again, I can look at the report.  I don't --

Walker R

30

1    Q.   Please do.

2    A.   -- remember off the top of my head.

3    Q.   Please do.

4    A.   There were 6.57 million shifts that were greater than six

5    hours as reflected in Taco Bell's raw punch data subject to

6    the assumptions that I applied to try to infer shifts from

7    punches.

8    Q.   So this 6.57 million, this is the number of shifts that

9    were greater than six hours; correct?

10   A.   Under those various assumptions, yes.

11   Q.   Now, you also -- you also identified the number of shifts

12   out of this 6.57 million that did not have a 30-minute meal

13   period that began before the end of the fifth hour; correct?

14   A.   Yeah, I calculated the number that did.  Yes.  That's

15   right.

16   Q.   Okay.  And so --

17   A.   Well, you can calculate it.  I mean, I don't recall

18   specifically writing that number down in a report.  I don't

19   think that that particular number is in there, but you can

20   deduce that number from other numbers that are in the report.

21   Q.   All right.  I'm looking at your report.  And correct me if

22   I'm wrong.  You indicate that there were 2,511,475 shifts, or

23   38 percent of shifts, at least six hours long lacking recorded

24   unpaid meal period premium that commenced -- meal period that

25   commenced before the end of the fifth hour of work.  I'm

Walker - D.

1    looking at paragraph 33.  That's what you wrote, right?

2    A.  Yes.  But this is -- this is the number of shifts lacking

3    a recorded unpaid meal period.  There were shifts among those

4    that had paid meal periods.  And that's why, you know,

5    that -- you can deduce the number of shifts that lacked a meal

6    period, but that number is not it.  That number is higher

7    because you have to subtract out the shifts that had paid meal

8    periods.  That number is elsewhere in the report.

9    Q.  Right.  We'll get there.  But you did write that in your

10   report, right?  That there were 2,511,475 shifts, or 38

11   percent of shifts, at least six hours long lacking a recorded

12   unpaid meal period that commenced before the fifth hour of

13   work?

14   A.  Yes.

15   Q.  And in terms of percentage, that's 38 percent.  Right?

16   A.  Yes.

17   Q.  All right.  And so that's the percentage of shifts that,

18   based on the records themselves, didn't show a meal period, a

19   30-minute meal period taken before the fifth hour of work for

20   those shifts that were greater than six hours long?

21   A.  That's the thing we just said.  No.  Because there are

22   meal periods that were paid.  So that's just the number of

23   shifts that lack an unpaid meal period without regard to

24   whether there were paid meal periods.

25   Q.  I understand.  I think what you're saying, correct me if

1    I'm wrong, that some number of those 2.5 million were paid;
2    correct?
3    A.  The 2.5 million are those -- that's right.  The 2.5
4    million that lack an unpaid and some of them have paid.
5    That's right.
6    Q.  Okay.  So I'm confused.  Does the 2.5 million include paid
7    and unpaid?
8    A.  The 2.5 million are shifts lacking an unpaid meal period.
9    Q.  Okay.
10   A.  So among the 2.5 million are shifts that include a paid
11   meal period.  So there are paid meal periods among the 2.5
12   million.
13   Q.  Okay.  So to answer my question.  The 2.5 million include
14   paid and unpaid meal periods?
15   A.  The --
16          MS. KENNEDY:  Objection.
17          THE WITNESS:  -- the 2.5 million are the number of
18   shifts that lack a timely unpaid meal period.
19   BY MR. THERIAULT:
20   Q.  Okay.
21   A.  So it includes shifts that had a timely paid meal period.
22   So 38 percent is an overstatement of the percentage of
23   relevant shifts that lacked a meal period.
24   Q.  Okay.  So what would be the percentage of relevant shifts,
25   if you were to deduct the paid meal periods?

1    A.   And that's what I said.  That's not in my report.  I

2    didn't -- you know, you can calculate it.  Because elsewhere

3    in the report, I have a count of the number of paid meal

4    periods.  But it's not something that's directly -- it's not

5    in there.

6    Q.   Okay.  But this is in there; right?

7    A.   Yeah.

8    Q.   Okay.  Now, you have a number of opinions, but I want to

9    focus on a couple right now.  So you made some

10   deductions -- you calculated potential damages in this case.

11   You already testified to that.  Correct?

12   A.   Yes.

13   Q.   All right.  And in calculating those potential damages,

14   you made certain assumptions about -- well, one, of course, if

15   liability were proven.  But you made certain assumptions about

16   whether or not certain people qualified for a meal period

17   premium; correct?

18   A.   Yes.  The liability assumption that, you know, an

19   unrecorded timely meal period gives rise to a pay premium

20   obligation is the assumption.

21   Q.   Before we get to numbers of what those damages are.  I

22   want to first discuss some of the things that you thought

23   should be excluded from -- should be excluded from the

24   calculation.

25        So do I understand that you have some understanding

1    that managers, who are also non-exempt employees at the

2    store -- manager, the manager shifts are included in this 2.5

3    million number; correct?

4    A.   Yes, that's correct.

5    Q.   All right.  Now, you deducted a certain number of shifts

6    that you believe were worked by managers from the

7    calculations; correct?

8    A.   You're talking about the damage estimate?

9    Q.   Well, yes, but to get there, you had to -- well, let me

10   back up.

11          Before you did the damage estimate, you made certain

12   calculations to the -- that total number, the 2.5 before you

13   got there; correct?  I mean, in other words, you didn't just

14   multiply 2.5 times various hourly rates and come up with a

15   number.  It's a much smaller number than that; right?

16   A.   You're talking, again, about damages?

17   Q.   I am.

18   A.   No, I did not just take hourly pay numbers and multiply

19   them by 2.5 million.

20   Q.   No, my question was did you deduct shifts from this 2.5

21   million dollars -- from this 2.5 million shifts that were

22   worked by managers?

23   A.   The problem is that those are sort of two separate

24   analyses.  I did lots of analyses.  And, in fact, the

25   paragraph that you're pointing at relates to lots of analyses

1    that are unrelated to damages.  Separately I was asked to do

2    some analyses related to damages.  And no, they did not relate

3    to 2.5 million shifts.

4    Q.   But when you did the analyses related to damages, you did

5    not include shifts worked by managers?

6    A.   That's right.

7    Q.   Okay.  How many shifts were worked by managers from the

8    time period 9-7-2003 to the time that you identified as the

9    end of the class period in your report?

10   A.   I'll have to take a look at the report again.

11   Q.   Please do.

12   A.   There were at least 888,000 shifts worked by managers in

13   the raw punch data.  I say "at least" because, as we see in

14   some of the data, occasionally managers would punch in or

15   punch out, notwithstanding any meal period agreements, and so

16   they might have been deducted before when I deducted the

17   timely meal periods.

18   Q.   All right.  So you deducted 888,694 shifts that you

19   assumed were worked by managers; right?

20   A.   I did not include such shifts in my calculation of

21   damages.  Right.

22   Q.   Okay.  You didn't include them.  All right.  Now, on this

23   issue, what was your rationale for not including managers?

24   A.   Well, the rationale is I was directed to do that.  This

25   entire exercise was something that Sheppard Mullin asked me to

1   do and they had some parameters that they wanted me to apply.

2   And so I applied them.

3   Q.  All right.  So Sheppard Mullin wanted you to ignore

4   potential damages of store managers when you calculated them?

5   A.  You'd have to ask Sheppard Mullin what they wanted.  They

6   told me to do this.  And I followed the instructions.  I did

7   have an understanding about why, but your question is why did

8   I do it.  And the answer is I was actually doing some specific

9   analysis that Sheppard Mullin instructed me to do.

10  Q.  Okay.  Fair enough.  Did you calculate the potential

11  damages of individuals who you identified as graveyard shift

12  employees?

13  A.  No.

14  Q.  And help us out.  What's your understanding of what a

15  graveyard shift employee is?

16  A.  Well, it's employees working the graveyard shift.  I don't

17  recall exactly -- somewhere in my report I've got the hours.

18  I think it's a shift that starts between eight p.m. and I

19  think two a.m., but I'm not exactly certain of the time.  But

20  a graveyard shift is a shift that starts late at night.  And

21  so employees working graveyard shifts, it's my understanding,

22  were subject to on-duty meal period agreements.

23  Q.  Okay.  Would your report refresh your recollection as to

24  the specific timing requirements for the definition of

25  graveyard shift employee as Taco Bell defined it?

37

1    A.   Yes, it would.

2    Q.   Okay.

3    A.   It's shifts starting between eight p.m. and four a.m.

4    Q.   Okay.  Now, did you identify the number of shifts within

5    the dataset that were worked by graveyard shift employees?

6    A.   Not exactly, no.  After going through some deductions,

7    where I had disaggregated shifts into different categories,

8    after having taken out a whole bunch of categories, I counted

9    the number of graveyard shifts that were remaining in -- after

10   having deducted others.

11   Q.   All right.  And how many were remaining after deducting

12   the others?

13   A.   Again, I have to look at my report.  141,938.

14   Q.   All right.  Now, you had an understanding, didn't you,

15   that the managers and the graveyard shift employees were

16   non-exempt employees of Taco Bell; correct?

17   A.   Yes.

18   Q.   And you had an understanding that the class definition

19   included non-exempt employees?

20   A.   Yes.

21   Q.   And you understood that the class definition didn't

22   exclude graveyard shift employees or managers; is that

23   correct?

24   A.   That's correct.

25   Q.   Okay.  Now, did you identify the number of paid 30-minute

1   meal breaks?

2   A.   As reflected in Taco Bell's time records, according to

3   certain assumptions in the raw punch data, yes.

4   Q.   Yes.  All right.  What is a paid meal break?

5   A.   That would have been a period commencing with a BK and

6   ending with a TI that lasted more than 30 minutes.

7   Q.   Okay.

8   A.   Which commenced prior to the completion of the fifth hour

9   of work.

10  Q.   And how do you know it was paid?

11  A.   It's my understanding that "BK" is the commencement of a

12  paid break period.

13  Q.   And by "paid," is it your understanding that they're just

14  paid their regular hourly rate during that period?

15  A.   Yes.

16  Q.   All right.  But they're not paid any premium pay during

17  that period?  Right?  In other words, when you say "paid," you

18  just mean a half an hour or whatever the punches tell you, but

19  no additional pay on top of that?

20  A.   No, I'm not talking about any additional pay on top of

21  that.

22  Q.   And do you have an understanding of why there were paid

23  30-minute breaks based on the punches?

24  A.   I'm not sure I understand your question.

25  Q.   Okay.  Well, what's the basis of your understanding that

1  these breaks were paid?

2  A.  It's my understanding, from discussions with Sheppard

3  Mullin, some discussions with some counsel directly from Taco

4  Bell, my review of depositions, my review of Taco Bell records

5  that were produced in discovery, that BK is the beginning of a

6  period of time during which the employee shall be paid.  And

7  that that specific time period ends when the employee punches

8  a TI, at which time they continue to be paid but the time

9  period that Taco Bell will count as break ends.

10  Q.  Okay.  Did you look at any payroll records to verify that

11  people who had punched out with a BK indeed received a paid

12  meal break?

13  A.  If you're asking whether I looked at paychecks to see

14  whether BK to TI was paid, I don't recall specifically looking

15  at that.  But I don't know what the team has done.  They may

16  have.

17  Q.  Okay.  But you didn't?

18  A.  I don't recall specifically looking at that.  Again,

19  you're talking two years ago.  And that's not something I

20  really would have spent a lot of time verifying.

21  Q.  All right.  It says -- you indicate you're not sure.  Does

22  your report indicate that you looked to determine whether or

23  not people who punched out with the BK were actually paid for

24  that 30 minutes?

25  A.  I don't think there's anything in my report that talks

1  about going through and seeing whether people, 29,000 people

2  over 13 years or so were paid --

3  Q.  All right.

4  A.  -- their break time.  It's my understanding that that's

5  what it is, that that's what the BK indicates and that that's

6  what this is about.  But no, I -- certainly my report doesn't

7  say that I went through and conducted an analysis to verify

8  that.

9  Q.  Okay.  But in any event, you made certain assumptions

10  based on certain discussions with counsel, some

11  representatives from Taco Bell, and you reviewed some other

12  documents that would indicate that as well?

13  A.  Yes.

14  Q.  And based on those assumptions, you indicated that there

15  were 377,355 of these shifts which should have included a paid

16  break based on the punch?

17  A.  I don't know where you got that 377,000 number.  If you

18  direct me to it, I can look at it again.  I'm not sure.  We

19  were talking about the meal period, not the rest break.

20  Q.  Oh, I --

21  A.  And I don't remember where this 377 came from.

22  Q.  All right.  We'll slow down.  Do you know how many shifts

23  that you found that you considered to be a paid meal break?

24  A.  Yes.

25  Q.  Okay.  How many?

41

1   A.   Again, can I look --

2   Q.   Please do.

3   A.   Ah, that is the 377.  So 377,355.

4   Q.   And when you did your damages analysis, you didn't include

5   these shifts because you were under the assumption -- you had

6   an assumption that they were, in fact, paid?

7   A.   Well, yes, that's right.  There was a break that was 30

8   minutes that began prior to the completion of the fifth hour

9   worked, 30 minutes or longer, yes.  And these breaks commenced

10  with a BK punch, so they were actually paid.

11  Q.   Now, going back up to the managers and the graveyard shift

12  employees.  I think you indicated that you're under the belief

13  or there was an assumption that they had signed on-duty meal

14  period agreements?

15  A.   It's my understanding that managers and graveyard shift

16  workers enter into on-duty meal period agreements, such that

17  they work -- they are paid for the time that they are taking

18  their meals.  And that's -- my understanding is partially

19  because they may not be fully relieved of work during the time

20  that they're taking meal periods.  In the case of the

21  graveyard shift workers, it was unsafe for them to actually

22  leave the restaurants because it's late at night.  That was my

23  understanding.  Yes.

24        As far as my assumption for purposes of damage

25  calculation, no, as I said, I did this because I was directed

1  specifically to perform certain calculations by Sheppard

2  Mullin and I certainly have, you know, an understanding of why

3  they did it.  But I didn't have to make any assumptions in

4  order to follow the instructions.

5  Q.  All right.  And you didn't see any on-duty meal period

6  agreements; correct?

7  A.  That's correct.  I have not actually seen the on-duty meal

8  period agreements.

9  Q.  And you don't know whether the law says that people who

10  signed on-duty meal period agreements, even assuming they're

11  valid, are not entitled to a timely break?

12  A.  Yeah, I'm not here to give legal opinions.  I don't know

13  what the law is.  The on -- the reason that you would exclude

14  the on-duty meal period agreements is because they wouldn't

15  have unpaid meal breaks showing up on their raw punch data.

16  But, no, I don't know how many of them took timely breaks.

17  For all I know, they all took timely breaks.

18  Q.  Right.  But you're just looking at the data.

19  A.  That's right.

20  Q.  You didn't include that?  You didn't include the managers

21  or the graveyard shift employees because you made certain

22  assumptions about whether or not they were entitled to a

23  break; correct?

24  A.  I think I just said the opposite.  I didn't include the

25  managers or the graveyard shift workers in this damage

Walker, R.

43

1    calculation because the damages calculation was something that

2    was asked of me by Sheppard Mullin.  I didn't have to make any

3    assumptions about the law in order to perform the

4    calculations.  I would assume that they're going to make

5    arguments, they're going to present evidence through other

6    people about the facts at the stores and legal arguments to

7    the Court.

8    Q.  Right.  All right.  Now, in one part of your report -- in

9    one part of your report where you're giving percentages -- and

10   I'm really looking at paragraph 36.  Maybe you can refresh

11   your recollection before we begin talking about it.

12   A.  Yes.

13   Q.  All right.  And I'm really concerned about the -- I have a

14   question about the last line on there.  Now, in this part of

15   your analysis, which I'm sure defendants are going to get to,

16   you deducted 114,496 shifts that were late by ten minutes or

17   less; right?

18   A.  Sort of.  I mean, the reason I say "sort of" is because

19   you're now inflating totally different analyses.  And so this

20   paragraph and much of the other paragraphs you're talking

21   about are unrelated to this damages analysis that you're

22   talking -- that you're also questioning me about

23   simultaneously.

24   Q.  Right.

25   A.  So, no, I was not instructed to deduct 114,496 shifts from

44

1   this number of shifts that are eligible for this damages

2   analysis.  This is something else entirely.

3   Q.  Okay.  Good.  That was what was unclear.  What I was going

4   to ask you was did you deduct this 114,496 shifts from the

5   damages calculation that you performed later on in your

6   report?

7   A.  No.

8   Q.  Okay.  As part of your report, you provided something

9   identified as Figure 14.  Are you familiar with that?

10  A.  There are figures.  And I assume there's a Figure 14.  I

11  know there's a Figure 14.

12  Q.  Take a look at it.

13  A.  Yes.

14  Q.  All right.  And is this, in chart form, a summary of the

15  damages that you determined in the event -- under certain

16  assumptions, plaintiffs win, et cetera, et cetera?

17  A.  Yes.  For the different class periods, yeah, under the

18  legal assumptions that you put forward and also the various

19  assumptions that I applied in order to try to extract shifts

20  from the raw punch data.

21  Q.  All right.  So let's go over what --

22  A.  And the instructions that were given to me by Sheppard

23  Mullin.

24  Q.  All right.  So my first question relates to between the

25  years 2003 and 2007, the missing meal breaks.

Case 1:07-cv-01314-SAB   Document 711   Filed 03/14/16   Page 45 of 265
Walker, D.

45

1    Now, am I correct in understanding that from 2003 to

2    2007, you found 100 -- in total, 134,819 missing meal breaks?

3    A.  Yeah, I found 134,819 shifts that lacked a recorded meal

4    break in the raw punch data.  Obviously I don't know how many

5    actual missed meal breaks there were, you know, given the

6    testimony of people not always punching in or out or for meal

7    breaks.

8    Q.  So within the data, are these shifts greater than six

9    hours?

10   A.  Yes.

11   Q.  All right.

12   A.  At least as reflected in the raw punch data, yes.

13   Q.  All right.  And it says year 2003, but to be exact, did

14   that start on September 7th, 2003?

15   A.  Yes.

16   Q.  All right.  And you end in 2007.  Do you recall the ending

17   date?

18   A.  I don't.

19   Q.  All right.  And do you recall whether or not the -- do you

20   recall why you included this chart, this column in that

21   damages category?

22   A.  Yes.

23   Q.  Tell us the reason.

24   A.  Sheppard Mullin instructed me that for that period, from

25   September of 2003 through some specific date in 2007, that the

1   auto-pay system would have paid 30 minutes of -- or of premium

2   pay for any instance in which there was a missing meal period.

3   Q.  All right.  And in terms of that specific date, I might

4   suggest that paragraph 37 of your report may provide you with

5   that information.

6   A.  The date was November 13, 2007.

7   Q.  All right.  So just a recap.  So this date, based on your

8   conversations with counsel as well as your review of other

9   documents that you indicated in your report, this -- well,

10  this period reflected by the auto-pay, this was a period which

11  Taco Bell, under its payroll system, was paying 30 minutes for

12  a missing meal break all together.  Correct?

13  A.  Yes.

14  Q.  And so between September 7th, 2003 and November 13th,

15  2007, you identified how many shifts greater than six hours

16  that did not have a recorded meal break?

17  A.  134,819.

18  Q.  And you understand that the plaintiff's allegation -- we

19  didn't talk about this class very much, so just to go back.

20        You understand that one of the classes that's

21  certified is something that's been referred to as the

22  underpaid premiums class.  And do you understand that that

23  relates where the plaintiffs are basically seeking the other

24  half an hour premium that plaintiffs allege wasn't paid in

25  those instances there.

1  A.  That's my understanding.

2  Q.  Now, when you calculated that -- when you calculated that

3  class, for lack of a better term, the underpaid premiums

4  class, did you only identify those shifts that had no meal

5  break at all or did you include shifts that had meal breaks

6  that were less than 30 minutes?

7  A.  Oh, this is -- well, I can't tell meal periods.  These are

8  just shifts and punches.  They're not even shifts.  They're

9  punches.  So these would be instances where, if you apply the

10  assumption that I applied, you ended up with shifts and those

11  shifts did not have some sort of a break that was 30 minutes

12  long.

13  Q.  All right.  So hypothetical, if the shift had a break that

14  was 20 minutes long, was it included or not included in that

15  calculation?

16  A.  That would be missing.  So I don't know how to interpret

17  your -- included or not included.  It would be a missing -- an

18  instance of a missing real break.

19  Q.  It's included in the 134,000?

20  A.  Yes.

21  Q.  819.  Okay.

22        All right.  Before I start writing, I want to talk

23  with you a little bit about how you figured out the damages.

24  Now, I understand that you performed some analyses of the raw

25  punch data in order to determine things such as shift length

48

1    and whether or not there was evidence, based on those records,

2    of a punch of more than 30 minutes to designate -- and with

3    the assumption that that was a meal break.  I want to move

4    that aside for a moment and focus on the other component.  And

5    that component being the hourly rates at which you applied

6    your damages analysis.

7         So you did apply various hourly rates to various -- I

8    don't want to say violations, but occurrences.  And by

9    "occurrences," I mean missing breaks, late meal breaks, et

10   cetera.

11   A.  Yes.

12   Q.  Okay.  Now, did the punch -- there's some water there if

13   you need it.

14   A.  Yeah.  Thank you.

15   Q.  If there is -- did the punch data that you received, did

16   that include pay rates for the individuals that were listed in

17   there?

18   A.  It included a dollar field, which I understood to be

19   hourly pay rates for many people, but not for all.

20   Q.  Okay.  And in terms of sorting or calculating, when you

21   performed the damages calculation that I'm looking at in

22   Figure 14, did you apply the damages -- the hourly rate for a

23   particular person or did you do that for a category of people

24   if they had the right job classification?  Or job category.

25   A.  Both.

1   Q.  Okay.  So in some instances, there was an actual hourly

2   rate for -- listed for that particular individual.

3   A.  Yes.

4   Q.  All right.  And do you recall how many instances?

5   A.  It was most of them.  Well, there was a dollar figure.

6   There were instances where the dollar figure was clearly not

7   an hourly wage.  I was told by Sheppard Mullin to assume that

8   some of those fields were populated by weekly pay rates and

9   then to calculate hourly rates based upon, I think it was a 40

10  hour work week.  I don't remember exactly.

11  Q.  Okay.

12  A.  And then there were others where it was missing entirely.

13  Q.  Okay.  So we talked about the instances where there was

14  actually an hourly rate, what appeared to be an hourly rate

15  listed for the employee; correct?

16  A.  Correct.

17  Q.  Would you say the majority of the punches have those?

18  A.  I don't recall.  The majority -- the vast majority had

19  something that corresponded pretty closely either to an hourly

20  rate or to some sort of weekly pay rate.  But I don't recall,

21  sitting here, whether the majority were the hourly versus the

22  weekly.

23  Q.  Okay.  And in terms of your calculations with respect to

24  the pay field that included, I guess what would be obviously

25  weekly rates.  And when you say, you know, they were weekly

Walker, R.

50

1    rates, how could you tell?

2    A.   Just by the size.

3    Q.   Right.  Okay.  And so in that instance, you performed an

4    analysis.  You took the -- you essentially took -- you assumed

5    that there was a 40 hour work week and came up with what would

6    be an hourly rate for those individuals.

7    A.   I mean, I think it was 40.  I mean, I haven't looked at

8    this in months.  If you like, I can look back.  I'm sure I'd

9    remember if I read it.  But I think it was 40.  But we did

10   something.

11   Q.   Did you not review -- did you review your report in

12   connection with your testimony here today?

13   A.   I did.  But I didn't focus on the damages numbers.

14   Q.   Okay.  All right.  Is there anything in your report that

15   would refresh your recollection about the calculation or the

16   formula that you used in order to determine the pay rate for

17   those individuals who had obvious rates that appeared to be

18   salaries?

19   A.   Yes.

20   Q.   Okay.  Could you please look at your report.  And once

21   your recollection is refreshed, please tell us the formula.

22   A.   Yes.  It was 40.

23   Q.   So your report confirms your recollection on the -- on

24   your calculations there?

25   A.   Yes.

Walker, D.

51

1   Q.  Okay.  Great.  Now, you indicated that some of the shifts

2   didn't have a pay rate associated with them.

3   A.  Did not.  Is that what you say?

4   Q.  Did not.

5   A.  Correct.

6   Q.  In other words, there was an absence of information which

7   would allow you to determine what the pay rate was.

8   A.  Right.

9   Q.  Okay.  What percentage -- does your report identify -- or

10  let me ask a different question.

11         Do you recall whether or not, what percentage of

12  shifts or what percentage of people did not have a pay field

13  associated with their name?

14  A.  No.

15  Q.  You don't -- would your report refresh your recollection

16  on that?

17  A.  Yes, it would.

18  Q.  Once you have the answer, let us know.

19  A.  Yeah, so 0.32 percent of the shifts related to late meal

20  periods and 2.49 percent of the shifts related to the rest

21  break calculation.

22  Q.  Okay.  Now, when performing the damages calculation, what

23  did you do with those shifts, that .32 percent of shifts that

24  did not have an hourly rate or any other type of rate which

25  would allow you to calculate the hourly rate?

52

1  A.  My recollection -- I could read it, but my recollection is

2  I used an average.

3  Q.  And an average of what?

4  A.  I think it was -- if I could tell, it would be by job

5  category.  And I think there was somewhere I couldn't even

6  tell the job category.  And I don't recall whether I used the

7  average for the entire class for that period of time or -- I'd

8  have to actually read it to determine what I did with those

9  particular .32 percent.

10 Q.  Please do.

11 A.  So I did it by job code by year.  And if I couldn't tell

12 the job code, but I could tell it was a manager, I would use

13 the manager average.  And if it was -- if I could tell it was

14 a non-manager, I would use the non-manager average for the

15 year.

16 Q.  All right.  Now, you got -- now, you got a bunch of years

17 listed on the left side.  The first year you have is 2003.

18 All right.  And then you have another column called "late meal

19 breaks."  What is that column?  What does that column

20 represent?

21 A.  Those were instances where there was a 30-minute break,

22 but it commenced after the fifth hour of work.

23 Q.  All right.  In 2003 --

24 A.  A late recorded break.

25 Q.  Late recorded break.  Okay.  In 2003 -- first of all, did

Walker - D

53

1    you exclude from this calculation any managers or graveyard

2    shift employees?

3    A.   Yes.

4    Q.   So these numbers that we're going to go through don't

5    include managers or graveyard shift employees?

6    A.   Well, employees are not graveyard shift employees, to my

7    understanding.  They're employees who worked over graveyard

8    shifts.  So I did not include shifts that occurred during the

9    graveyard.

10   Q.   Thank you.  All right.  So excluding graveyard shifts and

11   managers, how many late meal breaks did you find in 2003?  As

12   recorded in the punch data.

13   A.   I'm just trying to remember whether there are any other

14   adjustments to this number.

15   Q.   Would your report refresh your recollection?

16   A.   If I read the whole thing.  I mean, the whole damages

17   section.  Do you want me to --

18   Q.   Please do.  I want accurate numbers.

19   A.   All right.  The answer to your question, I think, was how

20   many late meal breaks did I count for 2003.

21   Q.   Yes.

22   A.   After eliminating graveyard shifts and shifts worked by

23   managers.

24   Q.   Yes.

25   A.   And the number is 26,835.

Walker - D.

54

1    Q.   Maybe 26,635?

2    A.   Yes.  I'm sorry.  635.

3    Q.   All right.  Now, you were looking at your report to

4    refresh your recollection whether or not there was any other

5    exclusions in addition to the graveyard shifts and the

6    managers.  Were there any other exclusions from that number in

7    addition to graveyard shifts and managers?

8    A.   No.

9    Q.   Okay.  You performed similar analysis in 2004; correct?

10   A.   Yes.

11   Q.   How many late meal breaks did you find in 2004?

12   A.   89,700.

13   Q.   Okay.  Oh, and before I -- before I forget, the beginning

14   time period here on 2003 is what again?  September 7th, 2003?

15   A.   Yes.

16   Q.   Okay.  You performed a similar calculation in 2005.

17   Correct?

18   A.   Yes.

19   Q.   How many late meals did you find in 2005?

20   A.   Look, again, these aren't late meals.  These are instances

21   where the recorded break is after the commencement of the

22   fifth hour of work.  And there were 92,971.

23   Q.   2006, did you perform the same analysis for that year?

24   A.   I did.

25   Q.   All right.  And how many meal breaks did you find that

1  weren't recorded by the fifth hour in that year?

2  A.  96,720.

3  Q.  2007, please.

4  A.  91,596.

5  Q.  And 2008?

6  A.  Again, reading from my report, 95,443.

7  Q.  And in 2009, did you perform the same analysis?

8  A.  Yes.

9  Q.  And how many -- what was the result of that analysis in

10  2009?

11  A.  There were 79,467 instances of shifts that had the meal

12  break recorded late in the raw punch data.

13  Q.  I'm going to start 2010 on the next page.

14        All right.  How about in 2010, can you provide us the

15  number there?

16  A.  The number of late recorded meal breaks was 76,991.

17  Again, subject to all of the assumptions that we talked about

18  before.

19  Q.  All right.  And in 2011, how many instances of meal breaks

20  not recorded before the end of the fifth hour?

21  A.  71,213.

22  Q.  2012, please.

23  A.  54,669.

24  Q.  Okay.  Now, in your report -- well, what's the -- you did

25  the whole calendar year 2013.  What is that number?

1    A.   13 -- I'm sorry, 15,318.

2    Q.   And in 2014, I just want to write it up here anyways.   In

3    2014, you found 13,024; correct?

4    A.   Yes.   There were 13,024 shifts six hours or more with a

5    late recorded meal --

6    Q.   All right.

7    A.   -- period.

8    Q.   Before we total this up, let me ask some more questions.

9    I'm looking at the numbers here from 2005, 2008, numbers from

10   the 90,000.   2009 it dropped to 79 and change.   76 in 2010,

11   71,000 in 2011, 54,000 in 2012, then 15,000 in 2013 and 13,000

12   in 2014.

13        Did you notice the -- well, what I characterize as a

14   fairly marked drop in the number of late recorded meal periods

15   in 2013 and 2014?

16   A.   I see that.

17   Q.   Did you do any investigation as to why there was a marked

18   drop in -- between 2012 and 2013?

19   A.   Yeah.   Totally unrelated to this, I did a number of

20   analyses to see whether or not the incidents of late recorded

21   meals was common across the class.   I did analyses to see

22   whether they were common across individuals, if they had

23   similar rates of late recorded meals.   I did an analysis to

24   see whether or not it was common across stores, whether

25   different stores tended to have the same rates.   I looked -- I

1   did an analysis to see whether it was common across managers.

2   Whether managers supervised shifts that had the same rates of

3   late recorded meals.

4          And I did an analysis over time to see whether the

5   incidents of late recorded meals, the percentage of relevant

6   shifts that had late recorded meals was consistent over time.

7   And I found that the incidents of late recorded meals was not

8   common over time.  I found that it declined markedly over the

9   class period.

10  Q.  It certainly declined markedly from 2012 to 2013; right?

11  A.  Yes.

12  Q.  All right.  So I'm trying to -- did you assess why there

13  was a marked drop from 2012 to 2013?  Did you ask any

14  questions?  Did you wonder why there was a marked drop there?

15  A.  I did not look specifically at this damages analysis and

16  ask why 2012 to 2013.  But as I said, you know, there's an

17  analysis that's in my report where I looked at the decline

18  over time, not just 2012 to 2013, but from the beginning of

19  the damage period to the end, there's roughly a downward

20  sloping line.  If you were to graph out the rate or the

21  incidents of late recorded meals, it's a higher percentage in

22  2003, you know, markedly higher than it ends up being in 2014.

23  Q.  Are you aware when the lawsuit was filed?

24  A.  I don't recall that.

25  Q.  All right.  Now, obviously you have new information that

Walker, R.

58

1    the meal period class is cut off as of July 1st, 2013.  Did

2    you perform any additional analyses with respect to the number

3    of -- well, let me ask you a different way.  Did you update

4    Exhibit 14 based on the new class period?

5    A.  No, I didn't.

6    Q.  Do you know how many instances of recorded breaks,

7    not -- strike that.

8         Let me try that again.  Do you know, from the period

9    of January 1st, 2013 to July 1st, 2013, how many instances of

10   late meal breaks -- and by "late meal breaks," my

11   nomenclature, I mean based on the time record review that

12   there is no recorded meal period before the end of the fifth

13   hour.

14   A.  No, I don't.

15   Q.  It's presumably less than 15,000, though?

16   A.  Yes.

17   Q.  All right.  Did you analyze -- did you analyze the data to

18   see if there was any difference in the occurrences of late

19   meal breaks by month?

20   A.  I don't recall doing any monthly analysis, no.

21   Q.  All right.  Well, okay.  So based on your analysis, from

22   September 7th, 2003 until the end -- until September 24th,

23   2014 anyway, what is the total number of instances or shifts

24   that you found that did not have a timely recorded meal break?

25         MS. KENNEDY:  Objection.  Relevance.  Beyond the

1   assigned period of the class.

2          THE COURT:  All right.  Sustained.

3   BY MR. THERIAULT:

4   Q.  All right.  I want you to exclude 2013 all together and

5   2014 all together.  What's the total number of -- since

6   September 7th, 2003 until the end of 2012, total number of

7   meal periods -- total number of shifts that don't have a

8   recorded meal period before the end of the fifth hour?

9          MS. KENNEDY:  Objection.  Relevance.

10         THE COURT:  All right.  I will ask for a sidebar.

11  And I also provide the witness with a calculator.

12         (The following proceedings were held at sidebar

13         between the Court and counsel:)

14         THE COURT:  All right.  Tell me what the relevance

15  is.

16         MS. KENNEDY:  Well --

17         THE COURT:  Tell me why the relevance objection.

18         MS. KENNEDY:  Because the number that -- the number

19  to be elicited from Mr. -- from Dr. Walker is --

20         THE COURT:  You have to move over here.

21         MS. KENNEDY:  The number of damages elicited by Mr.

22  Theriault is an irrelevant number to use for the jury by a

23  rebuttal expert who is offering numbers in rebuttal to Mr.

24  O'Brien's testimony.  The number being asked is not a number

25  they can give the jury in any respect with regard to the

1   amount of damages.  And so it's irrelevant, an irrelevant

2   number.

3          THE COURT:  I'm sorry, what is this -- this has been

4   a question that I've been wondering.  What is this witness

5   being offered for in the plaintiffs' case in chief?

6          MR. THERIAULT:  Establish the fact that the

7   defendants' expert found, based on the time records, a number

8   of late meal periods as well as rest breaks, missing second

9   rest breaks, and he offered an opinion as to the potential

10  damages.

11         THE COURT:  But why -- it's the defendants' expert,

12  not your expert.

13         MR. THERIAULT:  That's right.  But I want to also

14  bolster our case with defendants' expert because I think he

15  found numbers that are useful to us.

16         MS. KENNEDY:  Well --

17         THE COURT:  The reason -- I'm sorry to interrupt, Ms.

18  Kennedy, the reason you threw me off was the word "rebuttal

19  testimony."  So do you all have some sort of agreement worked

20  out with this witness?  Why is it -- why are you saying

21  "rebuttal"?

22         MS. KENNEDY:  Well, because --

23         THE COURT:  He's called him in his case in chief.

24         MS. KENNEDY:  Yes, he's called him in his case in

25  chief.  When Dr. Walker will explain he was requested to

1   provide this information in response to damages calculations

2   on which their expert, Mr. O'Brien, has testified about.  Mr.

3   O'Brien has been excluded.

4            THE COURT:  As a damage expert.

5            MS. KENNEDY:  And there was no foundation for the

6   damages being asked here.  He is an expert, so he can testify

7   and it's in his case in chief.  I will be discrediting all

8   those numbers.  And he wanted to call him in his case in

9   chief.

10            So my objection is that it's irrelevant to these

11  damage numbers because there's been no damages numbers offered

12  by the plaintiff in the case in chief.  And the numbers he's

13  being asked for have no bearing to the class, to the class

14  size that's been defined by the plaintiff according to the

15  pretrial order.

16            THE COURT:  Okay.

17            MS. KENNEDY:  He's going to continue to do this and I

18  will continue to object on the damages numbers.

19            THE COURT:  Okay.  So what you're objecting to is

20  he's using your expert to prove his damages.  And therefore,

21  it's irrelevant at this stage.

22            MS. KENNEDY:  Yes.  And there is no found --

23            THE COURT:  Yes.  I get that.  I get that.  Yes.

24            MR. THERIAULT:  Well, two responses.  There are two

25  issues.  The issue is the timing.

1              THE COURT:  No, I want the damages.

2              MR. THERIAULT:  The damages issue is his report

3       doesn't say "I'm submitting it in rebuttal to O'Brien."

4              THE COURT:  No.  Are you using this witness for

5       purposes of proving your damages?  I excluded O'Brien's

6       damages and so now are you using this expert to prove your

7       damages?

8              MR. THERIAULT:  Yes.

9              THE COURT:  Under what authority do you get to call

10      the defendants' expert to prove a case -- to prove your case?

11             MR. THERIAULT:  Well, I can find some authority.  I

12      don't have --

13             THE COURT:  And I think I have authority that goes to

14      the contrary on this issue.

15             MR. THERIAULT:  Okay.

16             THE COURT:  So I'm going to sustain the objection.  I

17      will give you an opportunity to brief that issue.  But if

18      that's what you're doing, then I'm not going to allow you to

19      prove through their expert your damages.  If it's rebuttal,

20      that's different.  But I'm not going to allow you to do that.

21      What other -- and then I'll give you an opportunity to be

22      heard and brief that and provide me with the cases that says

23      you can call their expert to prove your case in chief.

24             MR. THERIAULT:  Uh-huh.  In terms of -- so point of

25      clarification.  Okay.  So in terms of establishing what he

1   found in the time data, I'm going to do that the same with the

2   rest breaks too.  But I think what you're telling me --

3          THE COURT:  Yes.

4          MR. THERIAULT:  -- is that I can't go on and ask what

5   the damages are that he found.

6          THE COURT:  Yes.  Because it's your case in chief.

7   And, for instance, if you don't put damages in your case, then

8   I suspect that they're probably not going to want to raise it

9   in their case.  To dissuade it.  They're just going to say you

10  haven't proven it.

11         MR. THERIAULT:  Well, okay.  This is an area that I

12  cannot comment on.  I have to do the research on that.

13         THE COURT:  That's fair.

14         MR. THERIAULT:  Because I don't know.

15         THE COURT:  I mean, I would -- to me it sounds like

16  just a regular basis in trial proceeding.  But I'll give you

17  an opportunity to provide that.  It seems that you can't call,

18  especially when I excluded your witness, to call their expert

19  and say now I'm going to prove damages with your expert.

20         MR. THERIAULT:  I know.  But I thought the witness

21  put it in his report, he was questioned on it, fair game.  His

22  report doesn't say it's in rebuttal.  He offered the damages

23  without --

24         THE COURT:  But he's their expert.  That's the -- you

25  bear the burden.  You bear the burden of proof and so you're

64

1  having -- you're pulling in their expert to talk about -- I'll

2  give you an opportunity to brief it, to tell me.  And it's the

3  issue of whether or not you can use their expert for your case

4  in chief.

5          MR. THERIAULT:  Yeah.  I'll review that issue.

6          THE COURT:  Okay.  All right.  So are we going to be

7  doing this, because we're about ready to take the evening

8  break.  Are there other things that you can get into without

9  getting into that issue?

10          MR. THERIAULT:  I could get into -- you still

11  have -- you still have --

12          THE COURT:  I just meant for you.

13          MR. THERIAULT:  Yeah, I'm going to go through the

14  same thing with the analysis of the rest breaks.  There was

15  one other point I wanted to mention before we move on to rest

16  breaks.  We'll do the same for the rest breaks.

17          THE COURT:  Okay.

18          MR. THERIAULT:  But with respect to this 2013.  So he

19  testified that he gave you a report.  Now I'd like to ask him

20  a specific number, but I don't have it.  He doesn't know.

21          THE COURT:  Right.

22          MR. THERIAULT:  So if he does haven't it, I'm just

23  going to back out the damages.  Now defense saying that's not

24  relevant because that's not the proper class period.  It's

25  certainly not going to be less.  It's not to the defendant's

1   detriment, it's to the --

2          THE COURT:  It's their call if they're going to

3   object to it.

4          MR. THERIAULT:  It's their call to object to it, but

5   the argument it's not relevant, but it helps us is what the

6   argument is because I'm --

7          THE COURT:  Are you talking for Ms. Kennedy?  Helps

8   us or helps you?

9          MR. THERIAULT:  Helps them.

10         THE COURT:  Got it.  Got it.

11         MR. THERIAULT:  In other words, I'm offering a lesser

12  number than what the class --

13         THE COURT:  That's the whole thing we dealt with last

14  week of the lesser number.  It's for them to decide whether or

15  not they object.  And it appears that she allowed the

16  testimony to go to a certain extent and now she's asserting

17  her objections.  Which if she hadn't, then we'd be going

18  through.

19         MR. THERIAULT:  I guess it doesn't matter, I have the

20  numbers on the board, I can just --

21         MS. KENNEDY:  Well, that's going to be the issue,

22  Your Honor.  I mean, look, with all due respect, Mr.

23  Theriault, he's a subpoenaed witness to come in.  He can do

24  whatever he wants to do.  However, proving damages, proving

25  your damages with our rebuttal expert and our expert, he

1    cannot do that when there is no foundation for damages in the

2    first place.  So --

3           THE COURT:  Well, I can say this right now.  Whatever

4    Mr. Theriault has brought into evidence, without the

5    objection, he can use it if it does it.  I don't know.  That's

6    fair game.  Can't back in and do a relation back doctrine on

7    objections.

8           MS. KENNEDY:  And I don't disagree.  Which is why I

9    stopped it exactly where I stopped it.

10          THE COURT:  Got it.

11          MR. THERIAULT:  And for the record, I just don't

12   think the characterization as "rebuttal expert" is even

13   proper.  But I guess basically what you're saying is it

14   doesn't matter if it's a rebuttal expert or not.

15          THE COURT:  No, you're calling their expert in your

16   case in chief to prove your case.  In other words, it's -- I

17   mean --

18          MR. THERIAULT:  Yeah, all right.

19          THE COURT:  Okay?

20          MR. THERIAULT:  I'll get up to speed on that by

21   tomorrow morning.

22          THE COURT:  Thank you.

23          MS. KENNEDY:  And question, are we going to have Dr.

24   Walker come back tomorrow morning to continue?  Because then

25   this issue -- I'm assuming yes because --

1          THE COURT:  We should assume yes.

2          MS. KENNEDY:  Okay.  That's fine.

3          THE COURT:  Because you cannot get -- we wouldn't

4    have a final opinion from the plaintiffs until probably the

5    morning.

6          MR. THERIAULT:  I can have the answer tonight, but

7    it's still -- I still need to question him on the rest breaks.

8          MS. KENNEDY:  He's here tomorrow.  I'm just asking.

9          THE COURT:  I understand.

10          MS. KENNEDY:  That's fine.

11          THE COURT:  Looks like we're at a break.  You guys

12    wore it down, so we're about ready to take a break.  Were

13    there a couple of questions you'd ask that are not going to

14    pose objections before we break?

15          MR. THERIAULT:  I don't want to be rushed into doing

16    it.

17          THE COURT:  Okay.

18          MR. THERIAULT:  I'm just going to go through the rest

19    break analysis nexus, same thing.

20          THE COURT:  Same thing.  Same objection?

21          MS. KENNEDY:  Same objection to all the damages

22    issues.  I allowed the punch data because that's there.  But

23    the issue is the damages with no foundation.  Mr. O'Brien

24    testified to punches and that sort of thing.  That's why it

25    went as far as it went.  But the damages, I'm going to be

68

1   objecting to all that.

2          THE COURT:  Okay.  Okay.  So break?

3          MS. KENNEDY:  Yes, Your Honor.

4          THE COURT:  We'll take our own break.  Thank you.

5          (The following proceedings were held in open court:)

6          THE COURT:  All right.  Ladies and gentlemen of the

7   jury, we're going to take our evening recess at this time.

8          (The testimony concluded at 4:27 p.m.)

9                          * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Tuesday, March 1, 2016                    Fresno, California

2  2:57 p.m.

3          (The following proceedings were held out of the

4          presence of the jury at 2:57 p.m.:)

5          THE COURT:  We're going to go back on the record.

6          All right.  Dr. Walker, if you'll take the stand,

7  please.  And for the record, we are having a hearing for the

8  purposes of determining Dr. Walker's testimony based

9  upon -- that has not been set forth on the record, Ms.

10  Kennedy, the basis for which we're having the evidentiary

11  hearing.  So if you would just proffer, please.

12          MS. KENNEDY:  Yes, Your Honor.  Thank you, Your

13  Honor.  The purpose of this voir dire is to determine whether

14  or not Dr. Walker will be testifying as an expert with respect

15  to a purported damages analysis that's set forth in his

16  report, which is trial Exhibit 2051.

17          And the issue, as we discussed off the record, has to

18  do whether or not the methodology -- so-called methodology, in

19  our view the rebuttal testimony, with respect to a purported

20  damages analysis by Dr. Walker should be proffered in this

21  case before the jury.

22          THE COURT:  All right.

23                    **JONATHAN WALKER**,

24  called as a witness on behalf of the Plaintiffs, having been

25  previously sworn, testified as follows:

 1          THE COURT:  All right.  Ms. Kennedy.  You may

 2     proceed.

 3                    VOIR DIRE EXAMINATION

 4     BY MS. KENNEDY:

 5     Q.  Good afternoon, Dr. Walker.

 6          THE COURT:  And I should note for the record we are

 7     outside the presence of the jury.  Sorry.

 8          MS. KENNEDY:  Thank you, Your Honor.

 9     Q.  Good afternoon, Dr. Walker.

10     A.  Good afternoon, Ms. Kennedy.

11     Q.  Now, we've gone through, with Mr. Theriault, your

12     background and education.  So for purpose of this hearing, I

13     won't go over that.  But I want to talk to you first about

14     your assignment in this case that was given to you by my law

15     firm in this case.  What was that assignment?

16     A.  It was -- there were four pieces and then ultimately a

17     fifth.  The first was to develop an opinion as to whether the

18     raw punch data were a reliable basis to count up the number of

19     instances in which persons who worked at corporate-owned Taco

20     Bell stores in California, from approximately 2003 to 2014,

21     who worked for shifts longer than six hours, were offered

22     30-minute meal periods which commenced prior to the completion

23     of the fifth hour of work.

24          That first task was later augmented to address

25     whether those records were reliable for developing lists of

1    instances in which persons who worked at corporate-owned Taco

2    Bell restaurants from approximately that same time period, or

3    that exact same time period, working shifts from six to seven

4    hours, were offered 20 minutes of net paid rest.  Then there

5    was a subpart to that, which was were they offered at least

6    two 10-minute rest breaks.

7           The second was whether -- to develop an opinion as to

8    whether the raw punch data in this case were consistent with a

9    uniform policy by Taco Bell to only offer a rest -- a meal

10   break after the completion of the fifth hour of work for

11   employees who worked shifts six hours or longer in corporate

12   owned California Taco Bell stores during that time period.

13          The third was to develop an opinion as to whether the

14   raw punch data were consistent with a Taco Bell policy of only

15   offering 20 minutes, or alternatively two 10-minute paid rest

16   breaks for employees working six to seven hours at

17   corporate-owned Taco Bell restaurants in California from

18   roughly 2003 through 2014.

19          The fourth assignment was to ascertain and develop an

20   opinion about the reliability of Mr. O'Brien's counts of the

21   numbers of instances in which there were employees who worked

22   those types of shifts who didn't get meal periods in a timely

23   fashion, or employees who worked those types of shifts who did

24   not get 20 minutes of net rest.

25          There was also this request that I perform certain

1   damages calculations in anticipation of damages calculations

2   from the plaintiffs, according to certain, you know, rules

3   that you had laid out for me.

4   Q.   Okay.  So let's sort of start from the beginning sort of.

5   In light of those assignments, what was the methodology that

6   you were, I guess, instructed or what was the methodology that

7   you actually used in reaching your -- I'll call them your

8   opinions in this case?

9   A.   Well, I reviewed the complaint and other filings to

10  understand what the case is about.  And those other filings

11  included class cert motions, summary judgment motions, I don't

12  recall if there were motions to dismiss.  The Court's rulings

13  on several of those.  I read deposition transcripts.

14          And in the course of later on, looking at raw punch

15  data, I did some internet research to understand better what

16  other people had done regarding defining shifts.  I reviewed

17  other discovery type of material, admissions, there were some

18  declarations.

19          And I also got the raw punch data and began to

20  conduct analyses related to the raw punch data.  I reviewed

21  deposition testimony by Mr. O'Brien.  And, as I say, I went

22  and I tabulated the raw punch data and began to conduct

23  various analyses related to that.

24          That's the basic methodology that I employed to

25  address topic number one, two, three and four.

1          Number five, I just followed the instructions you

2    gave me.

3    Q.   And what were those instructions?

4    A.   To assume that any late or missing meal period was cause

5    for a premium, a pay premium, and then to adjust that to

6    account for auto-pay and for on-duty meal period agreements

7    that were entered into by managers, or assumedly entered into

8    by managers and by employees working graveyard shifts.

9          And then the same essential assumption for rest

10   periods, that to assume that if an employee worked a six to

11   seven hour shift, based on the tabulations I had done in the

12   raw punch data, that if there were such a shift and there

13   were -- there was less than 20 minutes of net rest, to assume

14   that that gave rise to a pay premium and to assume that such a

15   pay premium had not been paid.

16         And separately, to do a similar rest break analysis

17   where a violation is the absence of two 10-minute rest periods

18   as opposed to the absence of 20 minutes of net rest.  So those

19   are slightly different.

20   Q.   And you said you were asked to look at the raw punch data

21   and come to some opinion as to the reliability of the, I

22   guess, the counts in the raw punch data; is that correct?

23   A.   Yes.

24   Q.   And what did you do in that regard?

25   A.   Well, the reliability of the raw punch data to generate

1   counts of the numbers of instances in which people were not

2   offered either timely meal periods or 20 minutes of net rest

3   or two 10-minute rest periods.  And there, I looked at what

4   the raw punch data were.  I learned a bit about how they

5   differed from the pay that people actually got.  I read

6   testimony about people not necessarily recording all of their

7   breaks or all of their meal periods.  And I came to the

8   conclusion, based upon that, that you could not tell from the

9   raw punch data whether people were offered breaks or not.

10          I subsequently understood that the plaintiffs were

11  making an argument that a uniform policy was in place and that

12  given a uniform policy, you need not consider the specific

13  circumstances of the employee who missed a break or got an

14  untimely break or meal period.  And I conducted various

15  analyses, based upon raw punch data itself, to see whether

16  they were consistent with such a policy.  And I determined

17  that, in my opinion, they were not.

18          And based on all of that, I determined that, no, I do

19  not think you could rely on the raw punch data to determine

20  the number of instances in which employees were not offered or

21  provided or authorized a meal period which commenced prior to

22  the completion of the fifth hour of work.  Or 20 minutes of

23  net rest.

24  Q.  Based upon looking at the raw punch data, and I'll use

25  your words, I guess the unreliability of the raw punch data,

1   is that something that you would use as an economist to even

2   come up with a damages model or analysis?

3   A.   No.  Not under the circumstances that I was told here,

4   where I'm trying to measure damages that are related to the

5   failure to offer or make available either timely meal periods

6   or a certain amount of paid rest periods.

7   Q.   And in this case, were you told that you were to use the

8   raw punch data because that's the data, or the dataset that

9   was being used by Mr. O'Brien?

10  A.   Yes.

11  Q.   And again, were you -- part of your assignment was to, I

12  guess, respond to the methodology or the dataset that was

13  being used by Mr. O'Brien?

14  A.   Yes.  Certainly for number four, I was supposed to be

15  looking at what Mr. O'Brien did specifically.  And then I

16  understood that the reason to do these damages calculations

17  was in anticipation of a specific type of damage model from

18  the plaintiffs.

19  Q.   In your opinion, the -- is the damages analysis -- again,

20  in your opinion, based upon what you looked at and based upon

21  what Mr. O'Brien used, that being the raw punch data, are any

22  type of damages analysis that could be done in this case, or

23  even damages analysis performed at our request, are they

24  reliable?

25  A.   No, they're not.  I mean, throughout my report, I state

specifically, no, these are not reliable.  No, this is not a

reliable basis for damages.  And I said specifically that I

conducted this analysis at your specific direction and not

because it reflected my opinion about what damages are in this

case.

Q.  Well, let me ask you this:  What do you mean by that?  If

it's not reliable, what do you mean by that?

A.  I mean that there are -- based on what I've seen, based

upon what I've read, from deponents and from other types of

witnesses, there are instances in which there are unrecorded

breaks in the raw punch data that are not unrecorded in the

final records that are used to generate pay.  There are

instances of rest breaks that are created by the auto-pay

system that are not accounted for in the count of rest breaks.

       So when the auto-pay system auto-pays for missed meal

periods, they convert periods that were originally punched as

TO to TI, they convert that from unpaid breaks to paid breaks.

So that throws off the counts of the rest breaks.

       There are breaks that, although unrecorded, may never

have been not -- still may not have been untaken, even as

reflected in the PVRs.  And then finally, the fact that a

break was not recorded doesn't mean that it wasn't taken.

       So for all those reasons, the raw punch data are not,

in my opinion, a reliable basis to calculate damages related

to the failure to offer, authorize or permit timely meal

1   periods or adequate rest breaks.

2   Q.   As an economist, you've been asked to prepare damages

3   analysis in other matters; correct?

4   A.   Yes.

5   Q.   And in this particular case, if asked to prepare an

6   accurate -- an accurate damages analysis, with the information

7   that you've been provided, the raw punch data, is this how you

8   would go about doing it?

9   A.   No.

10   Q.   Why not?

11   A.   Because it -- as I say, it's clearly not accurate.  I know

12   that there are breaks that are unrecorded in the raw punch

13   data, yet were actually paid or were auto-paid.  I know that

14   there are instances in which there are breaks that were taken

15   that were never recorded in any sort of pay records.  I know

16   that there are instances where persons were offered breaks and

17   they didn't take them.  And, you know, it's from the testimony

18   of the plaintiffs themselves.  So I know that it's not true.

19   So I would not offer an opinion that's based on the premise

20   that it is.  I wouldn't knowingly do an analysis if I thought

21   you were going to put that forward as my opinion.  I would not

22   do it because it's not accurate and it's not true.  So --

23   Q.   Well, let me ask you this:  There are damages numbers in

24   your report; is that right?

25   A.   Yes.

1  Q.  And are those your expert opinions as to what the damages

2  are in this case?

3  A.  No.

4  Q.  Why are they in your report then?  Why are they there?

5  A.  They are there at your explicit direction.  And in my

6  report, I said that, that Sheppard Mullin asked me to conduct

7  these analyses and so I did.

8        And as a tactical matter, it was my understanding

9  that you expected a damages report from the plaintiffs, which

10 would not account for the auto-pay and which would not account

11 for the on-duty meal period agreements, and it was your

12 expectation that it would be -- at the very least those

13 deductions would have to be made from any sort of analysis

14 from the plaintiffs.

15       So that even if it were the case that they were able

16 to get a damages analysis approved by the Court and put before

17 the jury that was based upon raw punch data, that you would be

18 able to argue that at least you got to take out the -- some

19 reasonable estimate of the amount that was auto paid and the

20 amounts that are going towards people that are subject to

21 on-duty meal period agreements.

22       That was my understanding about why you wanted it

23 done.  And the reason it was included at all is because you

24 asked me to conduct this analysis.  But in my report, I say

25 I'm doing it because you told me to.  And in the text, I never

Walker VD (Kennedy)

79

1   say this is my opinion about what damages are.  Because it's

2   not.  To the contrary.  Throughout my report, there is

3   verbiage where I make it clear that I think that these data

4   are unreliable for this purpose.

5   Q.  What is your opinion as to -- you know, you have numbers

6   in your report, damages numbers based upon lots of

7   assumptions.  Do the damages numbers with respect to the meal

8   breaks, do those go through the entire meal period class,

9   which has been truncated from September 7th, 2013 through July

10  1st, 2013?

11          MR. THERIAULT:  Your Honor, objection.

12          MS. KENNEDY:  I misspoke.  I'll withdraw.

13  Q.  Are the numbers in your report related to meal periods for

14  the time period September 7th, 2003 through July 1st, 2013?

15          MR. THERIAULT:  Objection, Your Honor.  I don't know

16  if I should object at every question.  However, I can reserve

17  them for later on if --

18          THE COURT:  Tell me what the basis for your objection

19  is.

20          MR. THERIAULT:  The basis for the objection is the

21  following.  This is beyond the scope of what the voir dire was

22  going to be in my mind.  I thought Ms. Kennedy had indicated

23  that Mr. Walker's testimony was flawed in similar ways that --

24  Dr. Walker's analysis is flawed in similar ways as Mr.

25  O'Brien's.

80

1          Docket 574, which is the order limiting Mr. O'Brien's

2     testimony deals with one specific issue.  That specific issue

3     was the method that Mr. O'Brien used to identify the

4     average -- to identify the pay rate for those pay codes that

5     were not listed.  That was the sum and substance of it.

6          The rest of the order allowed him to testify.  So

7     this seems to me to go beyond what the parties had agreed to

8     or what I thought was contemplated for this voir dire.

9          THE COURT:  Well, you'll have to make a record of

10    what you say was contemplated here.  It's my understanding

11    that the defendants are saying that the information provided

12    as to damages by Dr. Walker are unreliable and should not be

13    relied upon in submitting the matter to the jury.  Correct?

14         MS. KENNEDY:  That's correct.  And that question was

15    linked with the foundation to the next set of questions.

16         THE COURT:  Okay.  So go ahead and make your record

17    on what you think the proceedings are about.

18         MS. KENNEDY:  I'm sorry, are you referring to me?

19         THE COURT:  Mr. Theriault.

20         MS. KENNEDY:  Oh, okay.

21         MR. THERIAULT:  During the conference that we had in

22    chambers, Ms. Kennedy indicated that the basis of -- that

23    Mr. -- that Dr. Walker's analysis was flawed in similar ways

24    as Mr. O'Brien.  Inasmuch as that Mr. O'Brien used a basis for

25    calculating the damages that did a couple of things.  One, it

1    averaged -- it used an average, without regard to pay rate,

2    without regard to the job code, without regard to whether or

3    not -- the time period and without regard to whether --

4    whether there was a field actually there or not.  And based on

5    that, the Court issued a ruling, docket 574.

6           So the scope of this voir dire hearing, I thought,

7    was to establish that -- the purpose from defendants'

8    perspective was to establish that, based on what was said,

9    that Dr. Walker's analysis is similarly flawed.  So that is

10   what I believe the scope is.

11          And I also think that the pretrial document -- I

12   don't have that in front of me, but I will when I

13   cross-examine Dr. Walker, similarly said that for the reasons

14   that Mr. O'Brien couldn't testify, Dr. Walker couldn't

15   testify.  And those reasons are identified in docket 574.  And

16   that's the scope.

17          THE COURT:  All right.  I did not get that from Ms.

18   Kennedy.  I'm not going to speak as to the latter part that

19   you just spoke about.

20          In terms of Ms. Kennedy's proffer, she had given an

21   example in the course and she was not -- she did not elaborate

22   extensively about that.  So I was offering the opportunity to

23   voir dire on this issue.  So I think it's perfectly

24   appropriate that we just deal with it all now and raise any

25   issues.  There was no opportunity to fully elaborate the

1    discussions that we had since we've been dealing with this on

2    the dime frankly.  You may think that, but you'll have an

3    opportunity then.  Okay.

4             MS. KENNEDY:  May I proceed?

5             THE COURT:  The objection is overruled.  You may

6    proceed.

7    BY MS. KENNEDY:

8    Q.  I believe --

9             THE COURT:  You want a read back?

10            MS. KENNEDY:  Yes.

11   Q.  I believe the question was, in looking at your report, you

12   had a damages figure.  I'm not saying it's your opinion.  You

13   had a damages figure for the meal -- late meal period claim.

14   Is that correct?

15   A.  Yes.

16   Q.  And my question was:  Was that damages figure that was in

17   your report for the time period September 7th, 2003 through

18   July 1, 2013 or was it a longer period of time?

19   A.  It's a longer period of time.

20   Q.  If you were to give an opinion in this case, based upon

21   what is written in your report and, again, as an economist,

22   would those numbers assist the jury in this case?

23   A.  No.  I think that they -- it's the opposite.  My opinion,

24   which is clear from my report is that I don't think you can

25   ascertain damages reliably based upon the raw punch data.

1          If you were to assume that the raw punch data are

2     accurate, then you would conclude that they can't be any more

3     than the 10 million dollars, the 7 and the 3 that you get from

4     those two figures.  But it could be half, it could be a tenth,

5     it could be one/100th.  And that's assuming that the raw punch

6     data are accurate.  And it's my opinion that they're not.

7          So I don't see how it could possibly, you know, be of

8     assistance.  It could only confuse the jury into thinking that

9     that's my opinion, notwithstanding the report itself makes it

10    clear that it's not.

11         THE COURT:  Dr. Walker, let me ask you.  If you're

12    assuming that the raw punch data is accurate, how could it be

13    less?

14         THE WITNESS:  Well, if you're assuming that the raw

15    punch data is accurately reflecting what people are actually

16    paid, then it could be less because there are instances when

17    people didn't record their breaks.  Notwithstanding that they

18    got paid one way, they've said "I didn't record my breaks."

19         THE COURT:  Okay.

20    BY MS. KENNEDY:

21    Q.  And following that, following that methodology and

22    basically sort of relying upon this, again, I'll use your

23    words, inaccurate or not complete raw punch data, you also

24    came up with a number for the rest break class; is that

25    correct?

1   A.   Yes.

2   Q.   And the number -- the figure for the rest break class, in

3   your expert opinion as an economist, is that a reliable

4   damages number and is that your opinion?

5   A.   It is not a reliable number for similar reasons, and, no,

6   it's not my opinion.

7   Q.   And if you were to be asked under oath in front of the

8   jury as to whether or not either of those numbers is actually

9   your opinion or an accurate number, what would your response

10  be?

11  A.   No, it is not my opinion as to damages.  Neither of those

12  are my opinion as to damages and, no, I don't think either of

13  them is an accurate reflection of damages related to failure

14  to authorize, provide, permit timely meal periods or adequate

15  rest breaks.

16  Q.   In your expert opinion, is there a way in this case, given

17  the information that you've been provided, that -- whether

18  it's the raw punch data or there's any other information, in

19  your expert opinion, can you actually come up with an accurate

20  damages figure for the meal -- late meal period class?

21  A.   I'm not aware of a way to do it on a class-wide basis.

22  You could get more accurate data or a more accurate number by

23  relying on the PVRs.  But then you would still be left with

24  the issue of determining whether or not a missing break is

25  missing because it was not offered or because it was not

1  taken.

2          And I -- you know, I understand the argument about

3  policy, but I would not purport an argument -- I would not

4  purport an opinion under my name even related to this notion

5  that you could rely on the PVRs and just assume that there was

6  a policy.  Because I've done all this analysis that has

7  convinced me that there isn't one.  All of the analysis that's

8  related to the second and the third of my two assignments.

9  Q.  Also as part of your assignment, you were asked to look at

10 Mr. O'Brien's, I'll call it his methodology.

11 A.  Yes.

12 Q.  And do you have an opinion as to that?

13 A.  Yes.

14 Q.  What is your opinion?

15 A.  That his methodology is not reliable.  I know the next

16 question, but I should wait.

17          THE COURT:  Do I need to know this?

18          MS. KENNEDY:  Yes.  Because --

19          MR. THERIAULT:  Objection.  Relevance.  This is

20 on --

21          THE COURT:  Yeah, that is my question.  Why is that

22 relevant now?

23          MS. KENNEDY:  Because we're going to get into

24 basically the final answer as to why all of this methodology

25 going to damages is not -- should not go before the jury.

1           THE COURT:  As to his opinion.

2           MS. KENNEDY:  As to his opinion.

3           THE COURT:  All right.  I'll allow it on that

4    proffer.

5    BY MS. KENNEDY:

6    Q.  The next question is:  Why is that?

7    A.  There are several reasons.  One has to do with this whole

8    seven minutes and -- I'm sorry, seven hours and defining

9    shifts based upon the seven hours.  That methodology can

10   introduce false positives.  There are circumstances under

11   which, if you assume a seven-hour differential to define

12   shifts, but Taco Bell applies one, you can have instances in

13   which you will have false instances where two shifts have been

14   created into one.  Neither of the shifts would have mandated a

15   meal period before the fifth hour of work according to the

16   rules of this case, yet this artificial shift does.

17           Similarly on rest breaks.  You can have false

18   positives by applying the seven hour method.  So one is this

19   whole seven hour method.

20           A second problem with what Mr. O'Brien did is that he

21   did not seem to -- I don't know, but there are arithmetic

22   errors.  And he did not talk about any sort of systematic

23   checking of his work.  So, you know, I don't think they're

24   reliable for that reason.

25           A third is that he did not account for auto-pay or

1  for on-duty meal period agreements.

2        And then fourth is that there are un -- the fact that

3  a break is missing from the raw data doesn't mean it's missing

4  from the PVRs.  And if a break is unrecorded, it doesn't mean

5  that it was not taken.  And if a break was not taken, it does

6  not mean that it was not offered.  So none of his counts

7  relate specifically to meals -- meal periods that were not

8  offered in a timely fashion or rest breaks that were not

9  offered in sufficient quantity.

10 Q.  So, Dr. Walker, in light of all of that and as part of the

11 assignment is to look at Mr. O'Brien's methodology and sort of

12 how he came up with counts at one point in time to come up

13 with his damages, his damages numbers.  As part of your

14 reports and as part of your analysis, have you come to a

15 conclusion as to whether or not -- based upon your assignment

16 to respond to Mr. O'Brien's analysis, have you come to a

17 conclusion as to whether your damages numbers -- not your

18 opinions -- have any useful utility in this case as an

19 economist to provide information to the jury based upon what

20 you know in this case?

21        MR. THERIAULT:  Objection.  It's beyond the scope of

22 the report.

23        THE COURT:  Overruled.

24        THE WITNESS:  No, I don't see any useful value at

25 all.

1          MS. KENNEDY:  Your Honor, I have no more questions.

2          THE COURT:  Mr. Theriault.

3                      VOIR DIRE EXAMINATION

4    BY MR. THERIAULT:

5    Q.  Dr. Walker, how many false positives did Mr. O'Brien

6    achieve from using a seven hour shift?

7    A.  Pardon me?

8    Q.  How many false positives did Mr. O'Brien obtain from using

9    a seven hour shift?

10   A.  I don't know.

11   Q.  Did you perform that analysis?

12   A.  No.

13   Q.  You don't know whether or not using the seven hour shift

14   affected the numbers, do you?

15   A.  I know that he has roughly 20 percent more asserted rest

16   break violations than I do.  He has a significantly higher

17   count of shifts that lasted six to seven hours.  I can't tell

18   whether that's due to the seven hour assumption or it's due to

19   some other error in his calculations.

20   Q.  And --

21   A.  There's no way for me to know why they're different.

22   Q.  Right.

23   A.  I know our numbers are different and there's no way for me

24   to know why.  Because his methodology wasn't explained in his

25   report or in his deposition.  So it was impossible for me to

1  try to figure out what the source of the differences were.

2  Q.  All right.  I want to focus on your opinion as opposed to

3  Mr. O'Brien's opinion.  You did not perform any analysis to

4  determine whether or not use of a seven hour shift resulted in

5  false positives?

6  A.  I don't know how I could have done that.

7  Q.  Okay.

8  A.  So no, I don't know how I possibly could have done what

9  you said.

10 Q.  Okay.  Now, is your opinion that the -- is your opinion

11 now that the time records, the punch data is an unreliable

12 means to assess whether or not there is a policy in place?

13 A.  I -- I would not say that.  I suspect that it is.  Because

14 it is the basis for the PVRs.  It is the basis for how people

15 are paid.  And when you look at the raw punch data, there's

16 just an overwhelming majority.  So I don't see how -- I don't

17 think that it's likely that that's all due to timely meal

18 periods that were then adjusted to be untimely meal periods in

19 the PVRs.  Or net rest breaks that show up in the raw punch

20 data, yet somehow they were removed from the PVRs.  It seems

21 somewhat implausible to me that that happened on a grand

22 scale.  And I really can't think of any reason why it would

23 have happened at all.

24 Q.  I'm sorry.  Repeat that.  Why what wouldn't have happened

25 at all?

1   A.  Why, in the correction from the raw punch data to the

2   PVRs, you would change timely meal periods into untimely meal

3   periods on a grand scale or you would remove rest break time.

4           The only thing that I'm aware of on a systematic

5   basis is rest break time being added, meaning the raw punch

6   data shows a TO to TI and sometimes that was converted

7   systematically by the auto-pay system to become a TI so that

8   money was added.  I can't think or how or why you'd be going

9   the other way on a grand scale, sufficiently grand such that,

10  you know, overwhelming majority of instances of timely meal

11  breaks are now converted to the opposite.

12  Q.  Okay.  So maybe I'm not following you.  Are you saying you

13  can't understand why a noncompliant punch would be turned into

14  a compliant punch?

15  A.  No.  I'm saying the opposite.  I'm saying that when you

16  look at the raw punch data, the compliant punches constitute

17  the overwhelming majority.  That you were asking me, is it the

18  case that somehow the raw punch data can't be used to

19  establish the absence of the policy that you're asserting?  In

20  order for that to happen, what you're saying to happen it's

21  got to be that all of these compliant punches have to be

22  converted into noncompliant punches.  And no, I don't really

23  know why that would happen.

24  Q.  But you're assuming, aren't you, that they were

25  noncompliant from the get-go in that analysis.

A.   No, I'm saying that 71 percent, according to Mr. O'Brien,
and roughly two-thirds, based on the counts that I've done, of
the instances where we found what appear to be shifts that are
greater than six hours long, roughly two-thirds of them have
meal periods that commence prior to the completion of the
fifth hour of work.  And that's before throwing in pay breaks.
And that's before accounting for on-duty meal period
agreements.

        And in order for that to be reversed, in order for
you to come to the conclusion that, well, you can't count
that, it must be that whatever is really going on, those are
errors and people are really taking their lunch break late and
that's being corrected in the PVRs.  I just don't see it
happening.  It doesn't seem to me to be a plausible thing.

        I don't know of any explanation for that to happen on
such a grand scale that you would observe, you know,
two-thirds compliance yet really it's a tenth or a five
percent compliance, or whatever the number would have to be in
order to infer there's actually a policy that these breaks
don't actually happen before the completion of the fifth hour
of work.

Q.   Okay.  Well, let's talk about what you actually did do.
Now, with respect to an analysis of the data, in other words,
to determine whether or not -- you understand what I say when
I say "qualifying shift"?  In other words a shift where the

1  meal break class would be greater than six hours.  Conversely,

2  a qualifying shift for the rest break would be between greater

3  than six and less than seven.  Can we just call that a

4  qualifying shift?

5  A.   Sure.

6  Q.   Do you think your analysis was flawed with respect to

7  identifying, in the raw punch data as you received it, the

8  qualifying shifts for either the meal break or the rest break

9  class?

10  A.   Flawed.  And I'm sure there are errors in it, yes.  I'm

11  sure there are errors in it.

12  Q.   Do you think there's enough errors to render the entirety

13  of your opinion unreliable?

14  A.   No, I don't.

15  Q.   Okay.  Well, let's talk about the things that you think

16  are reliable.  Do you think that the data that you received in

17  the form you received it is sufficient for you to render an

18  opinion on the number of potential qualifying shifts for the

19  meal break class?

20  A.   The number of potential qualifying shifts.  I think

21  there's error in it.  I don't know how much error there is.  I

22  don't really have an opinion about what the actual number is.

23  I've certainly performed calculations, they are what they are.

24        But my opinions, one, are they reliable to come up

25  with reliable counts of the numbers of late meal periods?  Or

1  missing meal periods?  Or insufficient breaks?  And they're

2  not reliable for that.

3      The second was if the raw punch data are reliable,

4  assume they are.

5  Q.  Okay.

6  A.  Are they consistent with a policy of not offering timely

7  meal periods?  And overwhelmingly the answer is no.  And it

8  actually doesn't depend ultimately on whether they're reliable

9  or not.  It's saying assuming they are, are they consistent

10  with a policy of not offering meal periods for qualifying

11  shifts until the completion of the fifth hour of work.  And

12  the answer to that doesn't depend upon whether they're

13  reliable or not either.  It assumes that they are.

14  Q.  Okay.

15  A.  The third, assuming that they are, are they consistent

16  with a policy of less than 20 minutes of net rest?  That

17  doesn't depend upon whether they're reliable or not.  It

18  assumes that they are because it's my understanding you need

19  that for your case.  So assume that it is.  And no, they're

20  not consistent with policy in that case.

21      And then the other, as to whether or not what Mr.

22  O'Brien did is reliable, I think that one of the reasons what

23  he did is not reliable is because, no, they're not reliable

24  for the purposes of identifying shifts where rest breaks

25  weren't offered.

1          So I don't -- I don't see how -- any analysis that

2   I've done is rendered unreliable by the raw punch data being

3   unreliable, except for this damages number because it's

4   predicated on the opposite of my real opinion, which is that

5   they are unreliable.

6   Q.  But your opinion is based on an analysis of the raw punch

7   data; correct?

8   A.  Yes.  I conducted analysis of raw punch data.

9   Q.  Your opinion is that we shouldn't rely on the raw punch

10  data.

11  A.  That's one of my opinions, yes.

12  Q.  So therefore we shouldn't rely on the damages that I

13  calculated based on the assumption that they were reliable,

14  right?  Isn't that one of your opinions in your case?  You

15  were asked by Taco Bell to provide opinion on the damages,

16  under the certain assumptions.  We talked about it in front of

17  the jury.  Some of the assumptions was that plaintiffs win.

18  That the data is reliable or reasonably reliable.  And that

19  was one of the things that you were tasked to do by Taco Bell,

20  correct?

21          MS. KENNEDY:  Objection to the form.

22          THE COURT:  The form of what?

23          MS. KENNEDY:  It's like five questions.

24          THE COURT:  Compound.  If you could break it up, Mr.

25  Theriault.

1   BY MR. THERIAULT:

2   Q.  Weren't you tasked by Taco Bell to provide an estimate of

3   the damages based on certain assumptions?

4   A.  Yes.  I was asked by Taco Bell to perform a

5   calculation -- I think there's more here, it's just closed.

6   Excuse me.

7            THE COURT:  That's all right, doctor.

8            THE WITNESS:  It was just closed.

9   BY MR. THERIAULT:

10  Q.  And so I really think it's a yes or no question.  Were you

11  tasked by Taco Bell to provide damages analysis under certain

12  assumptions?

13  A.  Yes.

14  Q.  And one of those assumptions was that plaintiffs prevail

15  in their case and damages would be owed.

16  A.  Well, the specific assumptions were not that plaintiffs

17  prevailed.  It -- I'm sure that was underlying why they asked

18  me to do what I did.  They asked me to calculate damages under

19  the assumption that any unrecorded -- late recorded or missing

20  recorded meal break in the raw punch data for qualifying

21  shifts gave rise to an obligation to pay one hour of wages to

22  the person that worked the shift.

23            That was the assumption.  And it was my assumption,

24  my understanding that that was one of your liability claims.

25  And that the only reason they would do that was that you would

96

1    prevail under liability.

2         But the specific instructions were to calculate the

3    damages under these assumptions.  If there was a late or

4    missing recorded meal period in the raw punch data, based on

5    the assumptions that I used to reorganize raw punch data into

6    shifts, assume that that gives rise to an obligation of a pay

7    premium and calculate what those pay premiums are after

8    deducting the auto payments and removing shifts that were

9    worked by graveyard workers or managers.

10   Q.  And that's what you did; correct?

11   A.  And that's what I did.

12   Q.  And the methods that you used in order to determine it

13   under the assumptions that you had to make were reliable;

14   correct?

15   A.  Absolutely not.  I don't believe those assumptions were

16   true.  A very large portion of my report goes directly to that

17   issue.  I don't believe that it's the case that an unreported

18   meal period in the raw punch data corresponds one-to-one with

19   meal periods that were not offered.  I don't believe, based

20   upon my analysis of the raw punch data, if the raw punch data

21   were true, that there is a policy.

22         And I find it hard to believe that the raw punch data

23   are reliable enough for any other purposes.  I don't believe

24   it's the case that Taco Bell has a policy of not offering meal

25   periods before the completion of the fifth hour of work given

1  the overwhelming majority of the instances that I have found

2  indicate otherwise.

3  Q.  Okay.  Let's focus on the damages aspect.  I know those

4  are your other opinions.  You don't believe there's a policy.

5  You believe there's wide variation in the number of shifts

6  over time by manager, by store, by employee, by manager, et

7  cetera.  I understand all that.  I want to focus in on the

8  damages because I think that's what we're really here to talk

9  about.

10         Okay.  So in the data that you reviewed, were there

11  pay fields indicated in that data?

12  A.  Yes.

13  Q.  Okay.  Now, some of these entries were clearly erroneous;

14  correct?

15  A.  Yes, they were.

16  Q.  How many?

17  A.  I don't know the number.

18  Q.  A few?

19  A.  There were many.

20  Q.  You know your report says that with respect to -- when you

21  say "many," do you mean many in a -- in absolute terms or

22  "many" when compared to the overall number?

23  A.  I mean that there were many.  That when I saw a pay field,

24  I expected that I would see hourly rates and there are a lot

25  that are not.

1  Q.  Yeah.

2  A.  So the managers, in particular, are clearly not hourly.

3  And I think that there are a lot.  A lot, however you want to

4  define "a lot."  A big number.  I don't know what the number

5  is.  But I know that either in percentage terms, it's not five

6  percent, it's not .3 percent, it's, you know, in terms of the

7  numbers of pay fields that are for managers, it's not hourly

8  numbers.

9  Q.  Well, let's talk on that for just one minute.  Well, this

10 is what you wrote.  Is this true or not?  "Most shifts had

11 usable pay information."

12 A.  Under some assumptions that are discussed earlier in that

13 report.  I say earlier in there that there are a lot of

14 numbers in there that are too large to be hourly pay numbers.

15 And I was told by Sheppard Mullin to assume that those hourly

16 pay numbers aren't really hourly, they're weekly pay numbers

17 for managers.  And so if I divided those numbers by 40, I got

18 some numbers that looked more plausible and more reasonable.

19         But I have not gotten that from -- I've not heard

20 that from any Taco Bell people.  And I expected that if I were

21 going to be testifying about damages based upon this, that I

22 would be preceded by someone at Taco Bell who would actually

23 close that loop.  Who would actually testify that the reason

24 that those pay numbers are so large really is because they're

25 weekly, not hourly, and that it's appropriate to divide that

1 | number by 40.

2 |       I got my information from Sheppard Mullin and not

3 | from Taco Bell.  Making that assumption, yes, most of the

4 | numbers would have been usable.

5 | Q.  Okay.  So let me just ask that question one more time.

6 | It's sort of a yes/no answer.  Did you write "Most shifts" --

7 |       THE COURT:  Mr. Theriault, then "yes or no" is the

8 | appropriate form of question.

9 | BY MR. THERIAULT:

10 | Q.  Yes or no.  "Most shifts had usable pay information."  Did

11 | you write that or not?

12 |       MS. KENNEDY:  Objection.  Vague, where in the report?

13 |       MR. THERIAULT:  I'm looking at paragraph 55.

14 |       THE COURT:  The witness doesn't -- you can ask him if

15 | he knows that.  If he needs to refresh, you can do so.

16 | Doctor, did you get the question?

17 |       THE WITNESS:  Yes.

18 |       THE COURT:  All right.

19 |       THE WITNESS:  I don't know for a fact.  I assume I

20 | did based upon you standing there.  But I don't recall

21 | specifically that.

22 | BY MR. THERIAULT:

23 | Q.  Would looking at your report refresh your recollection on

24 | this issue?

25 | A.  Yes.

100

1   Q.  I think it's Exhibit 55.  52.  I did that again.

2              MS. KENNEDY:  205.  2051.

3              MR. THERIAULT:  2051.

4              THE WITNESS:  I have it here.

5              THE COURT:  Oh, you have it there.  All right.  He

6   has it in front of him.

7   BY MR. THERIAULT:

8   Q.  I'm looking at paragraph 23.

9   A.  Paragraph 23?

10  Q.  Page 23.  Paragraph 55.

11  A.  Yes, I wrote that sentence.

12  Q.  All right.  Thank you.  Let's go through this a little

13  bit.  And by the way, you relied on those pay fields when you

14  did calculate the damages analysis; correct?

15  A.  Yes, I did.

16  Q.  Now, you indicated earlier in your report that there were

17  certainly some errors; correct?

18  A.  In the raw punch data?

19  Q.  Yeah.

20  A.  Yes, there are.

21  Q.  How many wage and hour cases have you done?  And by

22  "done," I mean provide opinion or analyzed.

23  A.  You asked done, provided opinion or analyzed?  I've been

24  retained in, I would guess, maybe a dozen wage hour cases.

25  Not many of those have actually led to testimony at this time.

1   I think only two or three have actually ended up in testimony
2   so far.
3   Q.  Okay.  With respect to those two or three, because I
4   understand you might -- there might be a confidentiality with
5   the others.  But the ones that ended up in testimony, who were
6   the employers in those cases?
7   A.  Big Lots.  And Excel Direct -- trying to remember what the
8   others ended up being, might being disclosed yet.  Those are
9   two that come to mind.  If you'd like me to look at my CV, I
10  can look and see which ones.
11  Q.  It might not be necessary.  I know a little bit about Big
12  Lots.  Were you employed by the employers in that case?
13  A.  Yes.
14  Q.  Okay.  When you -- did you review the time data?
15  A.  In the Big Lots case?
16  Q.  In either of those cases.
17  A.  Well, yes and no.  In the Excel Direct case, there were
18  different types of data.  There were three different datasets,
19  one of which included some times.  And I did look at time in
20  that.
21          In Big Lots, I don't recall -- I don't recall that
22  this was the same issue.  I don't recall time being part of
23  it.
24  Q.  Did you review the time records in the Big Lots case?
25  A.  What do you mean "the time records"?

1   Q.   The punch in and punch out?

2   A.   No, I did not review punch data in the Big Lots case.

3   Q.   With respect to the case that you did look at, did you

4   determine whether or not there was any errors in the data?

5   A.   With respect to the case that I did look at.

6   Q.   Yes.

7   A.   Which case are you talking about?

8   Q.   I think you said Excel.

9   A.   Yes.  Were there errors in the underlying data?

10   Q.   Yes.

11   A.   That wasn't a focus of my analysis.  I don't recall that

12   being a focus of the analysis.

13   Q.   Do you recall whether or not there were errors in that

14   data?

15   A.   I don't know.

16   Q.   Have you ever looked at a wage and hour case or cases

17   involving employers where you received the time data where the

18   data was 100 percent accurate?

19   A.   No.

20   Q.   Okay.  In any event, back to this case.  You indicate that

21   some of the entries are clearly erroneous as the employees'

22   hourly rate; correct?

23   A.   Yes.

24   Q.   And that's because the numbers were -- well, at least they

25   appeared to be too high to be an hourly rate for an hourly

1  worker at Taco Bell?

2  A.  Yes.

3  Q.  For instance, like 999 or 700, so you made an assumption

4  that those individuals weren't really making that hourly rate,

5  had to be something else; correct?

6  A.  For purposes of the calculation, yes.

7  Q.  Now, you assume that they were weekly rates; correct?

8  A.  Yes, I did.

9  Q.  All right.  And do you have any reason to believe that

10  they weren't weekly rates?

11  A.  No, I don't.

12  Q.  Did you ask Taco Bell's counsel to explain why some rates

13  were in what we would expect, 6 to $12 an hour, something like

14  that, versus 900, 600, 750, et cetera.

15  A.  Your question was did I ask why?

16  Q.  Yes.

17  A.  Yes, I did.

18  Q.  And what were told?

19  A.  That Sheppard Mullin didn't know.

20  Q.  You have no reason to believe that those rates were higher

21  than one would expect for an average for an hourly rate were,

22  in fact, weekly rates; right?

23  A.  Could you repeat that question?

24  Q.  Yes.  You have no reason to believe that they are, in

25  fact, weekly rates?

1    A.   I have no reason to believe that they are weekly rates?

2    Q.   That they are not weekly rates.

3    A.   That they are not.  No, I have no reason to believe they

4    are not weekly rates.

5    Q.   All right.  And so in those instances where you had the

6    pay rate, which was some larger than expected number for an

7    hourly pay rate, what did you do to calculate the -- what did

8    you do in terms of calculating the potential violations versus

9    the hourly rate?

10   A.   I think -- what did I do to calculate the potential

11   violations versus the hourly rate?

12   Q.   Let me break it down.  Didn't you take that number and

13   divide it by 40 in order to determine an hourly rate?

14   A.   Yes, I did.

15   Q.   Okay.  And did you understand that some of the managers in

16   the class, at least for some class period, were salaried

17   employees?

18   A.   Yes, I did.

19   Q.   Okay.  And so it made sense that some of these higher

20   numbers would have been or could have been managers with the

21   higher salaries; right?

22   A.   I don't know why the numbers were entered in that way into

23   this dataset.

24   Q.   That was an assumption that you made in your report,

25   though; correct?

1  A.  For purposes of this calculation, I assumed that those

2  numbers, which when divided by 40, came out to numbers more

3  reasonably approximated hourly rates, were weekly rates.

4  Q.  All right.  And Taco Bell's lawyers didn't tell you not to

5  do that, that there was otherwise some issue with doing it

6  that way; correct?

7  A.  Correct, they did not tell me that.

8  Q.  All right.  And you also found that some non-managers had

9  pay rates that were more consistent with weekly rates;

10  correct?

11  A.  That's my recollection.

12  Q.  All right.  And did you perform a similar analysis by --

13  i.e., did you divide that what appeared to be a weekly rate by

14  40 so you could determine a reasonable hourly rate?

15  A.  To -- yes, I did.  I assumed that that's what the issue

16  was.

17  Q.  All right.  And you made an assumption that all the weekly

18  pay rates were within the range of 6.75 to $30 an hour;

19  correct?

20  A.  I did.

21  Q.  Why did you use that pay range?

22  A.  Discussions with Sheppard Mullin about what a reasonable

23  ceiling would be for an hourly worker at a Taco Bell

24  restaurant.

25  Q.  All right.  And so that determination was, in your mind, a

1   reasonable one?

2   A.   For purposes of this calculation.

3   Q.   Okay.  Why did you use 6.75 as the lower hour?

4   A.   I used whatever the minimum minimum wage was.

5   Q.   Do you have an understanding of what the minimum wage is

6   during the years in the class period as defined by the

7   plaintiffs?

8   A.   I looked it up.  I don't have it in mind right now.

9   Q.   But you relied on the minimum wage when you made your own

10  calculations to determine whether or not the pay rate that you

11  used was -- I don't want to say consistent with what one would

12  expect, but certainly not below the minimum wage.

13  A.   Yes, that's right.

14  Q.   And if there was a rate -- now, there were some rates that

15  were listed that were below the minimum wage; right?

16  A.   Yes, that's correct.

17  Q.   And what did you do with those ones?

18  A.   I'd have to take a look at the report.  I think that I

19  calculated an average for the same job that year.  From the

20  data that I had.  And then when I couldn't do that because I

21  couldn't identify the job code to a job, I used an average for

22  a broader category, such as manager versus non-manager.  But I

23  would actually have to look to see.  I don't remember that I

24  did that exactly.  It's possible that I did something a little

25  bit different with those that were below the minimum wage.

1    I'd want to look at the report to refresh my recollection.

2    Q.   Let's talk about what you didn't do and then I'm going to

3    get into what you did.

4         Now, this is -- you didn't do this, right?  You

5    didn't take up -- you didn't calculate the damages based on

6    one average wage that was applied to all potential violations

7    regardless of the time period that the violation occurred or

8    the job code; correct?

9    A.   That's correct.  I did not.

10   Q.   You did something a little bit more scientific.  Correct?

11   A.   I did something that is more accurate than that.

12   Q.   Thank you.  Now let's talk about what you did.  For

13   that -- for those data fields that did not contain an hourly

14   rate, what did you do to fill that hourly rate in?

15   A.   Well, as I said, it's -- there were some instances where

16   either data were missing or, even after dividing by 40, you

17   ended up with an odd number or whether, for instance, the

18   number was too small.

19        All of those instances, in my recollection, is that I

20   used an average for the job category for the year, to the

21   extent that I could match the job code that was associated

22   with a punch to another job code or job category for which I

23   did have hourly data.  And if I couldn't, because for

24   instance, the job code couldn't be identified specifically to

25   a job category, I would match it to a broader category that I

1    knew it belonged to.  And if I couldn't even do that, I might

2    use the entire average for all the employees that year.

3    Q.  Okay.  Now, if the job code -- so in other words, I'm

4    trying to figure this out.  So if the job code was one that

5    was typically of a higher rate, say of a manager or someone, a

6    higher ranked employee, isn't the reason why you wouldn't use

7    an average of all pay codes through all years is because what

8    it would result in is a more inaccurate figure?

9         Or said another way, by -- in your opinion, using the

10   job code and the specific year would better approximate, in

11   your opinion, what the actual hourly rate was for that person.

12   A.  Better than what?

13   Q.  Better than averaging all of the shifts through all the

14   time periods through all the job codes.

15   A.  Yes.  I think that what I did is much more accurate than

16   this averaging method that you're describing.

17   Q.  All right.  And conversely, if the job code of a

18   particular individual was one that particularly commanded a

19   lower rate, than using an average -- and again, an average of

20   all people on all shifts -- would increase, artificially

21   increase the pay rate for that person; correct?

22   A.  I'm sorry.  The predicate in that was?  What is it that's

23   going to inflate it?

24   Q.  If the person was of a lower pay rate.  We talked about

25   the higher pay rate, the reason why you wanted to use people

1    within the same job code from the same years is because it

2    would better approximate the actual rate that person was more

3    likely to have used; right?

4    A.   Yes.

5    Q.   And conversely, if the person was -- had a job code that

6    commanded a lower pay rate, the reason why you'd use an

7    average for that particular year and that particular code is

8    because it would better approximate what you think that person

9    should have received.  Or likely received.

10   A.   Yeah, it would be a better estimate of what their wage

11   was.  Yes.

12   Q.   Similarly, with respect to the time period -- now, we

13   talked about the job code, but let's talk about the time

14   period.  Did you notice in the data any increase in the hourly

15   rates among the same job code?

16   A.   I didn't look for it.  So I did not specifically notice

17   it.

18   Q.   All right.

19   A.   I wouldn't be surprised if that were the case given that

20   the hourly minimum wage went up over time.

21   Q.   Right.  So one would expect in 2014, the average hourly

22   rate would be higher than in 2003?

23   A.   Yes.

24   Q.   Okay.  And so your analysis of the damages also similarly

25   broke down the unknown pay codes, only using the year that

1    that potential violation occurred; correct?

2    A.   Yes.

3    Q.   And in your mind, was that a better way of approximating

4    what that person's hourly rate was?

5    A.   Better than taking an average for the entire class, the

6    entire time period, yes.

7    Q.   Yes.  Now, in -- with respect to the amount of error in

8    there, your report -- yes or no, does your report indicate

9    that you replaced observed pay information with averages, as

10   described above, in .32 percent of the shifts for which you

11   calculated damages related to the late meal periods?

12   A.   I would have to look at the report to see if that's a

13   verbatim recitation of what the report says.

14   Q.   Please do.

15           THE COURT:  Can you direct him.

16           MR. THERIAULT:  Page 65 -- paragraph 65.

17           THE COURT:  Thank you.

18           THE WITNESS:  Yes, that's right.

19   BY MR. THERIAULT:

20   Q.   And that was accurate when you wrote it?

21   A.   Yes, it was.

22   Q.   All right.  And so therefore, in 99.68 percent of the

23   shifts that you analyzed, you used the actual pay rate that

24   was identified; correct?

25   A.   For late meal periods, yes.

1   Q.   99.68 percent.

2   A.   I'm sorry, what was the -- 99.68 percent of the --

3   Q.   Of the shifts that you analyzed damages for --

4   A.   Yes.

5   Q.   -- you used the actual pay field that was listed?

6   A.   Well, I used either the number that was listed or that

7   number divided by 40.  Yes.

8   Q.   All right.  Now, with respect to missing meal periods,

9   same paragraph.  You replaced only 2.49 percent of the shifts;

10  correct?

11  A.   I replaced for -- only in -- no, what you said is -- I

12  didn't replace shifts.  In 2.49 percent of the shifts for

13  which I was calculating damages relating to missing meal

14  periods, I replaced observed pay information with averages as

15  described above.

16  Q.   Right.  And with respect to the other 97.32 percent of the

17  shifts related to the missing meal periods, you used actual

18  data that was there?  You made no assumptions about it

19  whatsoever.

20  A.   I think you said 97.32, I think you meant 97.51.  And I

21  used either the number that was there or that number divided

22  by 40.

23  Q.   All right.  Over 97 percent of the time.

24  A.   Yes.

25  Q.   All right.  So now, with rest periods, you did the same

1   analysis with the rest period.  Correct?  That's going to be a

2   different paragraph.

3           THE COURT:  Do you know, doctor?

4           MR. THERIAULT:  I might be able to --

5           THE COURT:  He hasn't answered that he doesn't know

6   yet.

7           THE WITNESS:  I -- I don't know.

8           THE COURT:  Okay.  Now if you could direct him, Mr.

9   Theriault.

10  BY MR. THERIAULT:

11  Q.  Let me bring you to it.  Maybe I don't know either.  But I

12  know I saw it.  Give me a minute.

13          THE COURT:  Can you refresh his recollection, doctor?

14  BY MR. THERIAULT:

15  Q.  Doctor, can you refresh my recollection?

16          THE COURT:  All right.  Let's move on to the next

17  question.  Thank you.

18          MR. THERIAULT:  I want to -- if you don't mind, I

19  want to get this .5 percent in with respect to the rest

20  breaks.

21          THE COURT:  I'm just looking in the interest of time.

22  Okay.

23  BY MR. THERIAULT:

24  Q.  Is it true that you replaced only .5 percent of the shifts

25  with respect to the rest breaks because they had no pay

 1  information there?

 2  A.  I don't know.

 3          MR. THERIAULT:  Sorry, Your Honor, I tried.

 4          THE COURT:  So is it somewhere?

 5          MR. THERIAULT:  It is.  I'm just --

 6          THE COURT:  Why don't you have co-counsel look it up

 7  and if you could move on to the next question, that might be

 8  in the interest, again, of time.  Unless you think you can

 9  find it.

10          MR. THERIAULT:  I think I can.

11          THE COURT:  Okay.

12  BY MR. THERIAULT:

13  Q.  Oh, yeah, how about paragraph 86 on page 31.

14  A.  Yes, 0.5 percent of the shifts for which I ultimately

15  assumed a rest break violation required me to insert averages

16  into the pay field or replace information that was in the pay

17  field with averages as I discussed before.

18  Q.  All right.  So conversely, for 99.5 percent of the

19  potential violations in the rest break class, you used the

20  data that was assigned to that particular violation, actual

21  pay rate.

22  A.  Well, yeah, 99.5 percent of the shifts that had unrecorded

23  or inadequate recorded rest break time.

24          MR. THERIAULT:  Okay.  I have no further questions.

25          THE COURT:  Any redirect?

FURTHER VOIR DIRE EXAMINATION

BY MS. KENNEDY:

Q.  Dr. Walker, based on the questions asked of you from Mr.
Theriault, does any of that change your opinions in this case
that the damages numbers, calculations that you have provided
in your report, are something that you believe are your
opinions and would be helpful to the jury?

A.  No, not at all.  It didn't change my opinion whatsoever.
The reasons why this is not my opinion are not because the
data in the pay fields are inadequate.  It's all the other
things that I talked about before.  And also, to a much lesser
extent in my mind, but it's also the case that even the pay
information requires an assumption that I would have expected
Taco Bell to be putting on an actual witness to support.  I
mean, it's -- I'm not in any position to say that these odd
numbers should be divided by 40 provided the right number.
And I expected that Taco Bell would be putting on some sort of
an expert, a fact witness to make that position -- make that
claim.

Q.  And in your field, based upon the questions from Mr.
Theriault, is there any type of statistical analysis or
statistical standard upon which reviews where you would
actually, in this case, feel comfortable and reliable and
trustworthy in saying that it's your opinion in this case that
those damages numbers that you came up with are, in fact,

115

proper economic numbers that you feel are trustworthy for this

jury?

A.  I'm sorry.

Q.  That was a horrible question.  I will withdraw that

question.  And I'll break it down.

As an economist, is there any sort of standard,

statistical standard upon which you would base your opinions

in reaching a conclusion as to damages analysis?

A.  I don't know that I could put it in terms of a statistical

level of certainty as to what would, you know -- what would be

sufficient for me to say in this case what damages are.  This

is more are the fundamental premises there in order for me to

say, in my opinion as an economist, this is a reliable

estimate of damages?  And no, they're not there.

And I wouldn't want to put these numbers forward and

have somebody else suggest that I think that this is the

amount of damages that are related to this sort of a liability

finding.

If what you're trying to measure are instances where

a premium was due and unpaid for failure to offer, permit or

authorize breaks or premiums -- I'm sorry, breaks or meal

periods, I just don't think you can rely on these data to do

that.  And I would not -- if you were to hire me and ask me to

put these numbers forward, and I were to know we were to use

these for my opinion, I would not have accepted the

116

1   assignment.

2           MS. KENNEDY:  Your Honor, I have no more questions.

3           THE COURT:  Anything further?

4           MR. THERIAULT:  No.

5           THE COURT:  All right.  Thank you, doctor.  You can

6   step down.

7           THE WITNESS:  Thank you.

8           (The testimony concluded at 4:04 p.m.)

9                               ****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Wednesday, March 2, 2016                    Fresno, California
2    8:58 a.m.
3              THE COURT:  Call your next witness, please.
4              MR. THERIAULT:  Dr. Jonathan Walker, please.
5              THE COURT:  Dr. Walker, come forward.
6              MR. THERIAULT:  Your Honor, may I request a brief
7    sidebar?
8              THE COURT:  Yes, you may.  And Dr. Walker, I'm going
9    to remind you you're still under oath.
10             (The following proceedings were held at sidebar
11             between the Court and counsel:)
12             THE COURT:  We're outside the presence of the jury.
13   Watch it there.
14             MR. THERIAULT:  Okay.  So I read the Court's ruling
15   this morning.  I believe I understand the scope.
16             THE COURT:  Okay.
17             MR. THERIAULT:  The question is clarification.  He
18   did identify certain pay rates in the data, pay rates.
19             THE COURT:  That's in the raw data.
20             MR. THERIAULT:  In the raw data.
21             THE COURT:  Sorry.
22             MR. THERIAULT:  Is that fair game in terms of asking
23   him?
24             THE COURT:  I think that is fair game because it
25   depends on how -- what you mean by that, but if you're talking

1    about the punch data, what he reviewed, I think that is fair

2    game.  But Ms. Kennedy?

3         MS. KENNEDY:  I think it's -- I think it's going to

4    depend on the question, the phraseology of the question.  If

5    it's talking about -- I'm sorry, I didn't mean to interrupt.

6    If it's talking about cases that's one thing, that's fair.

7    But if it goes into the issue of damages, that's something

8    else.  So I think it depends on the question.  But it is in

9    his report, so I don't dispute that.

10        THE COURT:  I wasn't meaning to interrupt you.  But I

11   was going to say, I agree, it does depend on the question.

12   But the way I understood it from Mr. Theriault, he's talking

13   about the raw punch data and that does have those things on

14   there.  So --

15        MS. KENNEDY:  I would agree.  The questions are

16   what's in the data or what's in the report, about that, I

17   agree, I think that's fine.

18        THE COURT:  So how are we going to convey -- what is

19   the signal you want to give me in terms of your objection that

20   if he's crossing so that I can then know where you're focusing

21   as opposed to just some other -- I don't like counsel to say

22   "violation of the Court's order" because I don't want that to

23   be -- I've seen counsel do that.  I'd like to avoid that.

24        MS. KENNEDY:  I'm hard pressed to tell you what it's

25   going to be only because I don't know how the questions are

1    going to be phrased.  If Mr. Theriault is going to be asking

2    did you look in the raw punch data for the pay rates, are

3    those part of the report?  I think that's fine.

4         But I think if the question goes farther and there's

5    some connection from the pay rates and/or punch data, that

6    gets into the calculation.  So I could make an objection, just

7    say "objection, sidebar."  Although I'm not sure that's the

8    best approach either.

9         THE COURT:  Well, at least I know.  I almost think

10   it's outside the scope of this witness' testimony.

11        MS. KENNEDY:  Okay.

12        MR. THERIAULT:  My question is going to be pretty

13   pointed.

14        THE COURT:  I agree.

15        MR. THERIAULT:  Found there are pay rates listed in

16   there, please tell me the average pay rate for -- I mean, did

17   you find the pay rates were between X and Y.

18        THE COURT:  Okay.  So what I would say, Ms. Kennedy,

19   if you'd just say outside the scope of what this

20   expert -- outside the scope of this expert's testimony.  That

21   keys me in to we're talking about the motion in limine.

22        MR. THERIAULT:  Right.  But in terms of the questions

23   as I pose them, that seems fine.

24        MS. KENNEDY:  That seems fine.

25        THE COURT:  Seems fine to the Court tentatively, yes,

1    but I have to determine.  You never know as a witness may go

2    one way and it gets exciting.

3              MR. THERIAULT:  Sometimes the Judge does --

4              THE COURT:  By the way, it was exciting this morning.

5    That was good.  A good witness to call.  Should have broken

6    that up a little bit.  So, okay.

7              All right.  Oh, Mr. Theriault.  Ms. Kennedy.  So keep

8    in mind that I suspect that the plaintiff will be resting but

9    we are still addressing the issue of 98 and 99.

10             MS. KENNEDY:  And 100-A through D?

11             MR. THERIAULT:  Yeah, 100-A through D is basically

12   printouts.  The Court had a concern that you weren't able to

13   match it up.  100-A through D is printouts that would allow us

14   to say, okay, is this our 98, is this our 99.  There it is.

15             THE COURT:  We haven't had an opportunity to discuss

16   that or to look at that.  Mr. Theriault pointed that out

17   yesterday, but the Court hasn't had -- until I saw the brief.

18   And now have to deal with the first issue of the -- or I'll

19   paraphrase it as discovery, pretrial order violation coupled

20   with the summary and he's referring to the summary now.

21             MR. THERIAULT:  The first issue takes care of the

22   second to some extent.

23             THE COURT:  Right.  I understand.  I just want to

24   make sure that we're not -- that's clear that that still is

25   under the -- that's not without prejudice to raise that --

121

 1              MS. KENNEDY:  I agree with that.

 2              THE COURT:  -- and to recall --

 3              MS. KENNEDY:  Mr. O'Brien.

 4              (Off the record.)

 5              MR. THERIAULT:  As to Mr. O'Brien, you know, one of

 6    the things I could do is if the defendant would stipulate that

 7    Mr. O'Brien -- stipulate that basically this document was

 8    created by looking at the raw punch data, I don't even need to

 9    call him back.  That's where I'm hoping to reserve is the

10    foundation for the --

11              THE COURT:  Understand.

12              MS. KENNEDY:  Understand.

13              THE COURT:  Okay.  Thank you.

14              (The following proceedings were held in open court:)

15                        **JONATHAN WALKER**,

16    called as a witness on behalf of the Plaintiffs, having been

17    previously sworn, testified as follows:

18              MR. THERIAULT:  One moment, please.  If Your Honor

19    will just give me one moment.

20              THE COURT:  I will.

21              MR. THERIAULT:  Thank you.  Now, I know we have a set

22    spot where this goes.  I think is this acceptable?

23              THE COURT:  Can you see it, doctor?

24              THE WITNESS:  Yes.

25

1        CONTINUED DIRECT EXAMINATION

2   BY MR. THERIAULT:

3   Q.   All right.  Just so we're up to speed.  So the last time

4   you were here, we discussed the late meal period class;

5   correct?

6   A.   Yes, we did.

7   Q.   And we looked at various findings that you made concerning

8   your analysis of the raw punch data, Exhibit 36, with respect

9   to the number of shifts that did not have a 30-minute meal

10  period commencing before the fifth hour; do you recall that?

11  A.   Well, yes, the number of shifts that did not have a

12  recorded meal period based on my assumptions which derived

13  shifts, yes.

14  Q.   So we're going to move on to the next topic.  Rest breaks.

15        Okay.  Now, according to certain assumptions, did you

16  examine the raw punch data in order to determine the number of

17  shifts that were between six and seven hours?

18  A.   Yes.  The number of shifts in the raw punch data subject

19  to the assumptions we talked about before.

20  Q.   And did you find that there were 1,157,900 -- ah, let me

21  start again.

22        Did you find that there was 1,157,892 shifts between

23  six and seven hours?

24  A.   I don't remember the number.

25  Q.   Would your report refresh your recollection?

1   A.  Yes, it would.

2   Q.  Would you please look at your report, if you recall the

3   exhibit number, I believe it's 20 -- I do this every time.  I

4   think it's 2050 --

5        MS. KENNEDY:  2051.

6        MR. THERIAULT:  2051.

7   Q.  I might be able to short cut it a bit if you look at

8   paragraph 68.

9   A.  Would you like me to say the number or would you --

10  Q.  It was actually a yes or no question.  But I could

11  withdraw it.

12       How many shifts did you find -- from a time period of

13  9-7-2003 to December 24th, 2014, how many shifts between six

14  and seven hours did you find?

15  A.  1,157,892.

16  Q.  And did you analyze the data to determine how many

17  individuals within the overall punch data -- let's back up.

18  So the punch data includes -- do you understand --

19       THE COURT:  Sorry.  I gave him the piece of paper so

20  we're refreshing properly.

21  BY MR. THERIAULT:

22  Q.  So the punch data includes on all -- is your understanding

23  the punch data includes all non-exempt that worked at Taco

24  Bell, at the restaurant level in California?

25  A.  At the time that I did this, I thought that.

124

1   Q.   Okay.

2   A.   But I don't think that now.

3   Q.   Okay.  Well, anyway, as of the date of your report, did

4   you determine the number of employees within that punch data

5   that met the criteria in so much as their punch data reflected

6   that they worked between six and seven hours?

7   A.   I'm sure that I calculated the number.  I don't recall

8   whether that number is in my report or not and I don't recall

9   the number offhand.

10  Q.   Okay.  Would your report refresh your recollection?

11  A.   Yes, it would.

12  Q.   I think -- I might suggest to look at paragraph 68.  And

13  the question is:  How many employees did you find that worked

14  between six and seven hours?  Based on the punch data.

15  A.   31,423 employees.

16  Q.   And now you performed -- I know you performed many

17  analyses, but I want to focus on your analysis as it relates

18  to the identification of the number of shifts in which there

19  wasn't either two rest breaks of 10 minutes or a consecutive

20  20-minute period of rest time.  You understand what I'm

21  referring to?

22  A.   I do.

23  Q.   Okay.  And can you give us an explanation of the two

24  different analysis that you performed with respect to

25  calculating the number of shifts that didn't have either two

1    10-minute rest breaks or 20 consecutive minutes of rest break

2    time?

3    A.   I'm not sure I understand the question.

4    Q.   Well, okay.  Then I can ask it more directly.  Did you

5    calculate the number of shifts within the punch data that had

6    two recorded 10-minute rest breaks?

7    A.   Two recorded rest breaks of 10 minutes or more, yes.

8    Q.   Yes.  Okay.  Now, based on your report, did you find that

9    65.7 percent shifts -- 65.7 percent of shifts longer than six

10   hours but less than seven hours featured 20 minutes or more of

11   recorded paid break time?

12   A.   I don't recall the exact number, but the percentage is

13   something like that.

14   Q.   All right.  So then would your -- let's make sure that

15   we're on the same page quite literally.  Would your report

16   refresh your recollection in that regard?

17   A.   About the exact number, yes.

18   Q.   Yes.  Has your recollection been refreshed?

19   A.   It has not.  I was waiting for you to instruct me to look.

20         THE COURT:  How about now?

21         THE WITNESS:  Okay.  Thank you.

22         THE COURT:  All right.  Refresh it silently to

23   yourself, and then if you have been refreshed, if you would

24   put the paper back and provide the answer.

25         THE WITNESS:  Yes.  65.7 percent of the shifts that I

1    identified with those assumptions included 20 minutes or more

2    of net rest.

3    BY MR. THERIAULT:

4    Q.  All right.  And so then conversely, if we wanted to figure

5    out the number of shifts between six and seven hours that did

6    not have 20 minutes of rest period time, would we deduct

7    760,457 from 1,157,892?

8    A.  No.  I think you meant 65.7 percent.  Oh, you said

9    657,000?

10   Q.  No, I said if we wanted to figure out the number of

11   shifts --

12   A.  Yes.

13   Q.  -- that did not have a second recorded rest break, would

14   we perform the calculations that I just mentioned?  In other

15   words, subtracting the shifts that you did find that had the

16   second recorded rest break, 760,000 approximately, from the

17   1.157 million?

18   A.  Well, no.  One is -- I'm assuming that that number you

19   just stated is accurate, the 700 and some thousand, we haven't

20   gone over that yet.  And secondly, you can't tell how many

21   shifts included or failed to include 20 minutes of rest based

22   on the raw punch data because not all of the paid rest periods

23   are reflected in the raw punch data.

24        So you can calculate the number of shifts that do not

25   have a recorded break in the raw punch data by going through a

1   subtraction, the subtraction that you described.  But you

2   can't calculate the number of shifts that actually lacked 20

3   minutes of net rest by doing that.

4   Q.  Well, let's calculate what we do know.  You did find

5   760,000 shifts, give or take 500, that did not have -- that

6   did have a second recorded rest break; right?

7   A.  I don't know the number.

8   Q.  Paragraph 69.

9          THE COURT:  Remember to lay the foundation, counsel.

10  BY MR. THERIAULT:

11  Q.  Would your report refresh your recollection on that issue?

12  A.  Yes, it would.

13  Q.  If so, please direct your attention to your report,

14  paragraph 69.

15         THE COURT:  Thank you.

16         THE WITNESS:  Could you repeat your question?

17         MR. THERIAULT:  May I have the question read back,

18  please.

19         (Record read as requested.)

20         THE WITNESS:  No.

21  BY MR. THERIAULT:

22  Q.  What does the 760,457 number in your report signify?

23  A.  That's the number of shifts, subject to all those

24  assumptions, that had 20 minutes or more of net rest.

25  Q.  Okay.  Subject to those same assumptions, how many shifts

1  did not have 20 minutes net of paid rest break?

2  A.   That's the question you asked before.  You can't tell the

3  number of shifts that did not have 20 minutes or more net rest

4  time based upon the raw punch data.  So I don't know.

5          You can calculate the number that don't have recorded

6  20 minutes of net rest, but I don't know how many actually

7  lacked 20 minutes of net rest particularly since I know that

8  rest is added via the auto-pay system and otherwise.  So I

9  can't tell from the raw punch data.

10 Q.   Okay.  But I want you to limit your analysis to the raw

11 punch data.  That was the analysis that you performed;

12 correct?

13 A.   I did.

14 Q.   Okay.  So that's what I want you to focus on.  What

15 actually happened at the restaurants, I think we're getting

16 that through other ends.  But I want you to focus on what you

17 did in your report.  So let me ask the question one more time.

18         How many shifts did you find that did not have 20

19 minutes of paid rest break time in the punch data that you

20 analyzed?

21 A.   It's the phraseology.  My analysis does not go to the

22 number of paid rest breaks.  It goes to the number of recorded

23 rest breaks.  And I could answer the question.  But I can't

24 answer how many rest breaks there actually were, how much rest

25 time there actually was, how much rest time there actually was

1    not, you can't tell that from the raw punch data.

2    Q.   Okay.  How many shifts between six and seven hours, in the

3    raw punch data, that do not have 20 minutes of recorded rest

4    break time?

5    A.   Can I look at the --

6            THE COURT:  Do you not know the answer?

7            THE WITNESS:  I do not know the answer, I'm sorry.

8            THE COURT:  Would the report refresh your

9    recollection?

10           THE WITNESS:  Yes, it would.

11           THE COURT:  You may do so.

12           THE WITNESS:  Thank you, sir.  1,157,892 minus

13   760,457.

14   BY MR. THERIAULT:

15   Q.   And do you know what that equals?

16   A.   I don't off the top of my head, no.

17           MR. THERIAULT:  Your Honor, may --

18           THE COURT:  Would the Court's calculator refresh your

19   recollection?

20           THE WITNESS:  Yes, it would.  Thank you.

21           397,435.

22   BY MR. THERIAULT:

23   Q.   Would you repeat that for me one more time?

24   A.   397,435.

25   Q.   And what does that number represent?

1    A.   That's the number of shifts, subject to all those

2    assumptions, that I found in the raw punch data that were six

3    to seven hours long and did not include at least 20 minutes of

4    recorded net rest time.  Paid net rest time.

5    Q.   Thank you.

6    A.   Sure.

7    Q.   And -- I don't want to interrupt you.  I'm sorry.  And as

8    a percentage, what would the percentage of shifts -- under the

9    same criteria that you just described, what would that

10   percentage be in terms of the number of shifts

11   between -- eligible shifts between six and seven hours based

12   on the raw punch data?

13   A.   I don't know off the top of my head.

14   Q.   Would you be able to calculate that using the calculator?

15   A.   Yes, I would.

16   Q.   Please do.

17   A.   34 percent.

18   Q.   I want to move to a different topic now.  Did you -- in

19   the raw punch data, were there an indication of the pay rate

20   for the individuals listed within that data?

21   A.   There were dollar figures that I understood to be pay

22   rates, yes.

23   Q.   And what's the basis of your understanding?

24   A.   Sheppard Mullin told me that.

25   Q.   And defense counsel?

1   A.  Yes.

2   Q.  Now, there appeared to be -- let me ask you a different

3   question.

4          Is it your understanding that some of the pay rates

5   listed in there represented hourly rates?

6   A.  Yes.

7   Q.  All right.  And is it your understanding that some of the

8   rates listed there seemed to be too high to be hourly rates?

9   A.  Yes.

10  Q.  Okay.  Could you explain -- could you explain the basis of

11  your understanding and sort of what you understood about the

12  hourly rate versus a weekly rate?  In other words, what did

13  you find within the data when you looked at it?

14  A.  That there were entries that were too low to be hourly

15  rates and there were entries that were too high to be

16  plausible hourly rates for employees working at Taco Bell

17  restaurants in these jobs.

18  Q.  All right.  And with respect to the hourly rates that were

19  too high to be consistent with what an hourly rate of a Taco

20  Bell employee would be, did you perform an analysis to

21  calculate what that hourly rate would be under the assumption

22  that it was, in fact, a weekly hourly rate?

23  A.  Yes, I did.

24  Q.  Okay.  And could you describe what you did?

25  A.  I divided by 40.

1    Q.  All right.  Now, I note Figure 13 of your report, does

2    that contain findings as to hourly rates that were listed in

3    Exhibit 36, the raw punch data?

4    A.  I think that it does, subject to that assumption that

5    those big numbers were really weekly.  But I think it's Figure

6    13 that has that.  It might be Figure 15 or 12.  I don't

7    remember figure numbers.

8    Q.  All right.  Did you perform an analysis to

9    determine -- first of all, let's -- let me back up.  Were

10   there job codes listed in the raw punch data?

11   A.  Yes.

12   Q.  And what's your understanding of what a job code is?

13   A.  It's a description of -- it's an numerical entry that's

14   used to identify a specific job.

15   Q.  Okay.  And were you provided with information that would

16   allow you to determine -- match up a job code with a

17   particular position within the restaurant?

18   A.  Yes.

19   Q.  Okay.  What positions were identified?

20   A.  I don't recall offhand --

21   Q.  Would you --

22   A.  -- all the positions.

23   Q.  Would your report refresh your recollection?

24   A.  Yes, it would.

25   Q.  Please look.

1    A.   Could you repeat your question?

2    Q.   Were you provided with information about -- associating a

3    job code with a description of the work performed by an

4    employee?  In other words, the job category of the employee?

5    A.   I was given a way to match up code and job titles.

6    Q.   Thank you.  Now, what job titles were you provided with?

7    A.   May I?

8    Q.   Please.  If it refreshes your recollection, yes.

9    A.   It does.

10   Q.   Okay.

11   A.   I'm not going to be able to memorize this list and then

12   put the paper back and recite the list.

13            MR. THERIAULT:  Your Honor, may we dispense --

14            THE COURT:  Can you lead?

15   BY MR. THERIAULT:

16   Q.   What page are you looking at, Dr. Walker?

17   A.   I'm looking at Figure 12.

18   Q.   Thank you.

19            THE COURT:  Do you have any objection, Ms. Kennedy?

20   Ms. Kennedy, do you have any objection if he leads?

21            MS. KENNEDY:  No, not on this list.

22            THE COURT:  Then go ahead, Mr. Theriault.  There's no

23   objection.

24   BY MR. THERIAULT:

25   Q.   Okay.  So is it true, within the Figure 12, you were

134

1    provided with -- Figure 12 lists certain job descriptions;
2    correct?
3    A.  It has titles, categories and codes, yes.
4    Q.  Sure.  And among them, we have senior assistant manager;
5    correct?
6    A.  Yes.
7    Q.  Assistant manager.
8    A.  Yes.
9    Q.  What is "CA assistant restaurant general manager," what's
10   the "CA" signify?
11   A.  I don't know what the CA signifies.
12   Q.  This is a California assistant manager; correct?
13   A.  Yes.
14   Q.  Crew member.
15   A.  Yes.
16   Q.  Service champion.
17   A.  Yes.
18   Q.  Food champion?
19   A.  Yes.
20   Q.  Food and service champion?
21   A.  Yes.
22   Q.  Team member trainer.
23   A.  Yes.
24   Q.  Moving down towards the bottom now, a California RGM.
25   A.  Yes.

1   Q.   A shift leader.

2   A.   Yes.

3   Q.   Lead trainee.

4   A.   Yes.

5   Q.   And assistant manager trainee.

6   A.   Yes.

7   Q.   That's not exclusive.  There's other job categories listed

8   on there; correct?

9   A.   Yes.

10  Q.   All right.  Now, did you perform an analysis of the punch

11  data to determine which one of the titles listed on Figure 12

12  represented the most populous group within the punch data?

13  A.   I think that I did.  I certainly -- I don't recall whether

14  it was by category or whether it was by job title.  I did one

15  or the other.  I don't recall which.

16  Q.   Would your report refresh your recollection on that issue?

17  A.   Yes, it would.

18  Q.   Would you please look at it and then --

19  A.   I don't recall exactly where that is.  If you -- you can

20  save some time if you know where it is, you can tell me.

21  Q.   I'll look at the same time.

22        I'm going to withdraw the question and ask another

23  one.

24  A.   Sure.

25  Q.   Move this along.  I'm referring again to Figure 13.  And

136

1   with permission of the Court and counsel to lead the witness

2   on some of the findings related to Figure 13.

3          THE COURT:  Any objection?

4          MS. KENNEDY:  No objection.

5          THE COURT:  All right.  That's noted.  Proceed, Mr.

6   Theriault.

7          MR. THERIAULT:  All right.

8   Q.  And by reference as well to Figure 12, which is the actual

9   job codes.

10         Okay.  Now, there were -- we've already established,

11  I believe, let me verify.  There were some pay rates or what

12  we believe to be pay rates within the raw punch data

13  associated with employees; correct?

14  A.  Yes.

15  Q.  All right.  And what you did was you, from 2003 to 2014,

16  listed out on each year various job codes and matched them up

17  with the pay rates that were found within the data; correct?

18  A.  After having adjusted some to reflect what appeared to be

19  weekly rates, yes.

20  Q.  Yeah.  Right.  Yes.  Okay.  So in -- I want to focus on

21  this year by year.  So with respect to year 2003, did you

22  determine that job code 90100 -- did you find that job code

23  90100 had an average pay rate within that year of $7.36?

24  A.  I think you're at figure -- at a different figure.  And I

25  don't know the number offhand anyway.

1  Q.  Would -- okay.  Why don't you take a look at that Figure

2  13.  Refresh your recollection.

3  A.  Yes.

4  Q.  And I'm going to do this with several of the numbers on

5  here.  So let me see if I can ask you leading questions.  Did

6  you find that job code 90100 in 2003 had an hourly rate listed

7  of 7.36?  That was the average hourly rate for employees

8  meeting that definition.

9  A.  After the adjustment that I talked about, yes.

10  Q.  Yes.  Okay.  And I'm going to assume that there may have

11  been adjustments for all these job codes, but you're welcome

12  to qualify it with that if you want.

13         All right.  And job code 90500 had an hourly rate of

14  $12.56 for 2003 after the adjustments?

15  A.  Yes.  That was the average figure that was in the data.

16  Q.  All right.  And, for instance, job code 99040 had an

17  average hourly rate in 2003 after the adjustments of $10.16?

18  A.  Yes, that's correct.

19  Q.  In 2003, what was the lowest hourly rate that you found

20  within any of the job codes?

21  A.  I don't know the number.

22  Q.  Would you please look at Figure 13 to refresh your

23  recollection.

24  A.  No.

25  Q.  Okay.  On Figure 13, is the lowest hourly rate that you

1   put on that list $7.14?

2   A.   Yes.

3   Q.   And on that list, what is the highest hourly rate?

4   A.   $12.56.

5   Q.   In 2004, what is the lowest hourly rate that you

6   determined from the punch data as displayed in Figure 13?

7   A.   Well, Figure 13 does not display the lowest hourly rate

8   that I saw in the punch data.

9   Q.   Within Figure 13, what is the lowest hourly rate that you

10  listed on there in 2004?

11  A.   $7.42.

12  Q.   And what is the highest on Figure 13?

13  A.   $12.93.

14  Q.   Okay.   In 2005, what is the lowest that you listed on

15  Figure 13?

16  A.   $7.40.

17  Q.   And what is the highest?

18  A.   $12.55.

19  Q.   In 2006, what is the lowest figure that you listed under

20  calendar year 2006?

21  A.   $7.61 -- oh, sorry, $7.15.

22  Q.   And what is the highest that you listed on Figure 13?

23  A.   $12.50.

24  Q.   How about in 2007?  What's the lowest that you

25  found -- what's the lowest that you displayed on Figure 13 for

1    2007?

2    A.  $7.47.

3    Q.  And what is the highest?

4    A.  $12.50.

5    Q.  2008, what is the lowest hourly rate that you listed on

6    Figure 13?

7    A.  $7.45.

8    Q.  And what is the highest?  Same year.

9    A.  $12.72.

10   Q.  And 2009?  Lowest, please.

11   A.  $8.23.

12   Q.  And what is the highest?

13   A.  $13.08.

14   Q.  And in 2010, is the lowest $8.27 that you listed on Figure

15   13?

16   A.  Yes, it is.

17   Q.  All right.  What's the highest?

18   A.  $12.86.

19   Q.  And almost done.  2011.  What's the lowest that you found,

20   is it $8.05?

21   A.  Yes, it is.

22   Q.  And what's the highest?

23   A.  $13.22.

24   Q.  All right.  2012.  What's the lowest that you found?  Is

25   it $7.21?

1   A.   Once again, the lowest rate that you found is not on this

2   exhibit.   The lowest rate that I found would be something

3   significantly less.   These are all averages.

4   Q.   Right.   You found some -- you found some hourly rates that

5   appeared to be less than the minimum wage for California

6   during that year; correct?

7   A.   I don't know whether I found wages that were less than

8   minimum wage for that year.   I know that I found wages that

9   were less than anything supported on this exhibit for any year

10  because these are averages.

11  Q.   But you did list some numbers on Figure 13; correct?

12  A.   Yes.   There are figures on Figure 13.

13  Q.   Great.   What is the lowest on Figure 13 for 2012?   Is it

14  $7.21?

15  A.   Yes, it is.

16  Q.   All right.   And what's the highest?

17  A.   $12.64.

18  Q.   All right.   Two more years and we'll be done.   In 2013,

19  what's the lowest that you found and listed on Figure 13?   Is

20  it $7.02?

21  A.   Yes.   The lowest figure listed on Figure 13 for 2013 is

22  $7.02.

23  Q.   And what's the highest figure listed Figure 13 for 2013?

24  A.   $15.38.

25  Q.   And 2014, what's the lowest figure that you found and

1  listed on Figure 13?  Is it $7.45?

2  A.  Yes, that's correct.

3  Q.  What's the highest?

4  A.  $13.32.

5  Q.  Now, to wrap this up.  So these were average pay by job

6  code in year, as reflected within the punch data, that you

7  chose to list on Figure 13?

8  A.  Subject to the correction for those high numbers and the

9  assumption divided by 40, yes.

10          MR. THERIAULT:  Okay.  Thank you.  Your Honor, may I

11  have one moment?

12          THE COURT:  You may.

13          MR. THERIAULT:  Thank you.

14          All right.  Your Honor, I have no further questions.

15          THE COURT:  Cross-examination.

16          MS. KENNEDY:  Yes, Your Honor.  If we can take two

17  seconds to set up a couple of easels.

18          THE COURT:  Sure.  I'll give you a little longer than

19  two seconds.

20          MS. KENNEDY:  Okay.

21                    CROSS-EXAMINATION

22  BY MS. KENNEDY:

23  Q.  Dr. Walker, are you able to see both these easels?

24  A.  I can see the top of the one that you're standing at.

25  Q.  Okay.  That's what I figured.  If I move it back a little

1    bit, can you see it?

2    A.  If you move it to your left.

3            THE COURT:  If you go this way.

4            MS. KENNEDY:  This way?

5            THE WITNESS:  That's better.

6    BY MS. KENNEDY:

7    Q.  How is that?

8    A.  That's most of that one.  That's probably as good as

9    you're going to get.

10   Q.  Okay.  Fair enough.  All right.  Good morning, Dr. Walker.

11   A.  Good morning, Ms. Kennedy.

12   Q.  Let's start back at the beginning.  I know that Mr.

13   Theriault went through some of your background.  I want to

14   sort of back up from the start and go through some of the

15   issues in this matter.  As I understand, you got your Ph.D. in

16   economics from MIT; is that correct?

17   A.  Yes, it is.

18   Q.  Was there any specialty?

19   A.  Yes.  There were two.  Labor economics, which is the study

20   of labor markets, study of employment, study of wages.  And

21   industrial organization, which is the study of how businesses

22   are organized, both internally and also in competition with

23   each other.

24   Q.  And when you say "in competition with each other," is that

25   something related like antitrust?

143

1   A.   Yes, it includes antitrust.   Antitrust is a subspecialty

2   within industrial organization.

3   Q.   And in what year did you get your Ph.D.?

4   A.   1991.

5   Q.   And I believe you testified a little bit about your

6   professional background.   So since 1991, what was your first

7   job after you got your Ph.D.?

8   A.   I actually completed the Ph.D. while I was already

9   employed at Economists Incorporated.

10  Q.   What years did you work for the Federal Reserve Bank?

11  A.   Oh, I think 1988 to 19 -- I'm not sure.   I'd have to look.

12  It's in the late '80s I worked for the Federal Reserve Bank.

13  Q.   What did you do for the Federal Reserve Bank for those

14  couple of years?

15  A.   I was a visiting research fellow.   So at that time I was

16  completing work on my dissertation which was relevant to the

17  Federal Reserve system because the Federal Reserve system

18  regulates banks and my dissertation concerned bank regulation.

19  I also participated in the antitrust regulation of banks

20  because the Federal Reserve does that.   So those were my

21  primary duties while I was at the Federal Reserve.

22  Q.   And I think you testified that you also worked for Monitor

23  Company for a couple of years.

24  A.   Yes.

25  Q.   What did you do for Monitor Company?

1   A.   Monitor Company is a strategy consulting firm.  So I was a

2   strategy consultant, which meant that I went out and worked

3   for clients that were interested in ways to increase their

4   profitability.  Most of my time at Monitor was spent working

5   on projects for Caterpillar and for Sears and for AT&T.

6   Q.   And then I think you testified that you started at

7   Economists Incorporated in 1990?

8   A.   Yes, I did.

9   Q.   And you started as what position?

10   A.   Senior economist.

11   Q.   And as a senior economist, what did you do at Economists

12   Incorporated?

13   A.   I worked in a variety of projects.  I really didn't know

14   the industry at the time, so I supported other people.  I

15   worked on merger work.  A large part of what Economists

16   Incorporated does is it analyzes the antitrust consequences

17   when companies merge.

18        So I did lots of analyses to see whether it was

19   likely to harm competition for firms to merge.  I helped them

20   to understand how the antitrust enforcement agencies were

21   going to look at their proposed transactions.

22        I also worked on litigation matters.  So I don't

23   remember exactly when I started, but the first really big

24   litigation matter I worked on was a case called *McNeil versus*

25   *NFL*, and it was an antitrust suit involving the National

1    Football League and its player reservation rules.  I worked on

2    other litigation matters early on.

3            I did some employment related work then for the

4    Department of Justice Civil Rights Division.  Early on I did

5    some employment work for the National Lawyers Committee For

6    Civil Rights.  Those are some of the things that I did in

7    those first few years while I was a senior economist.

8    Q.  And while you were a senior economist, were you working on

9    a team with other economists on these projects?

10   A.  Generally speaking there would be a team.  Generally

11   speaking we have two economists, at least, working together so

12   they could check each other's work.  There may have been some

13   of the cases I worked on for DOJ where I was the only

14   economist.  Those were my cases I brought in.  And I had --

15   you know, still had teams.  I had research associates working

16   with me.

17   Q.  You mentioned that you also worked for the -- on a project

18   with the Lawyers Committee For Civil Rights.

19   A.  Yes.

20   Q.  What exactly did that involve?

21   A.  That was a lawsuit against Harris County, Texas concerning

22   discriminatory hiring practices by the Sheriff's Department.

23   The National Lawyers Committee For Civil Rights had

24   investigated the county and was suing them for underemployment

25   of minorities.  And the county had come forward with a cost

1   defense.  And my work, on behalf of the Lawyers Committee, was

2   to analyze that cost defense and to determine whether or not

3   they actually were saving money by the practices that were

4   leading to these adverse selections.

5   Q.  You also said, I think in response to Mr. Theriault's

6   questions, that you worked for the US Department of Labor

7   regarding pension funds; is that correct?

8   A.  Yes.

9   Q.  And what did you do in that regard?

10  A.  The Department of Labor oversees how trustees manage

11  pension fund assets.  And so the people that manage pension

12  fund money are supposed to manage it in a way that is in the

13  best interest of the beneficiaries.  And they were

14  invest -- on multiple occasions they've asked me to help them

15  to investigate whether or not the trustees' behavior, their

16  actual investments of pension fund money, benefits the

17  trustee -- the beneficiaries or not.

18       And so there were several cases where I did that,

19  where I helped them to understand whether or not the

20  investment practices that the pension funds were implementing

21  were in the best interest of the beneficiaries.

22  Q.  And how long were you a senior economist at Economists

23  Incorporated?

24  A.  I'd have to look at my CV to know the exact number.  I

25  think five or six years, I don't remember exactly when I was

1    promoted.

2    Q.   And what was your next position?

3    A.   Vice president.

4    Q.   And as vice president, did your job duties change?

5    A.   No.  It's sort of trailing.  The job duties change and

6    then the title changes.  So the promotion to vice president

7    indicated that I was spending a much more significant portion

8    of my time on cases where I was the actual leader of the

9    project.  And the same is true for the promotion to senior

10   vice president.

11   Q.   Basically kind of doing the same work, took on more

12   responsibility for the team and more management

13   responsibility?

14   A.   Over individual projects, yes.

15   Q.   And --

16   A.   It was -- those promotions did not involve management of

17   Economists Incorporated as a firm, but they did reflect more

18   authority over individual projects, designing the projects,

19   determining exactly what work was going to be done, allocating

20   tasks to different people within the project.

21   Q.   And then I think additionally you were promoted to

22   president?

23   A.   Eventually, yes.

24   Q.   And that was sometime in 2003?

25   A.   Yes.

1   Q.   And is that when you were -- you moved from the east coast

2   to the west coast?

3   A.   I actually moved to the west coast a little bit earlier

4   than that.   So in 2001, the people that were managing the firm

5   asked me to move out to California to open an office in

6   California.   And so I looked around the state, ultimately

7   decided upon the San Francisco Bay area and opened an office

8   there.   And that was when I became involved in management of

9   the firm as a whole.   And that's also when I moved to

10  California.

11  Q.   So you've been managing the firm for about 12, 13 years,

12  approximately?

13  A.   Yes.

14  Q.   Now, how big is Economists Incorporated currently?

15  Approximately how many people in your office in San Francisco?

16  A.   The San Francisco office is small.   So there are 10, 12

17  employees there.

18  Q.   And, okay.   So now let's sort of move to your assignment

19  here.   As part -- what was your primary assignment that we

20  provided to you to do in this particular case?

21  A.   There were four main topics.   One was to ascertain whether

22  the raw punch data were a reliable basis upon which to

23  determine the number of instances in which employees working

24  at corporate-owned Taco Bell stores in California from 2003 to

25  2014 were non-exempt, worked on shifts longer than six hours,

1    had meal periods that commenced -- either missed meal periods

2    or had meal periods that commenced after the completion of the

3    fifth hour of work.

4            Similarly, whether the raw punch data were a reliable

5    basis to ascertain the number of instances in which non-exempt

6    employees working at corporate-owned Taco Bell stores in

7    California from a specific date in 2003, I think roughly July,

8    to December 2014, who worked shifts from six to seven

9    hours -- I'm sorry.  Both of these are not how many there

10   were, but how many of them were not offered.

11           In the case of the rest breaks, rest breaks that

12   totaled a net of 20 minutes or paid rest breaks, two paid rest

13   breaks of 10 minutes or longer.

14           And as I said, I have to go back, but the first one

15   regarding meal breaks was not how many of them actually took

16   meal breaks, but whether the raw punch data were a reliable

17   basis to determine how many of them were offered meal breaks

18   that commenced prior to the completion of the fifth hour of

19   work.

20           There were other parts of the assignment, I don't

21   know if your question is for me to go through all of them.

22   Q.  No, we'll get into those in a little bit, Dr. Walker.

23   Thank you.

24   A.  Sure.

25   Q.  As part of your job as, I guess, the president and CEO of

1    Economists Incorporated and working with that organization, do

2    you actually -- do you and your team perform work on

3    employment related matters?

4    A.   Yes.

5    Q.   What type of employment related matters have you worked

6    on?

7    A.   I've worked on -- I've worked on antitrust cases that

8    involve allegations of fixing wages.  I've worked on

9    discrimination cases where my work primarily focuses on

10   statistical analysis of employment patterns.  I've worked on

11   discrimination cases where the issue is differences in pay

12   rates based on gender or based on ethnicity or based on age.

13   I've worked on wage and hour matters, such as we have here.

14   And the firm has worked on all -- in addition to me, other

15   people and I have worked on all those cases as well.

16   Q.   And in those employment related matters, you worked on

17   matters for the employer defendant and also the employees?

18   A.   Yes.  I've worked on both plaintiff and defendants' side

19   of employment related cases.

20   Q.   And the organizations that you represent, I don't need

21   names, that's fine.  Do you remember companies and private

22   industry as well as public entities and government entities?

23   A.   Yes.  I and Economists Incorporated have worked for

24   individuals, we've worked for nonprofit organizations, worked

25   for government agencies.  We worked for corporations.  And

1    that's both in the employment sphere and other spheres.

2    Q.   All right.  So let's sort of move forward.  Once you

3    received the assignment, what did you do in developing a team?

4    In other words, did you do all the work yourself or how did

5    you manage or organize this project?

6    A.   No.  I did not do all the work myself.  I had a team.  The

7    primary people working with me were Dr. Erica Gruelich and

8    also Ann Koyfman.  And in addition to them, later Dr. James

9    Bono participated to a certain extent.  And there were also

10   several research associates who helped us as well.

11   Q.   Dr. Erica Greulich, what is her background?

12   A.   Dr. Gruelich has a bachelors degree in math from Princeton

13   and she has a Ph.D. in economics from University of California

14   Berkeley.

15   Q.   And what about Dr. James Bono, what is his background?

16   A.   He is a former assistant professor of economics at

17   American University.  He has a Ph.D. in economics from -- I

18   always forget whether it's Riverside, Irvine or San Diego.

19   UC.  And he has a specialization in quantitative methods.

20   Q.   I'm sorry?

21   A.   Quantitative methods.

22   Q.   Can you tell me what that is?

23   A.   That would be various applications that are mathematically

24   related.  It's slightly different from econometrics, gain

25   theory and sort of different sorts of advanced statistics and

1    advanced math as applied by economics.

2    Q.   And were Dr. Gruelich and Dr. Bono sort of the team

3    leaders and you're overseeing them, is that how it worked?

4    A.   Yes, that's right.

5    Q.   And what was -- I want to say the role as team leaders or

6    what were they really responsible for in this project?

7    A.   There was a lot of work that was done.  There was a lot of

8    data analysis.  I did not personally write most of the code

9    that was involved in tabulating the data.  They did that.

10   They also supervised research associates.

11        So there were lots of tables that we created that

12   research associates would be involved in.  And they would

13   supervise them.  They also interface quite a bit with you all,

14   so there were some projects that were between them and you

15   that were not involving me.  So they have lots of different

16   roles.

17   Q.   And you mentioned there's another professional, Ann

18   Koyfman?

19   A.   Koyfman, yes.

20   Q.   And what was her role?

21   A.   She worked a lot on writing Stata programs that were used

22   to tabulate the data in different ways.  Specifically the raw

23   punch data.  I think she was also involved in the work that we

24   did with the PVRs for the named plaintiffs.  So whenever we do

25   quantitative work that involves any sort of Stata code

1    or -- Stata is a mathematical and statistical application.

2           So whenever we do work that involves tabulating data

3    by using applications like Stata, we will have somebody check

4    the code in order to check the work to look for errors.  All

5    the work has to be reviewed.  Somebody's got to check the work

6    in order to make sure it's accurate.  And so Ms. Koyfman would

7    check code that Dr. Gruelich wrote and Dr. Gruelich would

8    check code that Ms. Koyfman wrote.

9           Similarly, whenever we have data that's entered by

10   hand, that's done simultaneous, that's done independently by

11   two separate generally research associates so that we can see

12   whether they come to -- they've entered different sets of

13   data.  You can reconcile it too.  You compare the two, find

14   discrepancies and thereby identify errors and eliminate them.

15   Q.   And what is Ms. Koyfman's background, if you know?

16   A.   Yes, she has a bachelors in economics from Columbia and

17   she's been working in the consulting sphere for about five to

18   ten years, I don't remember the exact number.

19   Q.   You also mentioned research associates.  What are their

20   responsibilities on the project?

21   A.   They would be involved in -- if we did Excel work, most of

22   the Excel work would be done by them.  If there was any data

23   entry, the data entry would be done by them.  The idea is to

24   push down to them tasks that, you know, we think you don't

25   necessarily need to be a Ph.D. in economics to do, to do

1    accurately.  So they would be whatever tasks we think are

2    within their capabilities.

3    Q.  And these research associates, what is their general

4    background in education or work experience?

5    A.  They tend to be recent graduates from top universities who

6    have course work in economics, math, statistics and computer

7    science.  They tend to have GPAs that are 3.7 or better.  They

8    tend to work with us for a couple of years and then go on

9    either to get graduate degrees or law degrees.

10           Some of them who ultimately want to get MBAs work for

11   a year or two, because -- more, because increasingly the top

12   MBA programs require more than two years of work.  And we have

13   designed the program such that they should leave us after two

14   years because we think that they're going to stop growing

15   after that.

16   Q.  All right.  Well, let's talk about some of the documents

17   and data that you reviewed and/or received as part of your

18   project.

19           THE COURT:  Ms. Kennedy, this might be a good time to

20   take a break.

21           MS. KENNEDY:  Of course, Your Honor.  Of course.

22           THE COURT:  Thank you.  Ladies and gentlemen of the

23   jury, we are going to take our morning recess at this time.

24   The Court does have to cover a couple of matters unrelated to

25   this case again this morning, but we should be ready to go.

1   But rather than keeping you we'll just say we'll come back at

2   10:20.  And remember do not discuss this case, do not form an

3   opinion.  We'll see you back at 10:20.

4         (The jury left the courtroom.)

5         THE COURT:  All right.  We are outside of the

6   presence of the jury.  You don't need to move that.  I'll talk

7   through you all.  One thing that I thought about is there was

8   an issue raised yesterday about the undisputed facts.  If you

9   would please work that out and advise me where we are because

10   that may have an effect if you're close today.  So I just -- I

11   understand that issue is still floating out there.  You guys

12   meet and confer, advise me at the beginning of the -- after

13   the noon hour recess.

14         And then how much time do you need to respond to the

15   filings that were -- I'd like to have it by tomorrow, if

16   possible.

17         MS. KENNEDY:  Got it last night.  We can get it to

18   you tomorrow.

19         THE COURT:  Fine.  By 8:30 in the morning?

20         MS. KENNEDY:  Yes, Your Honor.  We can get it by

21   8:30.

22         THE COURT:  And then the Court will make it -- will

23   take the matter under submission, other than I might have to

24   have additional argument only for Mr. Theriault to articulate

25   on the record the summary aspect.

1          MR. THERIAULT:  Sure.  And with respect to the

2     evidentiary hurdles that I have to get through, you know,

3     I -- I'd sort of like that issue resolved.  What I'd like to

4     do is get them at least admitted as exhibits, make sure

5     they're exhibits and set the foundation for them as a

6     compilation through Mr. O'Brien.  But I don't know if it's

7     necessary to do it in front of the presence of the jury.

8          THE COURT:  Okay.

9          MR. THERIAULT:  Since the exhibits don't come in,

10    it's kind of awkward setting the foundation, the jury is like,

11    well, what are these things?  Are we going to see them?  We

12    don't know yet.

13         THE COURT:  All right.

14         MR. THERIAULT:  You know, I'd request that I be able

15    to put Mr. O'Brien on, unless Ms. Kennedy stipulates that he's

16    going to say that this is based on the raw punch data, which I

17    don't expect that you'll do.  But if you did, then -- if you

18    did, then I could dispense with that formality all together.

19    But --

20         THE COURT:  All right.  I would request, in the

21    interest of time again, a proffer as to how you intend -- if

22    he were called to testify, what he would lay the foundation

23    to.  And then that way if Ms. Kennedy or whoever is addressing

24    the issue, can decide I don't accept -- in other words, that's

25    not a proper foundation.  Rather than bringing Mr. O'Brien all

1   the way back and then he doesn't meet the foundational

2   requirements and you've got to -- so --

3        MR. THERIAULT:  How about I just type them out and

4   send them to you?

5        MS. KENNEDY:  Sure.  Absolutely.  That's fine.

6        THE COURT:  All right.  They have to respond by 8:30.

7   So don't give it a 10:36 p.m.

8        MR. THERIAULT:  No, no, I'm going to do it while I'm

9   listening to --

10        THE COURT:  Oh, okay.

11        MR. THERIAULT:  At least try.

12        THE COURT:  So we're going to take our break.  I'm

13   handling another matter.  Anything before we conclude?

14        MS. KENNEDY:  No, Your Honor.  But I'll be talking to

15   Mr. Chandler probably tonight.  I think we'll have a schedule

16   through the end of the trial.  Probably I'm anticipating,

17   depending on scheduling, finishing with our last witness on

18   Monday given the shorter day on Friday.  But I'm going to work

19   that out with Mr. Chandler and I should be able to then --

20        THE COURT:  So I was going to ask you what the

21   extent -- because of the Court's work yesterday on the expert

22   issue, the Court doesn't have the jury instructions obviously

23   to you.  But the Court wanted to review and assess, but wanted

24   to get -- this, obviously, expert was priority.

25            And I wanted to have jury instructions to you this

1    morning, again proposed after our conference on Friday.  I

2    mean Monday.  I will see, in the lunch hour, I have other

3    matters I have to deal with over the lunch hour.  But I'm

4    thinking that if you think you're going to close on Friday,

5    maybe it's prudent for us to deal with issues on Friday.

6              MS. KENNEDY:  I'm sorry, probably going to close on

7    Monday.

8              THE COURT:  Huh?

9              MS. KENNEDY:  I think we're going to close on Monday.

10             THE COURT:  Okay.  That being said, then we might

11   want to deal with jury instructions Friday.  Get it on the

12   record.  Deal with it.  Then you can prepare.  And then what I

13   may intend to do is just maybe call a dark day on Friday for

14   purposes of the jury.  If that -- if you're that close.

15             MS. KENNEDY:  I think, yeah, Your Honor, I can -- I

16   emailed counsel last night, just working out scheduling.  That

17   should work.  And I think maybe even -- I can speak with Mr.

18   Chandler over the lunch break to work out some of the

19   scheduling issues because I want to give him an entire

20   schedule for the rest of the witnesses, people are coming from

21   Irvine.  So if we have a dark day or even a shorter day on

22   Friday, that should work actually --

23             THE COURT:  Okay.

24             MS. KENNEDY:  -- with everything.  I don't really

25   want to keep the jury waiting on Monday.

1          THE COURT:  What I would want to say to the jury is

2     the reason we don't have any testimony, we're close to the end

3     and I intend to -- we intend to do closings early next week.

4     So we're taking this day off on Friday in order to do this and

5     then we'll deal with everything.

6          MR. CHANDLER:  I like that idea.

7          THE COURT:  At least the objections.  So let's go

8     off.  I need to give Ms. Hooven the break.  Thank you.  We're

9     in recess on this matter.

10          (Recess.)

11          (The jury entered the courtroom.)

12          THE COURT:  All right.  The record will reflect the

13     jury has returned.  You may proceed, Ms. Kennedy.

14          MS. KENNEDY:  Thank you, Your Honor.

15     Q.  Dr. Walker, just before the break, we were going to go

16     into the topics of the documents and the data that you

17     reviewed.  What documents or what type of data did you

18     actually review as part of your project?

19     A.  I reviewed court filings, that would include the

20     complaint, the various other types of filings that your firm

21     has made and that the plaintiffs' firm has made laying out

22     their arguments and your arguments and the facts that you're

23     each asserting.

24          Other types of court documents, interrogatories,

25     which are written questions that each side serves on the

1  other.  Interrogatory responses, which are written answers

2  that are, I understand, to be sworn under oath from each side

3  about issues that are part of the case.

4          Deposition transcripts, those are question/answer

5  sessions that occur under oath and are transcribed.  I read

6  those transcripts, lots of them.

7          I also did some just general research on certain

8  topics as I started to do my analysis.  And also we got, of

9  course, the raw punch data itself.  We did lots of tabulations

10  and analyses of those.  We got documents from Taco Bell,

11  business documents, business records, some of which, you know,

12  we've seen here.  Personal verification -- paycheck

13  verification reports for the named plaintiffs.

14          I think those are the general categories of

15  information that we received and reviewed in the course of my

16  developing my opinion.

17  Q.  And this raw punch data, did that come to you like on a

18  thumb drive, was it electronic information?

19  A.  Yeah, it was electronic information.  I don't remember the

20  exact medium by which it was -- by which we received it from

21  Sheppard Mullin, I don't recall if it was a hard drive or

22  what, but we got it in electronic form.

23  Q.  What was done with that raw punch data?

24  A.  The first step is opening it up and then taking a look and

25  trying to figure out exactly what it is.  There were some

1    descriptions about what was included in the various fields.

2    Cleaning the data, looking for outliers, looking for

3    observations which are clearly incorrect and not usable,

4    understanding what the fields are.  So there were

5    conversations, mostly between Dr. Gruelich and the people at

6    Sheppard Mullin.  And I think maybe even some people at Taco

7    Bell.  But how to understand the data, what the different

8    fields meant.

9          And then once we had it, we wrote various SAS and

10   Stata programs.  And SAS and Stata are two different

11   statistical and econometric packages that we use to tabulate

12   and analyze data.  We opened it and we started to do work to

13   try to generate from those data some semblance of shifts.

14   Because as I mentioned to Mr. Theriault, the data are not

15   shifts, they are just punches and they're just millions and

16   millions of punches.  So we did analyses to try to discern,

17   from among these punches, what looked to be shifts.

18         And after having done that, we did some analyses to

19   determine different counts of shifts that are of the relevant

20   length.  Of those shifts, we tried to identify shifts that did

21   and did not have the timely meal periods.  And we looked for

22   shifts that did and did not have 20 minutes or more of net

23   rest.  We looked for shifts that did and did not have two

24   10-minute rest breaks.  All of which were the same type,

25   meaning for the rest breaks, we looked for six to seven hour

Walker

162

1    shifts.  And for the meal period, we looked for punches that

2    looked like they corresponded to shifts that lasted more than

3    six hours.

4            And then after that, we conducted various analyses to

5    see whether or not those data looked like they were consistent

6    with a uniform Taco Bell policy of having meal periods

7    commence after the fifth hour of work.

8            And then separately, we did analyses to see when

9    those data seemed to be consistent with a Taco Bell policy of

10   less than 20 minutes of net rest or less than two paid

11   10-minute rest breaks.

12           And along the way, as I said, in order to generate

13   shifts, we had various assumptions that we had to make about,

14   you know, what is it that we're going to assume in order to

15   divide all the punches into shifts.

16   Q.  Did you see any documents from Taco Bell that defined what

17   it considered to be a shift?

18   A.  Yes, I did.

19           MS. KENNEDY:  And can we see Exhibit J 18 at page 5.

20   And Your Honor, this has been admitted and I request to

21   publish.

22           THE COURT:  You may.

23           MS. KENNEDY:  Joint Exhibit 18 at page 5.

24   Q.  And Dr. Walker, is this some of the information that you

25   were provided?

1   A.  Yes, it is.

2   Q.  And is this something you relied upon in, I guess,

3   defining the shifts that you had to define in the raw punch

4   data?

5   A.  Yes, it is.

6   Q.  Also as part of your review, did you review any written

7   report from Michael O'Brien?

8   A.  Yes, I did.

9   Q.  And was part of your assignment to opine on Mr. O'Brien's

10  analysis related to the raw punch data?

11  A.  Yes, it was.

12  Q.  We'll get to that in a minute.  First let's go back to the

13  raw punch data.  You said that it came in electronic form and

14  it had a variety of fields.  And did you come to some

15  conclusions as to sort of what was in that raw punch data?

16  A.  We did, yes.

17  Q.  And what are those fields, if you could explain it to the

18  jury?  What does it look like?

19  A.  Sure.  There are fields that indicate exactly what kind of

20  a punch it was.  So time in, time out, break.  And then there

21  were some others that were not terribly relevant to anything

22  that I was doing.

23          And then there are fields that relate to the person

24  making the punch.  So there's an employee ID and other

25  information that's specific to the person doing the punch.

1      And then there are data that are relevant to the

2  location at which the punch is being made, so there's a store

3  code, for example.

4  Q.  Okay.  And in looking at the raw punch data, I believe you

5  testified earlier there was some issues and some errors in it,

6  wasn't exactly perfect so to speak.

7  A.  Yes.

8  Q.  Did you do some analysis into identifying the errors in

9  the raw punch data?

10 A.  I did analyses that identified many errors, many types of

11 errors.  I can't say what errors were made and the analyses I

12 did were primarily illustrative as proof that there are errors

13 in the data.  There are errors that you know, you can just

14 look at them, you can tell that there's something wrong.  But

15 I certainly couldn't identify all of them.

16      The main point was to see what do the errors you can

17 find tell you about the overall reliability of the data for

18 the purposes that we wanted to use them in this matter.

19 Q.  Do you recall some of the errors that you found in the raw

20 punch data?

21 A.  Yes.

22 Q.  Okay.  And what are some of those errors that you saw?

23 A.  There were lots of simultaneous punches.  So there

24 were -- there were, I think, roughly 75, 76,000 instances of

25 pretty much simultaneous punches.  Or else a smaller number of

1   odd punch patterns that on their face looked like they're

2   probably mistakes.

3          The simultaneous punches, clearly one's wrong.  It

4   can't be that you time in and time out at the same time or

5   that you time in and BK at the same time.  Or that you time in

6   twice within the exact same minute.  One of them is a mistake.

7   And I think there are roughly 75,000 of these duplicate

8   simultaneous punches.

9          And then there were a couple thousand more that were

10  anomalous.  That would be a TO that's not simultaneous with a

11  TO, but there was a TO, a time out, and then the next thing

12  that the employee did is they timed out again.  Or there was a

13  break, and then the next punch is another break.  It's not

14  simultaneous, it might be a couple minutes later.  So you know

15  those are not right either.

16         So there were, I think, roughly 2,000, I don't know

17  the exact number off the top of my head, anomalous punches of

18  that type in addition to the roughly 75,000 instances of

19  simultaneous punches.

20         And then, you know, there were also -- and I can't

21  tell whether this is a punch error or whether it's some

22  interaction between punch errors and efforts to derive shifts

23  based on punches, but there were lots of shifts that, you

24  know, made no sense.  There were over 24-hour shifts.  And

25  there's just no way these people are really working 24-hour

1   shifts.  And that represented another 70 some thousand punches

2   are incorporated into these shifts that lasted 24 hours or

3   more.

4        Then there were also shifts that were sort of left

5   over.  So after we went through the process of identifying

6   shifts based upon this rule of one hour between the TI and the

7   TO to define a shift, a TO -- the next punch is a TI, at least

8   an hour between them, that's a shift.  And that defines the

9   end of the shift and the beginning of a shift.

10       After having identified those shifts, there were

11  thousands of punches left over that were sequences that either

12  did not begin with a TI or did not end in a TO and they were

13  orphans.  So all in between those various categories we talked

14  about, there was something like 150,000, 160,000 shifts -- I'm

15  sorry, punches that were erroneous.

16       In addition to those, there was -- we'll get, I

17  think, to it later.  But there were a couple thousand shifts

18  that were -- that were -- that commenced between two and four

19  a.m. and it's my understanding that that shouldn't be.  That

20  Taco Bell, as part of the same policy that leads to the

21  graveyard on-duty meal period agreements, does not have shifts

22  that start between two and four p.m.  And I don't recall how

23  many punches those couple thousand, 2, 3, 4,000 shifts relate

24  to, but all of those are questionable.  They look like errors.

25  Because people aren't supposed to be starting their shifts at

1   that hour.

2          And then the final sort of looks like it might be

3   error types of punches were punch sequences that looked like

4   breaks, looked like paid rest breaks except they start with a

5   TO.  So there would be -- roughly when you'd expect to see a

6   ten minute paid rest break, there would be a ten minute unpaid

7   break.  So there would be a TO, roughly 10 minutes, a TI

8   rather than a BK, roughly 10 minutes and then a TI.

9   Q.  So looking at all those, the -- we'll call them anomalies.

10  There was approximately, what, 150,000 shifts?

11  A.  These were punches.

12  Q.  150,000 punches where something seemed off?

13  A.  More than that, yes.

14  Q.  And so what did you do -- what concussion did you draw

15  from those anomalies?

16  A.  Well, I think that it generally undermined the reliability

17  of the ultimate counts of recorded -- or missing recorded rest

18  breaks or missing recorded meal periods.  Because when you

19  compare -- you know, one anomalous punch can lead to the

20  absence in the raw punch data of a reported meal period.  Or

21  one missed punch can lead to the absence of a recorded rest

22  period.

23         And so when you compare 150, 160,000 errors that you

24  know about to the numbers of shifts that appear to be lacking

25  in timely -- in complete rest breaks or lacking in timely meal

1   periods, it's actually a very large percentage.  And it

2   suggested to me that a large percentage of the counts of

3   missing or late meal periods or missing rest breaks could be

4   due to error.

5           That when you compare the two, the number of errors

6   that you know about to the counts that you ultimately got of

7   missing meal periods or missing rest breaks, it's a pretty

8   large percentage.

9   Q.  And as part of your report, did you create some -- I call

10  them tables or figures as part of your report to reflect some

11  of this information?

12  A.  Yes, I did.

13  Q.  And are the raw punch data errors reflected in your

14  report?

15  A.  Yes, it is.

16  Q.  Also, did you -- in looking at the raw punch data, did you

17  actually do an analysis as to sort of the grand total of

18  eligible shifts that may be pertinent in this case?  In other

19  words, shifts that would relate to the late meal break, late

20  meal period class and the late rest break -- and the rest

21  break class?  Excuse me.

22  A.  Yes, I did.

23  Q.  Yes.  And how did you go about doing that?

24  A.  I -- you know, I sorted the data.  Sorted the shifts.  I'm

25  sorry.  Sorted the punches by person and by time.  And then we

1   applied this one hour rule to try to determine when a sequence

2   of punches all related to one shift.

3          Having identified shifts in that way, we looked for

4   shifts for the timely -- for the meal period class.  We

5   identified shifts that were longer than six hours based on

6   those assumptions about what constitutes a shift.  And then

7   for those shifts longer than six hours, we looked to see when

8   timely meal periods -- when meal periods commenced.

9          And then by that method, we identified a certain

10  number of shifts both that were relevant and then also that

11  included a timely meal period.  That left us with another

12  bunch of shifts that did not include a timely unpaid meal

13  period.

14         We adjusted that, because there were auto paid shifts

15  among them.  There were also, among those shifts, shifts with

16  timely paid meal periods, periods that began with a BK, ended

17  with a time in that lasted 30 minutes or more and started

18  before the end of the fifth hour of work.  So we identified

19  those.

20         We also identified shifts that were worked by either

21  managers or that were graveyard shifts, shifts that commenced

22  between eight p.m. and four a.m.  Because those types of

23  shifts, shifts worked by managers or shifts that were

24  graveyard shifts, those would be employees -- I was told, it

25  was my understanding, that those employees would be working

170

1   subject to on-duty meal period agreements where they wouldn't

2   necessarily punch in or out and they would be paid for their

3   meal periods regardless of when they started or how long they

4   were.

5         So we disaggregated all of the shifts first

6   into -- first into those that were over six hours and then

7   into those that fell in these various different categories,

8   the final being the ones where I think there was -- there was

9   no timely meal period, but because -- it was because of a de

10  minimus amount of time.  So they were late by 10 minutes or

11  less.

12  Q.  Okay.  So let's sort of back up a little bit on that.  So

13  I understand you're looking at all this sort of raw punch data

14  we've been talking about.  And is all your analysis that you

15  have in this case based upon the raw punch data?  In other

16  words, the dataset regarding punches.

17  A.  The vast majority of it is, yes.

18  Q.  And as an economist in your field, doing this labor

19  economy type of work, is that the type of data that you would

20  want to use in reaching an opinion regarding time in, time out

21  or punches?

22         MR. THERIAULT:  Objection, Your Honor.  May I have a

23  sidebar, please.

24         THE COURT:  Yes, you may.

25         (The following proceedings were held at sidebar

1          between the Court and counsel:)

2          THE COURT:  We're outside the presence of the jury.

3          MR. THERIAULT:  I do not see that opinion in his

4  report about what data he would prefer to use.  I don't see

5  anywhere in his report where he opines that I wouldn't use

6  this data to make these observations.

7          THE COURT:  Go ahead.

8          MS. KENNEDY:  He opines in his report it's not

9  reliable.  He is going to testify what is reliable and the

10  documents he would want to have.  He's already testified he

11  reviewed PVRs for the main plaintiffs.  And consistent with

12  his report, he says all this information that he's relied

13  upon, all this punch data is not -- is not reliable.  He can

14  be asked the basis for that.

15          MR. THERIAULT:  Okay.  But I'm sorry -- I don't see

16  the opinion that says what an economist would review and that

17  this isn't the data that he would review.  I don't see that

18  here.

19          THE COURT:  An economist or him?

20          MR. THERIAULT:  Either.  Neither one is in here.

21          MS. KENNEDY:  He talks extensively in every

22  paragraph.

23          MR. THERIAULT:  He says it's not reliable.

24          THE COURT:  Don't interrupt.

25          MR. THERIAULT:  Sorry.

1          MS. KENNEDY:  He talks extensively about the lack of

2     reliability in these numbers.  He just talked about the raw

3     punch data.  He also -- what he's going to testify to is that

4     in his analysis he would have preferred to use the PVRs and

5     the -- the PVRs or time records.  He did look at the PVRs for

6     the named plaintiffs, he's testified to that already.  And

7     consistently he's going to say -- we know in his report, and

8     he wasn't asked about what else he would use in his

9     deposition.  But that's what he would testify to if he had

10    been asked.

11         THE COURT:  All right.  Matter submitted?

12         MS. KENNEDY:  Matter submitted.

13         THE COURT:  I have considered the request.  The

14    objection is overruled.  You may proceed.

15         (The following proceedings were held in open court:)

16    BY MS. KENNEDY:

17    Q.  Dr. Walker, is this -- the raw punch data that you

18    reviewed in this matter, is this the type of data that you, as

19    an economist, would rely upon in reaching conclusions

20    concerning the validity of punches, time in, time out, breaks

21    and the like?

22    A.  No.

23    Q.  What type of data or information would you rely upon in

24    your opinion as an economist to make conclusions regarding

25    time punch entries, break entries, time outs and the like?

1   A.  Well, within the context of this case, I would want the

2   payroll, the paycheck verification reports.

3   Q.  And why is that?

4   A.  Because they correct for a lot of the errors that exist in

5   the raw punch data.  They've been verified by the employees

6   and by the -- and they're the basis for their pay.  And I've

7   read deposition testimony in this case about corrections that

8   have been made where missing time has been added, where breaks

9   that had not been recorded initially by the employee,

10  according to the employee, is added.  So we know there are

11  errors in the raw punch data that don't exist in the PVRs.

12  Q.  And in this particular case, what is the reason why you

13  relied upon raw punch data here as opposed to PVRs?

14  A.  It's my understanding that that was what the plaintiffs

15  were relying on in order to make their case.  And so my

16  assignment was all related to the raw punch data.  It's all

17  related to whether or not one can reliably draw these

18  conclusions about the legal issues based on the raw punch

19  data.  And it's all about whether or not analyses that the

20  plaintiffs did with the raw punch data are valid.

21  Q.  Okay.  Let's sort of move to your analysis as to

22  the -- the disaggregation of the shifts.  In other words,

23  starting from the grand number of shifts to how you got down

24  to your conclusions regarding the total number of eligible

25  shifts.  And how did you go about doing that?  In other words,

1   how did you start the project and how did you come to your

2   conclusions?

3   A.  Well, as -- we did the analysis of the data that we

4   discussed.  Identified the total number of shifts, based on

5   those assumptions.  And then out of that, we identified the

6   number of such shifts that were over six hours.  And out of

7   that, we found the number of shifts that included a timely

8   meal period.

9           And then out of that, we disaggregated the data

10  further, and I don't remember which order we did it.  But we

11  identified shifts that had timely paid breaks.  We identified

12  shifts that were worked by managers.  We identified shifts

13  that were graveyard shifts.  We identified shifts that had

14  already been auto-paid so there would not have been, based on

15  my understanding, the need for any more premium.  The premium

16  had already been paid.  We identified shifts that were late by

17  some small, you know, de minimus amount of time.  Some very

18  small amount of time, like less -- what we used was less than

19  10 minutes.

20  Q.  Okay.  So let's start at the top.  I guess what are the

21  total number of shifts across the class period for the meal

22  periods, do you remember the total number of shifts that were

23  sort of in the grand scheme of shifts that you looked at?

24  A.  Yes.  It was approximately 9 million.  But I don't know

25  the exact number off the top of my head.

1   Q.  If you -- could you refresh your recollection if you

2   reviewed your report at Figure 3?

3   A.  Yes, I could.

4   Q.  Okay.  Take a look at that.

5   A.  I found 9,311,285 shifts in total.

6   Q.  Sorry.  9 million, 200?

7   A.  311,285.

8   Q.  Okay.  And then what did you do after you found -- after

9   you looked at all those 9.3 million shifts?

10  A.  The next step was to identify, of those 9 million shifts,

11  how many of them were six hours or more than six hours long.

12  Q.  And so you took those shifts out because they -- why did

13  you take those shifts out?

14  A.  Well, I took out the shifts that were less than six hours,

15  six hours or less, because it was my understanding they

16  weren't relevant to the meal period case.  And I started with

17  the meal period case first.

18  Q.  Okay.  So how many shifts were those?  Approximately.

19  That you took out, so to speak.

20  A.  Roughly 3 million.  But I would, again, have to look at

21  the report to give you the exact number.

22  Q.  Okay.  Please do that.

23  A.  2,741,080.

24  Q.  These are the shifts that are six hours or shorter or less

25  than six hours?

1    A.   Yes.

2    Q.   Okay.  And then what was your next step in the analysis?

3    A.   The next was to identify those shifts, among the -- I

4    subtracted.

5    Q.   Minus.  Okay.

6    A.   And the next step was among the remaining 6 million or so

7    shifts, to find the number that included a timely unpaid meal

8    period.  So among those 6 million shifts over six hours, how

9    many of them involved a meal period, an apparent meal period

10   that commenced prior to the completion of the fifth hour of

11   work.

12   Q.   Okay.  So -- and take a look at your report, do you know

13   what that number was, the difference between 9.3 million and

14   2.7 million?

15   A.   It was -- yeah, it was 6,570,205.

16   Q.   Okay.  And then what was the next step, again coming to

17   the eligible number of shifts?

18   A.   It was to identify the number of those 6 million that

19   included a timely meal period.

20   Q.   And the timely meal period, that would be a meal period

21   before the commencement -- before the end of the fifth hour of

22   work?

23   A.   Yes.  I said a timely, but I looked for unpaid.

24   Q.   Unpaid.

25   A.   At this step.

1  Q.  Okay.  And how many shifts were those?

2  A.  Looking at my report, 4,058,730.

3  Q.  And then did you subtract that number from the 6.5 million

4  to get another new number?

5  A.  Yes, I did.

6  Q.  And what number was that?

7  A.  Looking at my report, 2,511,475.

8  Q.  And then what was your next step?  What was your next

9  deduction?

10  A.  I'd have to look.  I don't remember which one we did next.

11  Q.  Okay.  Please refresh your recollection.

12  A.  We looked for shifts that were worked by managers.

13  Q.  And how many shifts were those?

14  A.  Again, looking at the report, 888,694.

15  Q.  So these were manager shifts?

16  A.  Yes.

17  Q.  And why did you take out the manager shifts?

18  A.  It was my understanding that managers were parties to

19  on-duty meal period agreements, so I understood that they were

20  paid for their meal periods.  So they didn't get an unpaid

21  meal period, instead they were paid while they ate and the

22  meal period would last however long it lasted.

23  Q.  Okay.  And then did you deduct the 888,000 from the 2.5

24  million to get a new eligible list, so to speak?

25  A.  Yes, I did.

Walker

178

1    Q.   And what is that number, Dr. Walker?

2    A.   Looking at my report, the number is 1,622,781.

3    Q.   And did you do any other deductions in determining the

4    eligible shifts?

5    A.   Yes, I did.

6    Q.   What was your next deduction?

7    A.   I think the next deduction was employees working graveyard

8    shifts.  Or actually it was graveyard shifts.

9    Q.   Okay.  And how many of those graveyard shifts did you

10   deduct?

11   A.   Looking at my report, 141,938.

12   Q.   And what was -- did you subtract those shifts from the

13   prior total?

14   A.   Yes, I did.

15   Q.   And what was that next number?

16   A.   Again, looking at the report, 1,480,843.

17   Q.   Did you do any other deductions of looking at the eligible

18   shifts?

19   A.   Yes, I did.

20   Q.   What was your next deduction, if any?

21   A.   I don't recall offhand, I'd have to look to see.

22   Q.   Certainly.

23   A.   It was the shifts that included a timely meal period.  I'm

24   sorry.  A timely paid meal period.  So these would be periods

25   that commenced with a BK, lasted for 30 minutes or more and

1  commenced before the completion of the fifth hour of work.

2  Q.   And how many were those?

3  A.   Looking at my report, there were 377,355.

4  Q.   And what was the difference between those two numbers now?

5  A.   1,103,488.

6  Q.   Any further deductions in coming up to the eligible

7  shifts?

8  A.   Yes.

9  Q.   What was the next deduction?

10  A.   I think -- I'll learn in a minute.  I think it was

11  auto-pay, it was the shifts that had already been auto-paid.

12  Q.   Do you need to refresh your recollection?

13  A.   Yes.

14  Q.   Please look at your report, sir.

15  A.   Actually, it was not auto-pay, it was shifts with meal

16  periods 10 minutes late or less.

17  Q.   Okay.  So these were late by 10 minutes.

18  A.   Or less.

19  Q.   And why did you make that deduction?

20  A.   Because those would be shifts that could be due to a

21  broken clock, could be due to an effort to get out on time.

22  These were shifts that seemed to me to be so -- late by such a

23  little amount of time that it's harder to tell if it was

24  intentionally late.

25  Q.   Okay.  And how many of those de minimus, I guess, shifts?

1    A.   1,114,496.

2    Q.   Is that -- 1 million?

3    A.   I'm sorry.  It's 114,496.

4    Q.   Okay.  And then did you then make another deduction?  I'm

5    sorry, did you make another subtraction?

6    A.   Yes, I did.

7    Q.   And what is that number?

8    A.   That leaves 988,992 shifts.

9    Q.   And is that the total number of eligible shifts or any

10   other deductions?

11   A.   Well then there was the auto-pay.

12   Q.   And how many auto-pay shifts did you deduct?

13   A.   Looking at my report, 164,922.

14   Q.   And what was the final number of eligible shifts for -- in

15   the raw punch data that you had?

16   A.   After all of those deductions and disaggregation, 824,070

17   shifts remain.  824,070.

18   Q.   Okay.  Now, those are the -- all the eligible shifts,

19   based upon the raw punch data, making all those assumptions;

20   correct?

21   A.   Yes.  I mean, that's what you end up with after making

22   that -- doing that disaggregation.

23   Q.   And in your opinion, was that the appropriate way to sort

24   of look at what would be the eligible -- the total potential

25   eligible shifts, given the raw punch data?

1  A.   There's a sort of a legal component to that.  Certainly,

2  you know, assuming that the managers and the graveyard workers

3  are subject to on-duty meal period agreements and that the law

4  says that they should be excluded.  The late by 10 minutes, I

5  don't know what the law is on that.  But I do think that this

6  is a good way to look at the data to determine whether or not

7  there is a policy of late -- of late commencement of meal

8  breaks at Taco Bell corporate-owned restaurants during the

9  relevant time period.

10 Q.   I guess a better question would be from an economist

11 perspective.  Is that, in your opinion, as an economist, a

12 valid way of looking at what would be the eligible shifts?

13 A.   Yes.

14 Q.   In looking at the data, did you also look at the data in

15 other ways, any other groupings to figure out whether or not

16 there was any type of uniform policy at Taco Bell?

17 A.   Yes, I did.

18 Q.   And why did you look at the data in other ways?

19 A.   Well, first, because this analysis suggested to me

20 strongly, and, in fact, it was sufficient for me to develop my

21 opinion that there was no policy, uniformly applied policy to

22 have meal periods commence after the completion of the fifth

23 hour of work.

24      And so I wanted to do further analysis to see such

25 things as whether or not there were -- there was a skewness in

182

1    this data, whether it was the case that a relatively small

2    number of people is responsible for a very large percentage of

3    the late meal periods.

4          I also wanted to see whether there were differences

5    by store and by manager over time that might explain or might

6    further indicate that there's not a uniform policy, but that

7    different people, either based on who they are or based on

8    what stores they worked at or who their managers were, were

9    subject to different forces that were defining the number of

10   late meal periods and late meal breaks.

11         It looked like there was not a single unifying factor

12   that was determining whether or not people's meal breaks were

13   late, it looked like there were all sorts of individualized

14   circumstances.  And I wanted to see, to test that.

15   Q.   Okay.  So let's talk about maybe one of your first tests.

16   Did you look at the raw punch data and organize it by groups

17   of people?

18   A.   Yes, I did.

19   Q.   And what types of groups or how did you divide your

20   analysis in that regard?

21   A.   Sure.  I looked at all of the -- I looked at every person

22   and I attached every person a number of these late meal

23   periods that I counted.  And then I sorted the people based

24   upon the numbers of late meal periods that they were

25   responsible for.

1          So at the top of my list, I had the person that had

2   the most late meal periods in the data, then the next person,

3   the next person and the next person, so that the entire set of

4   people that had late meal periods were represented in the

5   order based upon how many late meal periods they had.

6   Q.  So when you say you want to look at who had the most and

7   who had the least, how did you go about actually, I guess,

8   mechanically determining that?

9   A.  Well, you know, I'd gone through this analysis before,

10  that identified what appeared to be shifts that had late meal

11  periods.  And then I just -- in each of those late meal

12  periods, each one of those shifts is associated with a person.

13  So then I could sort that by the number -- by people.  And

14  then for each person I could add up the number of late meal

15  periods they had.  So I got a number of late meal periods per

16  person.

17          And so then I could sort that list of people based on

18  the number of late meal periods that they had.  So that I

19  could see how the late meal periods were distributed among

20  people.  Did everybody have the same average number or was it

21  the case that some people had a lot more and were responsible

22  for a lot more of the late meal periods that we're identifying

23  in the data.

24  Q.  And looking at the data, what conclusions did you draw by,

25  I guess, dividing the data up by persons or by groups?

1  A.  I found that they were incredibly skewed.  That a huge

2  percentage of the late meal periods were accounted for by, I

3  think, roughly a third of the people.  And that if

4  you -- like, I think it was, 90 percent of the late meal

5  periods were attributable to roughly a third of the people.

6          That when you look down to 80 percent, roughly 20

7  percent of the people in the dataset were generating roughly

8  80 percent of the late meal periods.

9          And then I looked at different percentages of late

10  meal periods that were accounted for by different groups of

11  people, and ultimately I found that, yes, they were a small

12  group of people that were responsible for an awful lot.

13          And even when you get up to a third, the people were

14  responsible for, say, 90 percent.  I think it was a third of

15  the people were responsible for 90 percent of the late meal

16  periods.

17  Q.  And as an economist, how do you explain that?

18  A.  You -- well, it shows that there are different factors

19  influencing the likelihood of late recorded meal periods.  And

20  they vary significantly across different class members.  I

21  can't tell you whether these people are different, in terms of

22  the likelihood they're going to record their meals properly or

23  whether they're different in their likelihood of actually

24  having late meals.  It's one of those two.  And -- but I can

25  tell you that there are significantly different forces leading

185

1  to late meal periods for different groups of people.

2  Q.  Let's talk about that.  Did you prepare some figures

3  regarding these groupings in your report?

4  A.  I did.

5  Q.  Do you remember those exact figures?

6  A.  No, I don't.

7  Q.  Do you need to look at your report to refresh your

8  recollection?

9  A.  Yes, I do.

10  Q.  Please do, Dr. Walker.  I believe it's Figure 5.

11  A.  Yes.

12  Q.  Now, does that refresh your recollection as to the

13  percentages?

14  A.  Yes.

15  Q.  Now, is this -- again, we're just talking about meal

16  periods here; is that correct?

17  A.  Yes.

18  Q.  So these groupings are by late, timely and missing meal

19  periods recorded by certain groups; is that correct?

20  A.  Yes.

21  Q.  Okay.  And looking at the groupings, how did you go about

22  grouping these individuals to come to your conclusion that

23  somehow these meal periods are skewed by certain groups?

24  A.  Yes.  So as I said, I -- of all the people that had late

25  meal periods, I calculated the number of late meal periods

1   they had.  Then I sorted them based on that, based on number

2   of late meal periods.  And then I looked to see, well, how far

3   down the list do you have to go in order to account for 90

4   percent of all late meal periods?  So I had a total number of

5   late meal periods.  I knew what it was.

6        And then I could add up, the number one person has so

7   many and the number two person has so many and add the number

8   three and number four, and how long -- how far down that list

9   do you have to go to account for 90 percent of all the late

10  meal periods that you saw, that I saw, late recorded meal

11  periods that I saw in the data.  And I determined that once

12  you'd gone down and just identified the top, looking at my

13  report, 36 percent of the employees -- "top" meaning the ones

14  that had the most -- that accounted for 90 percent of the late

15  meal periods.  Which means that the remainder, the 64 percent,

16  only are responsible for ten percent of the late meal periods.

17       So the top third of the people, in terms of the

18  frequency of late meal periods, had nine times as many late

19  meal periods as the bottom two-thirds.  So there's a huge

20  disparity in the likelihood of having a timely -- late meal

21  period among the class members.

22  Q.  And did you group these categories -- group these

23  categories of employees in any other way?  In other words, did

24  you look at the top 40 percent or 50 percent?

25  A.  Yes, I looked at other -- I looked at, well, how many

187

1  people does it take to explain 80 percent?  So that -- first I

2  did 90, then I did 80, I did 50, I did 20 and I did 10.

3  Q.  Okay.  So for the top -- for the 80 percent, what

4  percentage of the population were responsible for 80 percent

5  of the late meal period punches?

6  A.  22 percent of class members were responsible for 80

7  percent of the late meal periods.

8  Q.  And what percentage was responsible for 50 percent of the

9  late meal period punches?

10  A.  Six percent of the class members were responsible for 50

11  percent of the late meal periods.

12  Q.  And what percentage was responsible for 20 percent of the

13  late meal period punches?

14  A.  Again, looking at my report, the top one percent of the

15  class members were responsible for 20 percent of the late meal

16  periods.

17  Q.  And what percentage, if at all, were responsible for 10

18  percent of the late meal period punches?

19  A.  Again, looking at my report, 0.4 percent of the class

20  members were responsible for ten percent of the late meal

21  periods that I identified by the methods we've discussed.

22  Q.  And Dr. Walker, what conclusions, if any, do you draw from

23  that, I guess, skew in late meal period punches?

24  A.  Well, one, that a very small percentage are responsible

25  for a very large percentage of the late meal periods.  And,

1  two, that if you were to look at the average, the average

2  percentage of late meal periods -- and making up a number,

3  let's say it's 12 percent of relevant shifts are late, that

4  the typical class member's incidents of late meal periods

5  would be much, much less than that.

6          So, for example, among that top group, the top

7  one-third versus the next two-thirds, the percentage of late

8  meal periods -- you know, the late meal periods divided by

9  number of shifts that those top third worked is something like

10  17, 18 percent.  While for the bottom two-thirds, it's

11  something like three, four, five percent.

12          There are huge differences in the experiences of

13  class members in terms of late meal periods.  So if you were

14  to bring somebody forward and ask them what their experiences

15  are, it matters whether they're somebody that's in this top

16  third or top ten percent or whether they're somebody who's at

17  the median or whether they're somebody that's at the bottom

18  five or ten or 20 percent.

19  Q.  And given the skew in the groups, can you draw any

20  conclusions as to whether or not there is any type of uniform

21  or unifying policy at Taco Bell that is, I guess, making or

22  forcing employees to punch out late for their meal periods?

23  A.  Yeah, well, based on even the overall number, the

24  aggregate number is sufficient for me to conclude that there

25  is no uniform policy applied to all of them.

1        Moreover, the different skew suggests that there's

2   some circumstances that are individualized that are playing a

3   very strong role in determining whether or not people are

4   going to record late meal periods.

5   Q.   And again, looking at all this data, did you also divide

6   the data into job codes or job categories?

7   A.   Yes, I did.

8   Q.   And why did you -- again, you looked at groups already.

9   Why did you now look at job categories?

10  A.   Because there was evidence in the record to suggest that

11  late meal periods would vary based upon what people's jobs

12  were.   There was evidence to suggest that managers, for

13  example, would have fewer late meal periods recorded and also

14  fewer timely.   That the managers were much less likely to

15  record any sort of meal period because they would be subject

16  to on-duty meal period agreements.

17        So I suspected that there's going to be a

18  relationship between what your job actually was and the

19  likelihood of recording late meal periods.

20  Q.   And why is that important for you, as an economist, in

21  doing this type of analysis?

22  A.   Well, because the -- my understanding of the allegations

23  here were that there was a uniform policy applied against all

24  class members, regardless of job category, to take meal

25  periods late.   And so if you disaggregate by job code, you can

1    see whether it's appropriate, as a matter of economics, to

2    aggregate all these different job codes and look at them as

3    one.

4    Q.  All right.  So let's take a look at the job codes.

5    What -- did you look at -- I know Mr. Theriault went through

6    some of the job codes.  I won't go through all of those.  But

7    did you look through various job codes and make some

8    determination as to each of those job codes and whether or not

9    there is a skew, so to speak, in the data?

10   A.  Yes, I looked at job categories.

11   Q.  Job categories.

12   A.  There are different job codes that are aggregated in each

13   category.  So there are different -- several different job

14   codes that are all RGMs, restaurant general managers.  And

15   there are a few that are all AGMs, assistant general

16   managers -- assistant restaurant managers.  And there are a

17   few that are all different types of crew.  But yes, I looked

18   at different job categories.

19   Q.  So what are the job categories that you actually used in

20   looking at the raw punch data?

21   A.  Off the top of my head, RGM, AGM, management trainee I

22   think.  Excuse me.  Shift leader.  Crew.  And then I think

23   that there were some job codes that I didn't know.  I

24   couldn't -- given the mapping I had, I couldn't assign to one

25   of those categories.  That's off the top of my head.  I would

1  prefer to look to make sure I got it right.

2  Q.  Certainly.  Go ahead.  I believe it's Figure 5 or 6.

3  A.  Yes, that's right.

4  Q.  So RGMs, AGMs, management trainee, shift lead and crew.

5  A.  Yes.

6  Q.  And what did you find in your analysis when you sorted by

7  job categories?

8  A.  I found that the likelihood of a timely meal period was

9  greater the less management authority someone had.  I found

10  that the incidents of late meal periods was different across

11  job categories.

12        I found that those differences were statistically

13  significant at a very high level, meaning that you could rule

14  out that it was just a matter of chance that each of these job

15  categories was really driven by the exact same sort of forces

16  generating these late meal periods, but that just out of

17  chance they tended to be different.  I could rule that out to

18  the one in one trillion level.

19  Q.  I'm sorry.  One in one trillion?

20  A.  Yes.

21  Q.  How many zeros is that?

22  A.  12.  And actually it was much more than that.  I just

23  stopped.  I mean, I just -- within the data, there are many

24  more than 12 zeros when I ran the test, the statistical test.

25  It's just I didn't -- I described it as one in a trillion or

1    less whenever I ran the test because that's as persuasive as I

2    needed to be.

3    Q.   So when you say it's likelihood is, I'll say, one in one

4    trillion, you mean one in one trillion likelihood that there

5    is a common policy?

6    A.   Yes.

7    Q.   And how did you run that statistical analysis?

8    A.   Well, I calculated the percentage of late meal periods for

9    these different job categories.  And then I conducted a T

10   test, which is a statistical test of differences in means or

11   differences in percentages.  And a T test gives you a

12   probability of observing an observed difference as large or

13   larger.  And you then can calculate an exact probability of

14   seeing it.  And that's what I did.

15   Q.   So in looking at, I guess, by job categories and looking

16   also by groups and also looking by just sort of the groups in

17   general, have you reached any conclusions as to -- based on

18   those three analyses, as to whether or not there is any type

19   of one or two policies by Taco Bell that is requiring or

20   forcing employees to take late meal periods?

21   A.   There is -- I concluded that there is not a uniform policy

22   applied across the class.  That there are differences across

23   job categories that are statistically significant that prove

24   beyond any sort of reasonable doubt to me, as the economist,

25   that the same factors are determining the number of late meal

1    periods for people regardless of job category.  That the

2    number of late meal periods is a function of your job category

3    among potentially other things.

4            And that looking at it in an individual level, that

5    not all people are generating late meal periods at the same

6    rate.  That there are differences across individuals and that

7    there is a small minority of individuals that are generating a

8    disproportionate share of all the late meal periods.  And that

9    if you look at the averages, they're going to be overly

10   influenced by those individuals and they will significantly

11   overstate the frequency at which late meal periods occurred.

12   Q.   Did you also --

13   A.   Recorded meal periods, I'm sorry.

14   Q.   I'm sorry, Dr. Walker.  And did you also, then, again try

15   to do another double checking in the analysis, did you also

16   sort by restaurants or by stores?

17   A.   Yes, I did.

18   Q.   Why did you decide to look at stores?

19   A.   Because looking at the background information and just

20   knowing a little bit from having been to a fast food

21   restaurant, I expected that there are going to be differences

22   that would likely vary by store.  That could be due to the

23   management that's at the store or it could be due to where a

24   store is, what type of demand the restaurant faces.

25           I would imagine that circumstances would be a lot

1    different at a Taco Bell that's out in the Mojave Desert than

2    there would be at a Taco Bell that's right in the center of

3    LA.  So I wanted to see whether the incidents of late meal

4    periods varied significantly based upon the store.

5    Q.  And so how did you go about, I guess, sorting or dividing

6    that data to determine whether or not there's any skew in the

7    data with respect to restaurants?

8    A.  I had -- again, I had all of those punches and each of

9    those punches has with it a store that's associated with it.

10   So I was able to then develop a list by store of the number of

11   late -- of shifts with late meal periods.  And then I could

12   sort them.  And so I sorted all these stores based upon the

13   number of -- actually the percentage of late meal periods.  I

14   used a percentage because a bigger store is going to have more

15   just by virtue of being bigger.  The incidents of late meal

16   periods might be the same, but a bigger store is just going to

17   have more numbers.

18          So I calculated for each store having over some

19   threshold number, I don't remember the exact number, I think

20   it had to have at least 1,000 shifts in the data.  I sorted

21   them based upon their percentage of late -- shifts with late

22   meal periods.  And then I looked at the top ten and I looked

23   at the bottom ten and I compared the top ten to the bottom ten

24   to see whether they were similar.

25   Q.  And what did you find?

1   A.   They're not.

2   Q.   Okay.  Let's take a look at that.  So looking at the top

3   ten, you said the top ten by the number of shifts at a certain

4   store?  Is that how you sorted them?

5   A.   My recollection was it was a percentage of timely -- of

6   late meal periods divided by the -- the number of late meal

7   periods at a given store divided by the number of relevant

8   shifts at that store.  But I'd really prefer to look at the

9   exhibit to recall exactly.

10  Q.   Okay.  If you take a look at I think it's Figure 7 in your

11  report.

12  A.   Yes.

13  Q.   Okay.  So how did you divide the -- I guess the top ten

14  and the bottom ten.

15  A.   Yeah.  It was the late recorded meal periods divided by

16  the relevant meal periods for a store to determine its

17  percentage of late recorded meal periods.  Sorted all stores

18  based upon the percentage of late recorded meal periods.  And

19  then I looked at the top ten and I compared them to the bottom

20  ten.

21  Q.   And in looking at the top ten, what did you conclude from

22  the top ten?

23  A.   And here, top ten means the most --

24  Q.   Correct.

25  A.   -- in this example.  So top ten is the worst ten.  And the

1   top ten, the percentage of late recorded meal periods, it was,

2   you know, quite high.  It was 45 percent at the very worst

3   store.  And then it quickly dropped off, but it's still quite

4   high.

5          When you get down to the tenth worst, that was

6   roughly 28 percent.  So even here, at the worst stores, one,

7   they were high relative to what we've seen before looking at

8   the overall instance of late meal periods.

9          But it still, even among the worst stores, didn't

10  seem to be consistent with a uniform policy of having meal

11  periods commence after the fifth hour of work.  Because even

12  at the worst stores, it was less than half of the time, half

13  of the relevant shifts that had a late meal period.  And

14  that's before correcting for on-duty meal period agreements,

15  before correcting for -- for amounts that were auto-paid.

16  Still, even at the worst stores, the worst store was less than

17  half of the time do you see a late meal period.

18  Q.  So just let me understand something.  Looking at the top

19  ten or sort of the worst stores, so to speak, the shifts you

20  looked at were -- actually the number was greater because it

21  had all the auto-pay added back in, the de minimus shifts were

22  back in and that sort of thing; correct?

23  A.  Correct.

24  Q.  All right.  So the bottom ten, which is basically those

25  are the restaurants with the best percentages; correct?

1   A.   Yes.

2   Q.   And what did you conclude from the bottom ten?

3   A.   I -- one, I concluded that they were significantly

4   different.  And I'd have to look at the exhibit to give you

5   the exact numbers.

6   Q.   Sure.

7   A.   Great.  They ranged from 0.7 percent to 3.1 percent.  So

8   in 0.7 percent of the shifts that were qualifying, the best

9   store had a late meal period.  And then the tenth best store,

10   in 3.1 percent of the relevant shifts, had a late recorded

11   meal period.

12   Q.   So Dr. Walker, in looking at, I guess, the range.  This

13   will be the range, the .7 percent to 45 percent.  And again,

14   as an economist, can you explain what could be the factor or

15   factors that would explain this large disparity between, I

16   guess, compliance with punches or noncompliance with punches?

17   A.   Well, later we're going to see some evidence that managers

18   seem to be a big part of this.  Because I also looked at

19   managers specifically.  But other than that, I can't tell you

20   exactly why the stores differ.

21        What I can tell you is that they do.  That it's a big

22   difference what store you're at.  And certainly at a store

23   where 0.7 percent of the relevant shifts end up with timely

24   meal periods, to me, it's just impossible to say that there is

25   a uniform policy to have -- to have late meal periods when you

1  only see them 0.7 percent of the time.

2         So I can't tell you exactly why the stores are

3  different, but I can tell you that they are different.  And

4  that they are not all subject to the exact same forces that

5  are generating these late meal periods.  There's got to be

6  something about the stores, in particular, be it the manager

7  or the nature of demand.  I don't know what.  But there's

8  something about the stores that differs.  So adding up all the

9  stores doesn't seem to be an appropriate way, as an economist,

10  to look at this.

11  Q.  Now, you did read some deposition testimony in this case

12  from some of the named plaintiffs, being Ms. Medlock and Ms.

13  Hardiman.  And did you read any deposition testimony, if you

14  recall, from Ms. Naranjo and Ms. Leyva?

15  A.  I did read it, but I can't tell you sitting here what's in

16  it.  But I did read it.

17  Q.  Fair enough.  Looking at some of -- I'll call it testimony

18  or some of the discovery in this case, did you see any

19  evidence of employees talking about being told when to take

20  their meal periods or rest breaks?

21  A.  Yes.

22  Q.  And did you use any of that as part of your analysis?

23  A.  It informed my decision to do the analyses that I did.

24  Q.  And when you say informs your, I guess, decision to do the

25  analysis, what do you mean by that?

1    A.  I mean that it suggested to me that manager effects could

2    be a cause for different levels of late meal periods.  That it

3    could be that who your manager is determines whether or not

4    you're going to have a late meal period as opposed to some

5    uniform policy driving it.

6    Q.  So we talked a little bit about sort by the restaurant.

7    And you understand that in some stores, at least from the

8    testimony, RGMs or restaurant general managers, and sometimes

9    shift leads are the ones directing employees when to take

10   their meal periods or rest breaks, have you seen that in the

11   evidence?

12   A.  Yes.

13   Q.  And have you also heard some testimony and seen documents

14   related to a deployment chart or a chart or something that is

15   erasable.

16   A.  Yes.

17   Q.  You've seen that as well?  Okay.  Now, let's talk about

18   the sorted -- assortment, so to speak, by manager.  How did

19   you go about doing that analysis?

20   A.  That's a little trickier.  So this explanation may not be

21   as clear.  Because you can't tell always what manager is

22   influencing things because some stores have multiple managers.

23   So I identified store months.  So for each store, there's a

24   month for that store.  Identified store months where there was

25   only one RGM or one AGM that punched in to that store.

1          So within the data, I've got information about what

2     store each punch belongs to and I was able to identify stores

3     that only had one AGM or RGM punch in to that store in a given

4     month.  So then having identified stores where I could say,

5     this is a particular AGM that is -- or RGM that is the manager

6     of that store, I then was able to attribute to each such RGM

7     or AGM the percentage of late meal periods that occurred under

8     his or her sole watch.

9          And then I just sorted all of the RGM/AGMs based upon

10    the percentage of late meal periods that occurred when they

11    were the sole managers in a store for a month.  So that I

12    could try to get an idea about manager effects, the effect of

13    just the manager.  And this is a way to isolate the influence

14    of individual managers from other managers.

15    Q.  And again, did you do this similar analysis that you did

16    with restaurants, in other words, take sort of the top ten and

17    the bottom ten?

18    A.  I did.

19    Q.  And why did you do it that way for managers?

20    A.  Once again, the point, one, is to see, you know, whether

21    these manager effects are there.  The reason I do the top ten

22    and bottom ten is to see if there are differences.  If there's

23    this uniform effect across managers, that it's really a

24    uniform policy, it's not really the manager, it's the uniform

25    policy.  The top ten and the bottom ten shouldn't be that much

1    different.  They should be pretty close.  There certainly

2    should not be a statistically significant disparity between

3    the top ten and the bottom ten.  And there shouldn't be

4    absolute disparities if they're very large.  So I looked to

5    see whether or not there were such disparities.

6    Q.  And what did you find when you sorted by manager?

7    A.  I found significant differences.  Statistically

8    significant differences.  Meaning differences that could not

9    be explained by chance.  And I also saw differences that were

10   big just in absolute terms.

11   Q.  Okay.  So do you know those off the top of your head?

12   A.  I don't.

13   Q.  Do you need to take a look at your report?

14   A.  Yes, I do.

15   Q.  Please do, Dr. Walker.

16   A.  Yes.

17   Q.  So what did you conclude from the ten managers with the

18   highest percentage of shifts with the late meal period, what

19   did you find there?

20   A.  I found there were really high percentages for the bad

21   managers.  That the percentage ranged from 44.1 percent to

22   57.8 percent of the relevant shifts when they were the sole

23   manager included late meal periods.  So the very worst -- I'm

24   looking at my report.  The very worst store manager, sorry,

25   had 57.8 percent of the relevant shifts when he or she was the

202

 1    sole manager had untimely meal periods.  It was 418 out of

 2    723.

 3         Then the number 10, still very, very high, was 44.1

 4    percent.  And, you know, what I got out of this is that these

 5    managers are really, really bad.  Because you know, looking at

 6    the overall data, that it's nothing like 58 percent or 44

 7    percent of relevant shifts that have late meal periods.

 8         And what I also found, looking at this, was that only

 9    five, the five worst managers, were over that 55 percent mark.

10    So even there, it doesn't seem like this is supportive of a

11    uniform policy to have late meal periods.  One, even among the

12    top ten, once you get out of that top five, even some of the

13    worst aren't having even half that are late.  And even at the

14    very, very worst, as bad as that is, to me that's not

15    consistent with a uniform policy to have late meal periods.

16         If there's a uniform policy, I was expecting

17    influenced against -- applied to everyone, I would have

18    expected to see something that's more like 80, 85, 90 -- I

19    don't know exactly where the threshold would be, but it

20    wouldn't be 57.8.

21    Q.   And what about the ten managers with the lowest percentage

22    of shifts with a late meal period, what did you find there?

23    A.   Again, looking at my report, that ranged from 0.6 percent

24    to 1.1 percent.  So for example, one shift manager who had

25    1212 such shifts, out of them only 12 had late meal periods,

1   late recorded meal periods.

2          The very best percentage was by a manager that had

3   886 shifts longer than six hours in stores where he or she was

4   the only manager and out of the 886 such shifts, only five had

5   late recorded meal periods.  So as I say, the range was 0.6

6   percent to 1.1 percent.

7   Q.  And in looking at the percentages, comparing the manager

8   and the restaurant, did you draw any conclusions based upon

9   those two analyses?

10  A.  Yes.  That there were factors that varied by restaurant.

11  There were factors that varied by manager.  It could be that

12  they were really all just the same thing.  But certainly

13  there's variation by manager and variation by restaurant.  And

14  that those variations are significant in absolute terms.  And

15  they are statistically significant.

16         In both of those cases I ran similar sorts of T tests

17  where I looked at all of the top ten restaurants, I looked at

18  all of the bottom ten restaurants.  And once again, the

19  difference was statistically significant at a scale that I

20  decided it's not worth quantifying it any more finely.  It was

21  greater than less than one in a trillion chance of seeing the

22  disparity as large.

23         The exact same thing was true on the manager level.

24  When I looked at the top ten managers and I looked at the

25  bottom ten managers, the disparity between the two, in terms

1   of percentage of late meal periods, was statistically

2   significant at a very, very high degree of certainty, less

3   than one in a trillion chance that there's really no

4   difference in the factors that are generating late meal

5   periods between those groups of stores.

6   Q.  Did you also do any kind of analysis related to the start

7   times?  I know you mentioned earlier that there are some

8   stores or some anomalies where the start times were two a.m.

9   or four a.m., did you actually do any analysis related to the

10  start times of employees?

11  A.  Yes, I did.

12  Q.  And why did you look at start times?

13  A.  Again, looking at the deposition testimony and actually

14  now some of the trial testimony that I've heard since sitting

15  here, there would be differences in the likelihood of late

16  meal period depending upon when in the day the shift actually

17  occurred.

18          And then also, I expected that.  Just, again, having

19  some basic knowledge about fast food, I would think that the

20  likelihood of a late meal period would depend upon whether or

21  not you're part of a late rush or whether or not you work in a

22  graveyard shift.  That will affect whether or not the store is

23  really busy.  So I wanted to see whether time of shift seemed

24  to be driving late meal periods as opposed to late meal

25  periods being part of some uniform policy applicable to

1   everyone.

2   Q.  And what conclusions, if any, did you draw in looking at

3   the timely recorded late and unrecorded meal periods by start

4   time?

5   A.  I found that there were big disparities in the percentages

6   of relevant shifts that were late, the percentages of relevant

7   shifts that had timely meal periods, the percentages of shifts

8   that had no meal periods recorded at all.  The findings were

9   consistent with shift mattering, that it was consistent with

10  the idea that it matters when the shift occurred.

11        And it also was consistent with graveyard shift

12  workers being subject to on-duty meal period agreements

13  because I found very low -- very high instances of no recorded

14  meal periods at all among graveyard shift workers or shifts

15  that occurred during the graveyard.

16  Q.  Now, you understand this case is a class action being

17  bought by several individuals.  And were you asked to do any

18  analysis related to Ms. Hardiman, Ms. Medlock, Ms. Leyva and

19  other individuals?

20  A.  I was.

21  Q.  And what type of analysis were you asked to do with

22  respect to the class representatives?

23  A.  To be honest, I don't remember which analyses in this

24  regard I was asked to do and which ones I decided to do and

25  show you.

1    Q.   Okay.  Why don't you tell me the ones you actually did.

2    A.   I know that I looked at the instance of late recorded meal

3    periods by the class representatives.  I looked at, based on

4    the raw punch data for the class representatives, how many

5    shifts did they work in the raw punch data, how many of those

6    shifts included late meal periods.

7         And I also disaggregated it based upon what they were

8    doing, because some of them were managers during part of their

9    employment and whether they had a late meal period varied.

10   And I thought it might.  Based upon whether they were managers

11   at the time or whether they were not.

12   Q.   And in looking at the class representatives, and looking

13   at their, I guess, instances of recording late meal periods,

14   what conclusions did you draw, if any?

15   A.   That they did not tend to have late recorded meal periods.

16   That the class representatives themselves did not generally

17   have late meal periods when they worked shifts that were six

18   hours -- that were longer than six hours.

19   Q.   And do you recall what all those numbers are off the top

20   of your head?

21   A.   I don't.

22   Q.   Do you have a chart about it in your report?

23   A.   I do.

24   Q.   You need to refer to it?

25   A.   Thank you.

1    Q.   And I think it's Figure 11.  So let's start with Ms.

2    Hardiman.  In looking at your report, does that refresh your

3    recollection as to the analysis performed with respect to late

4    meal periods for Lisa Hardiman?

5    A.   Yes, it does.

6    Q.   And in looking at the raw punch data information for Lisa

7    Hardiman, what did you find, Dr. Walker?

8    A.   I found, in looking through my report, that she worked 315

9    shifts longer than six hours.

10   Q.   And out of the total number of shifts, how many of those

11   shifts where there was a late meal period punch?

12   A.   Again, looking at my report, there were 57 out of those

13   315.

14   Q.   And what percentage is that?

15   A.   18 percent.  18.1 percent.

16   Q.   And did she work shifts longer than six hours where she

17   actually punched out for a meal period, in other words, before

18   five hours?

19   A.   Yes.

20   Q.   And what percentage of those shifts -- well, actually, how

21   many shifts were those and what is the percentage?

22   A.   In looking at my report, I found that there were 250

23   shifts in which she punched out or the data reflects she

24   punched out for a meal period prior to the completion of the

25   fifth hour of work.

1   Q.   And what percentage of timely meal periods for Ms.

2   Hardiman?

3   A.   79.4 percent.

4   Q.   And did you do a similar analysis for Ms. Medlock?

5   A.   Yes.

6   Q.   And what did you find for Ms. Medlock?

7   A.   Well, Ms. Medlock had several different jobs.  And I

8   didn't do an aggregate number for Ms. Medlock.  I did

9   different numbers, depending upon what job she held at a

10  particular point in time.

11  Q.   So let's go through Ms. Medlock.  What job code, job

12  titles did she have that you based your analysis on?

13  A.   Different job categories.  So she was AGM, which is

14  assistant general manager.

15  Q.   What other position?

16  A.   Crew.  Shift lead.  And management trainee.

17  Q.   Okay.  So for Ms. Medlock, what was her total number of

18  shifts that were longer than six hours?

19  A.   106.

20  Q.   That was --

21  A.   As AGM.

22  Q.   Okay.  And for the AGM, how many of those shifts longer

23  than six hours where she had a late meal period punch?

24  A.   None.

25  Q.   None.  Okay.  And so her percentage then was zero?

1   A.   Yes.

2   Q.   Okay.  And what about shifts longer than six hours with a

3   timely meal period?

4   A.   Eight.

5   Q.   And what percentage was that then?

6   A.   7.5 percent.

7   Q.   Okay.  I'm sorry, 7 point --

8   A.   7.5.

9   Q.   7.5 percent.  Got it.  Okay.

10   A.   And I would -- we're calling those timely meal periods.

11   In this particular case, given these circumstances, I think

12   it's a little more accurate to say it's an unpaid break.

13   Q.   Okay.

14   A.   I don't know whether this was a day where -- that was 30

15   minutes or longer.  So I don't know if this was for a meal or

16   not, but given what's next, I doubt it.

17   Q.   All right.  So let's go to when she was a crew member, how

18   many shifts longer than six did she have?  Six hours.  Excuse

19   me.

20   A.   109.

21   Q.   And of the 109, how many of those shifts that were six

22   hours or longer with a late meal period?

23   A.   In the raw punch data, a late recorded meal period was 21.

24   Q.   And what was that percentage then?

25   A.   19.3 percent.

1  Q.  This is late.  Okay.  And then how many of her shifts

2  where she had a timely meal period?

3  A.  As a crew member, the timely recorded meal periods was 76.

4  Q.  And what is that percentage?

5  A.  69.7 percent.

6  Q.  All right.  And let's move down to shift lead.  How many

7  shifts did she have as a shift lead?

8  A.  I found 36 shifts.

9  Q.  And of the 36, how many of those had a late meal period

10  punch?

11  A.  Four.

12  Q.  And what was that percentage then?

13  A.  11.1 percent.

14  Q.  And how many shifts did she have with longer than six

15  hours a timely meal period?

16  A.  14.

17  Q.  And what was that percentage?

18  A.  38.9.

19  Q.  All right.  And finally, she's a management trainee?

20  A.  Yes.

21  Q.  And how many shifts did she have as a management trainee?

22  A.  15.

23  Q.  And of those 15, how many were shifts longer than six

24  hours with a late meal period punch?

25  A.  One.

1    Q.   And then how many shifts did she have with shifts longer

2    than six hours with a timely meal period when she was a

3    management trainee?

4    A.   Two.  Should say recorded.

5    Q.   Recorded.

6    A.   I don't really know what happened in terms of timing of

7    breaks.

8    Q.   And then of those shifts with six hours or longer, with a

9    timely meal period, what percentage is that?

10   A.   13.3 percent.

11   Q.   Did you draw -- again, just looking at Ms. Hardiman and

12   Ms. Medlock, did you draw any conclusions based upon the

13   review of Ms. Hardiman and Ms. Medlock's punches in the raw

14   punch data?

15   A.   Yes, I did.

16   Q.   What conclusions were those?

17   A.   Well, one, that they tended to take -- they did not tend

18   to have late meal periods.  So the data didn't support the

19   idea that there was a uniform policy applied against them to

20   commence meal periods after the completion of the fifth hour

21   of work.

22        Second, in Ms. Medlock's case, you can see that the

23   number of timely and the number of untimely adds up to a very

24   small percentage of all.  So while Ms. Medlock was a manager,

25   while she was an AGM, most of the time she didn't report her

1  meal periods at all.  And that was consistent with her having

2  been subject to an on-duty meal period agreement while she was

3  an AGM.

4  Q.  And again, in looking at this, why did you think this was

5  important to do as part of your analysis?  If at all.

6  A.  Because, one, it tended to address the question about

7  whether or not the named plaintiffs themselves seemed to have

8  late meal periods as a general matter.  Which, in my mind, was

9  relevant to understanding whether or not there was a uniform

10  policy applied to all class members to have meal periods

11  commence late.  Because they were the representatives.  They

12  were supposed to be representative of the class.

13         And secondly, I wanted to see, at this more granular

14  level, where there seemed to be support for the idea that

15  managers were different than non-managers.  And that seemed to

16  be the case.

17  Q.  With respect to meal periods, did you do any other

18  analysis by sorting, according to class rep, restaurant,

19  manager, job code or any other analysis in, I guess, slicing

20  and dicing the information?

21  A.  The one I remember is time.

22  Q.  Time.  Okay.  And what did you do in that respect?

23  A.  I looked to see whether or not the circumstances seemed to

24  have changed over time.  Whether or not it was the case that

25  the incidents of late meal periods was the same in 2003 as it

1  was in 2004 and 2005, 2006, throughout the class period.

2  Q.   And what did you find in looking at that analysis?

3  A.   That it was not.  That it declined over time.  And that

4  when you looked at the end points, there was statistically

5  significant differences between 2003 and 2014.

6  Q.   And is there anything that you can conclude from that, any

7  policy or procedure or practice that you can conclude from

8  that analysis?

9  A.   That there seems to be differences, that the forces seem

10  to be different over time.  And when comparing shifts that

11  were worked in one year versus shifts that were worked in some

12  other.

13  Q.   Now, did you also do an analysis with respect to

14  the -- I'll call it the second rest break claim.

15  A.   Yes.

16  Q.   And what type of analysis did you do for the second rest

17  break claim?

18  A.   Well, the first step was to try to identify the number of

19  shifts that were seven hours within the raw punch data.  And

20  to see, you know, threshold question, well, is it the case

21  that the majority of such shifts have less than 20 minutes of

22  net rest time.  And then I also did it separately to see

23  whether or not the majority of such shifts had fewer than two

24  10-minute or longer paid rest breaks.

25  Q.   Now, why were you looking at 20-minute net rest?  I mean,

1   why did you look at that?

2   A.  It was my understanding, from Sheppard Mullin, which is

3   consistent with my reading of this Court case, that that's the

4   rule.  That 20 minutes of net rest is due for a shift that

5   lasts from six to seven hours.

6           So, for example, if someone took a rest break of nine

7   minutes after a few hours and then took a rest break of 11

8   minutes a few hours later, that counts as 20 minutes of net

9   rest time.  Similarly, if they took 12 and 8, or 13 and 7, or

10  16 and 4, or just one 20-minute paid rest break, it's my

11  understanding that that is compliant with the law.  That's

12  what you told me to assume for purposes of that analysis.

13  Q.  And in looking at your analysis for the rest break, did

14  you go through sort of a similar analysis, what I mean by that

15  is did you go about sorting the data in similar ways that you

16  did for the meal period class?

17  A.  I did.

18  Q.  And again, why did you do that analysis for the rest break

19  class?

20  A.  I wanted to address similar issues as I had addressed with

21  the meal periods.  I wanted to see whether a minority of the

22  rest break class members were responsible for a

23  disproportionate share of the late recorded rest periods.  And

24  they were.

25          I wanted to see whether there were differences across

1  job categories and the likelihood of having less than 20

2  minutes of recorded rest.  There was.  I wanted to see whether

3  manager effects seemed to be present in the recording of rest

4  time.  It was.  I wanted to see whether variations by store

5  were discernable.  They were.

6          And all of this went to the notion of whether there

7  was a uniform policy applied against all the rest break class

8  members to take less than 20 minutes of net rest.

9          And then alternatively I did an analysis to see

10 whether there was such a policy to take less than two

11 10-minute or longer breaks.

12 Q.  And looking, I guess, for the rest breaks, did you come to

13 a conclusion as to the number of eligible shifts?  In other

14 words, number of shifts that would actually sort of be part of

15 this rest break class?

16 A.  I did.

17 Q.  And do you recall the number of eligible shifts?  Without

18 looking at your report.

19 A.  No.

20 Q.  Okay.  Take a look at your report.  And I could probably

21 direct you to page 24.

22 A.  Yes.

23 Q.  And so just so we can sort of start from the beginning

24 again.  Did you look at the total number of all the shifts

25 that were possible and is that number the same number we

216

1    looked at for the meal period?

2    A.   Yes.

3    Q.   As a starting point.  So from the 9. -- 9,311,285 shifts

4    that were sort of the universe of shifts, did you come to a

5    number of eligible rest break shifts that are at issue here?

6    A.   Yes.

7    Q.   And how did you go about doing that?

8    A.   I identified shifts the way that we talked about before,

9    and then I identified those shifts that lasted more than six

10   hours and less than seven hours.

11   Q.   Okay.  So if we look at the rest break shifts, we start

12   with the 9,311,285.  And then what was the number of shifts

13   that you actually came -- you concluded were actually part of

14   this class?

15   A.   1,157,892.

16   Q.   So this would be the number of eligible rest break shifts;

17   correct?

18   A.   Based on the raw punch data, yes.

19   Q.   Right.  So these are shifts that are between six and seven

20   hours?

21   A.   Yes.

22   Q.   And once you looked at the number, that number of shifts,

23   what did you do to determine -- to do your analysis?

24   A.   Well, I looked to see, of those shifts, how many of them

25   included intervals that began with a "BK" that added up to 20

1    minutes.

2    Q.  And what percentage, if you know off the top of your

3    head -- if not, you can look at your report -- were those

4    shifts?

5    A.  I don't know off the top of my head.

6    Q.  Can you take a look at your report, Dr. Walker.

7    A.  Sure.  65.7 percent.  So roughly two-thirds included 20

8    minutes or more of net rest.

9    Q.  Okay.  So of the 1.1 million approximately -- going to do

10   the math, 600 or so thousand shifts?

11   A.  Yes, something like that.

12   Q.  And so looking at the number, what's the total number of

13   shifts, then, that I guess did not have a total 20 minutes of

14   net rest?  Do you know what that number is?

15   A.  Not without looking.

16   Q.  Can you look at your report, Dr. Walker.

17   A.  I'm going to have to use His Honor's trusty calculator.

18   397,435.

19   Q.  397,405?

20   A.  435.

21   Q.  435.

22   A.  Had less than 20 minutes of recorded net rest.

23   Q.  And that's out of the total possible number of shifts of

24   9.3 million; correct?

25   A.  Yes.

1    Q.  Okay.  Let's start on your analysis of the rest break

2    punches.  Now, in looking at that, did you again do the

3    analysis based upon job category, did you do some analysis?

4    A.  Yes, I did.

5    Q.  And was that for the same reasons you did the analysis for

6    the meal period class?

7    A.  Yes.

8    Q.  And did you use the same job categories that you used for

9    the meal period class?

10   A.  Yes, I did.

11   Q.  All right.  Well, let's take a look at that.  Do you

12   remember those job categories that you used to sort the data

13   for the rest break class?

14   A.  They were the same.  RGM, AGM, management trainee, shift

15   lead.

16          THE COURT:  Ms. Kennedy, is this area going to

17   be -- how much -- I'm just gauging --

18          MS. KENNEDY:  Probably -- I should be done in about

19   an hour or less.  Total.

20          THE COURT:  Oh, I just meant this section you were

21   getting into.

22          MS. KENNEDY:  We can stop here.  I can just do job

23   category.

24          THE COURT:  I think this is time.  We'll take a

25   little longer break today.

1          MS. KENNEDY:  Absolutely.

2          THE COURT:  Ladies and gentlemen of the jury, we are

3     going to take our noon recess at this time.  And we will come

4     back at 1:15.  Remember, do not form an opinion.  Do not

5     discuss this case.  We'll see you back at 1:15.  Thank you.

6          (The jury left the courtroom.)

7          THE COURT:  All right.  We are outside the presence

8     of the jury.  I decided to cut it since you were moving into

9     an area and I knew you would --

10          MS. KENNEDY:  That's fine.

11          THE COURT:  -- ask some questions when we last left.

12     So just save me some time.  Give people a little break.

13     Anything before we conclude for the lunch break?  Plaintiffs?

14          MS. KENNEDY:  No, Your Honor, none for the defense.

15          THE COURT:  Plaintiffs?

16          MR. THERIAULT:  No.

17          THE COURT:  Okay.  Thank you.  Mr. Theriault, did you

18     give -- do they have the other side's, the summary item?

19          MR. THERIAULT:  Exhibit 99?  Yeah, I believe I gave

20     them.  I also gave you in paper form at as well.

21          MS. KENNEDY:  Yes.  I have -- I have a copy of the

22     paper format of 98 and 99 and you sent me the email for

23     Exhibit 100-A through D.

24          MR. THERIAULT:  Right.  Describing what pages they

25     were on so you could cross-check.

220

1          THE COURT:  Do I have 100-A through D?

2          MS. BALDERRAMA:  Yes, Your Honor.

3          THE COURT:  Okay.  How is it marked?

4          MS. BALDERRAMA:  It's the footer has Exhibit 100-A

5     through D.

6          THE COURT:  Okay.  All right.

7          MR. SOKOLOWSKI:  I believe A through D are all

8     stapled together, Your Honor.  If you page, the footer will

9     distinguish A through D.

10         THE COURT:  Got it.  Thank you.  We're in recess.

11         (Recess.)

12         (The jury entered the courtroom.)

13         THE COURT:  All right.  The record will reflect the

14    jury has returned.  You may proceed, Ms. Kennedy.

15         MS. KENNEDY:  Thank you very much, Your Honor.

16    Q.  Good afternoon, Dr. Walker.

17    A.  Good afternoon, Ms. Kennedy.

18    Q.  Do you have water up there?

19    A.  I do.  Thank you.

20    Q.  I believe before the lunch break, we were starting with

21    the rest break analysis with respect to -- the analysis based

22    upon job category.  Do you recall that?

23    A.  I do.

24    Q.  In fact, you did do a similar analysis for job category

25    that you did for the meal period class; is that correct?

1  A.  Yes.

2  Q.  And again, I think we talked earlier that you used the

3  same job categories for the rest break class as you did for

4  the meal period class; correct?

5  A.  Yes, that's correct.

6  Q.  Okay.  So those categories would be RGM --

7  A.  RGM, AGM, management trainee, shift leader and crew.

8  Q.  Okay.  And with respect to your sort by job category, what

9  did you conclude or what did you discover in your analysis?

10 A.  I found that the incidents of 20 minutes or more of net

11 paid rest varied between job categories in a statistically

12 significant way.

13 Q.  And how so?

14 A.  I'd have to look at the exhibit.

15 Q.  Okay.  I think it's Figure 15 of your report.

16 A.  Thank you.  As with the -- as with the meal periods, the

17 non-management jobs, the management trainee, shift leader

18 and -- well, actually, it was the shift lead and the crew had

19 significantly fewer -- significantly, meaning a meaningful

20 difference, a large number, a lot fewer instances of not

21 having -- I'm sorry, of having 20 minutes or more of net paid

22 rest than RGMs and AGMs.

23         But there were also differences just between RGM and

24 AGM, between management trainee and shift leader, between crew

25 and the other job categories.  So any comparison between two

1   job categories, there were meaningful differences that were

2   statistically significant.  And it was the case that RGMs and

3   AGMs, in particular, were much less likely to record 20

4   minutes or more of paid net rest.

5   Q.  And did you draw any conclusions as to why that was?

6   A.  I can't say from the raw punch data.  But based upon

7   having also reviewed testimony, deposition testimony and now

8   some testimony here at trial, it's the managers that are

9   telling the non-management personnel to take breaks and the

10  managers themselves are apparently not recording as frequent

11  breaks as are being recorded for the other staff.

12  Q.  And did you also do an analysis of the raw punch data for

13  the rest break class by restaurant?

14  A.  I did.

15  Q.  And did you follow the same methodology as you did for the

16  meal periods?

17  A.  Yes, I did.

18  Q.  All right.  Let's take a look at that.  And actually,

19  we'll sort of do it side by side like we did before.  Did you

20  also do a rest break analysis by manager as well?

21  A.  I did.

22  Q.  All right.  Is it okay if we can compare those two like we

23  did last time?

24  A.  Sure.

25  Q.  So Dr. Walker, let's start with the sort by restaurant.

1  We'll start that first.  Okay?

2  A.  Yes.

3  Q.  And like for the meal period, did you sort by, I guess,

4  the top ten and the bottom ten, so to speak?

5  A.  Yes, I did.

6  Q.  And the same thing with the manager sort; is that correct?

7  A.  Yes, that's correct.

8  Q.  So let's look at the information concerning the

9  restaurant.  Did you break the analysis down into shifts that

10  were between six and seven hours?

11  A.  I did.

12  Q.  And then you looked at the shifts between six and seven

13  hours with at least 20 minutes of break time recorded; is that

14  correct?

15  A.  Yes, that's correct.

16  Q.  All right.  And so look at -- we'll call them the top ten,

17  or that would be the ten with the highest percentage of shifts

18  with at least 20 minutes of net rest; is that correct?

19  A.  That is what the top ten was, yes.

20  Q.  Okay.  Can you explain what you learned or concluded based

21  upon that analysis?

22  A.  Yes.  That there was -- as with the meal periods, there

23  was a significant difference, even among the top ten.  And

24  that when you compared the top ten to the bottom ten, that the

25  top ten had a statistically significant difference in the rate

224

1   at which there were timely -- I'm sorry, complete amounts of

2   rest break offered.  To get more detail, I'd have to actually

3   look at the figure, but that was the general conclusion.

4   Q.   Okay.  Can you take a look at Figure 16 of your report.

5   A.   Yes.

6   Q.   And looking at the top ten, again, with the highest

7   percentage of at least 20 minutes of net rest, what was the

8   percentage -- what is the percentage range?

9   A.   Again, this -- in this time, top ten means best.  Meal

10  period, top ten meant worst.  Because this is the percentage

11  of relevant shifts that had at least 20 minutes of net rest.

12  And it ranged from 83.6 percent of relevant shifts -- and I'm

13  reading from my report -- to 95.3 percent for the store that

14  was the best.

15  Q.   And in looking sort of just at the hard numbers, so, for

16  example, look at the one that's 95.3 percent.  What are the

17  number of shifts that were eligible and the number of shifts

18  that actually had 20 minutes net rest?  Just as an example.

19  A.   There were 1,177 relevant shifts at that best store.  And

20  then of those 1,177 relevant shifts, 1,122 of them had

21  10 -- I'm sorry, 20 minutes or more of net rest.

22  Q.   And the -- what store had the most number of shifts?  The

23  number of shifts, not percentage.  What was the number of

24  shifts?

25  A.   Among the top ten?

1  Q.  Yes, Dr. Walker.

2  A.  Store number -- restaurant number 2756 had 8,107 relevant

3  shifts.

4  Q.  And what was the percentage of shifts that were in the top

5  ten percentage?

6  A.  I'm sorry, could you repeat your question?

7  Q.  Certainly.  For store 2756 that had 8,107 shifts, what was

8  that store's percentage?

9  A.  It was 83.6 percent.

10  Q.  So the store with the most shifts, again in the top range,

11  had the lowest percentage?

12  A.  Yes.

13  Q.  So let's look at the bottom list, which is the ten with

14  the sort of, quote, worst, so to speak, percentages.

15  A.  Yes.

16  Q.  What are the ranges there?

17  A.  It ranges from 35.6 percent to 44.5 percent.

18  Q.  And what are the ranges in the numbers of shifts, so the

19  highest and the lowest?

20  A.  141 shifts, but I didn't mention that I limited this

21  analysis to stores that had 100 shifts or more.

22  Q.  Okay.

23  A.  So 100 relevant shifts or more.  And among the bottom ten,

24  one store among the bottom ten had 141 such shifts.  And one

25  of them had 8,002 such shifts.

1  Q.  And you also did a similar analysis by manager; correct?

2  A.  I did.

3  Q.  And just looking at the manager shifts -- the manager

4  analysis, did you take the ten managers with the highest

5  percentage of qualifying shifts where there's at least 20

6  minutes of net rest?

7  A.  I did.

8  Q.  And then, of course, the ten managers that were the lowest

9  percentage of net rest for that applicable shift; right?

10  A.  Exactly, yes.

11  Q.  So let's take a look at these.  So for the top ten, what

12  is the range of percentage of shifts?  I mean, percentage of

13  shifts per manager.

14  A.  Off the top of my head, I don't know.  I'd have to look at

15  the exhibit.

16  Q.  Please do.  I think it's Figure 17.

17  A.  The top ten ranged from 90.9 percent, that's 90.9 to 94.7

18  percent.

19  Q.  94.7?

20  A.  Yes.

21  Q.  And the bottom ten, what is the range there?

22  A.  6.7 percent to 21.7 percent.

23  Q.  And in looking at the range on the bottom, the range from

24  6.7 percent, how many shifts were in that category for that

25  manager?

1    A.   104.

2    Q.   So -- okay.  So very few number of shifts?

3    A.   Yes.  Relative to the others.  Limited it to 100, to make

4    sure you were not getting outrageous percentages just because

5    there were few observations.

6    Q.   And take a look at the top ten on the manager.  The

7    percentage that is the lowest percentage for the manager, what

8    is the -- that's the 90.9 percent?

9    A.   Yes.

10   Q.   And how many shifts are in that category for that manager?

11   A.   2,686 relevant shifts.

12   Q.   And the compliance rate, so to speak, how many was that?

13   A.   The number of shifts that were -- that included 20 minutes

14   or more of net rest was 2,442.

15   Q.   And Dr. Walker, in light of that number, what conclusion,

16   if anything, do you draw from that particular manager?

17   A.   Well, certainly for the shifts that -- where that manager

18   was the sole manager, it is not plausible to me that those

19   shifts were subject to a uniform policy to take less than 20

20   minutes of net rest on shifts that last from six to seven

21   hours.  You know, over 90 percent of such shifts included 20

22   minutes or more of net rest.

23   Q.   And --

24   A.   A net rest.

25   Q.   In looking at the restaurants analysis and the manager

1   analysis, is there any way to correlate those two?  So for

2   example, if, for example, the worst manager, so to speak, is

3   in one of the worst restaurants?  Or do you know?

4   A.   I'm sure it's possible.  I did not attempt to do such an

5   analysis.

6   Q.   Okay.  Let's look at the next sort of analysis that you

7   did.  Did you do an analysis sort of over time to see how rest

8   breaks were being punched in or out?

9   A.   I did.

10  Q.   What kind of analysis did you do?

11  A.   Well, there are two that are time related.  One again was

12  shift start times.  And I saw differences in the incidents of

13  20 minutes or more of net rest that varied by when shifts

14  start.

15          And then another one just over time, meaning over the

16  years, what is the percentage of relevant shifts that have 20

17  minutes or less than 20 minutes of net rest and how has that

18  changed over time, over the years of the class period.

19  Q.   And so if we look at it over time, what was the time

20  period you were looking at?

21  A.   2003 through -- well, I think it was September, I always

22  forget the month.  2003 through December of 2014.

23  Q.   And for the start time analysis, were you looking at the

24  rest break class as to the start of the shift or the start of

25  a break time?

1  A.  Start of a shift.

2  Q.  And why were the break -- for the rest break class, was

3  the start of the shift important to you?

4  A.  Well, again, that would determine what span of time would

5  be covered by the shift.  And it was my expectation that

6  whether or not a shift covered a typical rush period would be

7  relevant.  And where the rush period falls within the shifts

8  would be relevant.  So I expected that there might be patterns

9  that were based upon shift start times that were driving the

10 incidents of late recorded or inadequate recorded rest break

11 time.

12 Q.  Did you also do an analysis as to the rest breaks with

13 respect to the named plaintiffs or the class representatives?

14 A.  I did.

15 Q.  Again, was it a similar analysis as for the meal period?

16 A.  It was.

17 Q.  All right.  We'll just look at a couple of the named

18 plaintiffs.  We'll look at Ms. Hardiman and Ms. Medlock.

19 A.  Okay.

20 Q.  And do you know those figures off the top of your head?

21 A.  I don't.

22 Q.  Do you need to take a look at your report to refresh your

23 recollection?

24 A.  Yes, I do.

25 Q.  Please do.  And I believe it's Figure 20, Dr. Walker.

Walker

1    Now, for this analysis, Dr. Walker, did you rely upon

2    the raw punch data?

3    A.  Yes.

4    Q.  Did you look at anything else for the rest break analysis

5    as to the class representatives?

6    A.  Not for this exhibit, no.

7    Q.  So looking at Ms. Hardiman, did you do the analysis that

8    we talked about with respect to rest breaks in the same way

9    you did for the meal periods?

10   A.  I did.

11   Q.  And tell me what you did for Ms. Hardiman.

12   A.  I looked at the raw punch data to identify the shifts that

13   she worked six to seven hours.  And then of those shifts, I

14   looked to see how many of them included 20 minutes or more of

15   net rest and calculated what percentage that constituted

16   involved such six to seven hour shifts.

17   Q.  How much shifts did Ms. Hardiman have?

18   A.  96.

19   Q.  And of those shifts, how many of those shifts did she have

20   with at least 20 minutes of paid break time?

21   A.  81.

22   Q.  And what was that percentage?

23   A.  84.4 percent.

24   Q.  And for Ms. Medlock, did you do -- how many shifts for Ms.

25   Medlock?

1   A.   There were -- again, I did it based on her job category.

2   She had two different -- fell in two different job categories

3   that included six to seven hour shifts.

4   Q.   Okay.  Let's start with, she was crew and shift lead?

5   A.   Yes.

6   Q.   How many shifts did she have as a crew member?

7   A.   There were 8 shifts that Ms. Medlock worked that showed up

8   in the raw punch data that were lasting from six to seven

9   hours.

10  Q.   So when you look at the raw punch data for your entire

11  career, she only had eight shifts that were between six and

12  seven hours?

13  A.   That showed up in the raw punch data for which she worked

14  as a crew member.

15  Q.   Okay.  And for the shift lead, how many shifts did she

16  work as a shift lead that were between six and seven hours as

17  shown in the raw punch data?

18  A.   One.

19  Q.   And for the time that she was a crew member on the eight

20  shifts, how many of those shifts were actually paid -- she had

21  paid break time of at least 20 minutes?

22  A.   Five.

23  Q.   And what is that percentage?

24  A.   62.5 percent.

25  Q.   And when Ms. Medlock was a shift lead, how many of

1   those -- how many of the shifts, of the one shift, was

2   actually paid?  Had a paid rest break?

3   A.   One.

4   Q.   So that would be 100 percent; correct?

5   A.   Yes.

6   Q.   Again, in looking at Ms. Medlock and Ms. Hardiman, what

7   conclusions, if any, do you draw with respect to rest breaks

8   being authorized and permitted for them on the shifts that

9   were between six and seven hours?

10  A.   That based on the data that relate to them, the raw punch

11  data indicates they were not -- it does not support the idea

12  that they were subject to a uniform policy that you would only

13  get less than 20 minutes of paid rest time for shifts that

14  last six to seven hours.  Most of the time when they worked

15  shifts of that length, they got 20 minutes or more of paid

16  rest.

17  Q.   Now, Dr. Walker, during all this analysis, where you had

18  meal period analysis and rest break analysis, did you draw any

19  sort of overall conclusions as to Taco Bell, whether it had a

20  policy or not a policy, or whether or not it had any other

21  practice with respect to meal periods not being provided to

22  its hourly employees?

23  A.   Yes.

24  Q.   What is that overall opinion, Dr. Walker?

25  A.   That the data that I reviewed is not consistent.  That the

1    raw punch data are not consistent with Taco Bell having

2    enforced and applied a uniform policy across the class of

3    having meal periods to not start until after the completion of

4    the fifth hour of work when non-exempt employees at

5    corporate-owned stores in California from 2003 to 2014 worked

6    on shifts that lasted longer than six hours.

7    Q.   And what about with respect to rest breaks, what is your

8    opinion, again, based on all of the data and all of your

9    analysis?

10   A.   That the data, the raw punch data are not consistent,

11   they're inconsistent with the idea that Taco Bell applied a

12   uniform policy across the 2003 to 2014 time period of allowing

13   only one 10-minute paid rest break on shifts that lasted

14   between six and seven hours.

15   Q.   Dr. Walker, you did see in some of the raw punch data,

16   there's sometimes -- it's not 100 percent, sometimes there are

17   missed punches, sometimes people did not punch out for the

18   meal periods or the rest breaks.  How do you account for that

19   in coming to your conclusions?

20   A.   Well, there are individualized explanations.  It's not a

21   policy that's driving it.  And the potential explanations are

22   myriad.  We've talked about errors.  Some of these could be

23   instances where breaks were taken, but not recorded.  And some

24   of these could be instances where breaks were offered, but not

25   taken.  And some of these could be instances, as the

1    plaintiffs say, where breaks were not offered.  You can't tell
2    from the raw punch data.
3    Q.  Also part of your assignment, you were asked to look at
4    some of Mr. O'Brien's, I guess I'll call it the raw punch data
5    analysis; is that correct?
6    A.  Yes.
7    Q.  Did you take issue of some of Mr. O'Brien's raw punch data
8    analysis?
9    A.  Yes.
10   Q.  And what do you take issue with in Mr. O'Brien's analysis?
11   A.  There are a few sort of categories --
12   Q.  Okay.
13   A.  -- of error related to it.  The first is defining shifts
14   based on the seven hour rule.  So Mr. O'Brien also had to
15   organize the data, which are just punches, try to derive
16   shifts from it.  And he applied a rule that if there's seven
17   hours from a TO until the next TI, that he assumed that that's
18   what it would take to define a separate shift.
19          That methodology can lead to false positives.  It can
20   lead to -- if it's true, if Taco Bell has defined shifts based
21   on one hour, yet you define shifts based on seven hours, then
22   you can end up taking two different shifts that are not
23   violative and come to the conclusion that really it's one long
24   shift that is.  And that could be the case with respect to the
25   meal period or it could be the case with respect to the rest

235

1    breaks.

2              Moreover, it just is different.  So one, it can lead

3    to these false positives.  And two, it would just lead to a

4    different list of instances in the raw punch data where there

5    is a violative series of punches.  A series of punches that

6    tend to indicate the lack of timely recorded meal period or

7    the lack of adequately supplied rest.

8    Q.  Did you take issue with any other analysis by Mr. O'Brien?

9    A.  Yes.

10   Q.  What other issue did you -- what other part of his

11   analysis do you take issue with?  If you know.

12   A.  Yeah, the second broad category has to do with

13   just -- with ensuring data -- ensuring accuracy.  There were

14   big errors that he had found.  And based on his deposition

15   testimony and other testimony that I saw, he seemed to find

16   them just by happenstance.  It didn't seem as though he was

17   having people check his work.

18              As I mentioned, our policy at Economists Incorporated

19   is to have somebody independently review all code so that you

20   can find it when somebody mistypes in a code that might

21   ultimately lead to a significant numerical error.  And we have

22   two separate people entering data so that if there's a data

23   entry error, you can identify such errors.

24              And in Mr. O'Brien's case, there was an error that he

25   found that it sounded as though by happenstance, that had left

1   him to misstate the size of the underpaid premium class by

2   something like 20 percent.

3        There was an error with regard to the meal period

4   class that led to an error that was roughly, again, 20

5   percent.

6        At one point in time, when dealing with the initial

7   batch of data, that covered the period through July of 2013,

8   he had counted 6 million, roughly, work shifts that lasted six

9   hours or more that included a timely meal period.  Then he got

10  more data covering the period July 2013 to December '14 and

11  when he counted up the number of shifts that included a timely

12  meal period, once he added more shifts, his total tally went

13  down by a lot.  So it went from 6 million to approximately 5

14  million when he added more data.

15       So one of those -- and he had testified about both at

16  different points in time.  One of those was wrong.  I can't

17  tell which one, I don't know exactly why.  But clearly there

18  was some sort of error in the analysis.

19       I've mentioned before that when we -- when I've

20  counted up the number of rest breaks, the number of shifts

21  with missing recorded rest breaks, I end up with -- when you

22  define "missing" as having less than two 10-minute rest

23  breaks, I end up with a number that's roughly 20 percent less

24  than his.  I don't know why that is, but I know that there's a

25  big difference.

1       And so I have doubts about the accuracy of the

2  analysis because I don't believe -- although I don't know for

3  a fact what Mr. O'Brien did in terms of checking the accuracy,

4  but I don't believe that the work was checked independently

5  based on the errors that I've seen and what little I know

6  about what Mr. O'Brien actually did.

7  Q.  Do you take issue with any other part of Mr. O'Brien's

8  analysis?

9  A.  Yes, I do.

10  Q.  What other issues do you take?

11  A.  From O'Brien's counts of missing or late meal periods

12  doesn't account for auto-pay or for on-duty meal period

13  agreements.  So his counts include shifts which, whether they

14  are violative or not, there's already been a premium paid.

15  And it also includes shifts that I understand were subject to

16  on-duty meal period agreements.

17  Q.  Any other issues?

18  A.  Yes.

19  Q.  What other issues?

20  A.  There are the sort of general problems that we talked

21  about before that relate to the reliability of the raw punch

22  data to ascertain how many unrecorded -- how many meal periods

23  were not offered on a timely basis and how many rest breaks

24  were not offered in adequate quantity.

25       These are all the same things that are just endemic

238

1    to raw punch data.  That you can't tell from the raw punch

2    data whether a shift included a break that was not recorded.

3    You can't tell from the raw punch data whether a break that's

4    missing is missing because someone wasn't offered the meal

5    period, for example, or whether they chose to work through the

6    meal period for more money rather than take the time off on an

7    unsupervised basis.

8              And then as I say, endemic in the raw punch data are

9    errors.  And those errors are large in relation to the number

10   of alleged violations that are found.  So I don't remember the

11   exact number of rest periods that I found, we went over

12   before, but it's not that big relative to 150,000, 160,000

13   known errors and the potential for similar numbers of unknown

14   errors.

15             Along those same lines, there are -- we know, based

16   on the discovery record, that there is unrecorded rest break

17   time that, as part of the auto-pay system, when the auto-pay

18   system identifies a shift, a relevant shift that does not

19   include 30 minutes of unpaid break time, a TO and a TI that

20   lasts for 30 minutes, not only is the employee given an hour

21   of pay, but the unpaid time, the -- so if there's 29 minutes,

22   it's not 30.  So there's no meal period.  The auto-pay system

23   not only gives the employee an hour wages for that shift, but

24   that TO to TI that was 29 minutes is converted to break time.

25   So the actual paid break time on shifts with auto-pay may be

1   significantly different than what shows up in the raw punch

2   data.  So the raw punch data will tend to understate recorded

3   breaks for anybody that got auto-pay.

4          Those are the major, you know, problems that I see

5   with what Mr. O'Brien did and use of his counts for the

6   purposes that I understand they're to be used for.

7          MS. KENNEDY:  Your Honor, if you give me two seconds,

8   I believe I'm done.  I'd just like to check my notes.

9          THE COURT:  Yes.  .

10         MS. KENNEDY:  Your Honor, according to my co-counsel,

11  I am done.

12         THE COURT:  All right.  Mr. Theriault, redirect.

13         MR. THERIAULT:  Yes, Your Honor.

14         THE COURT:  You may proceed.

15                   REDIRECT EXAMINATION

16  BY MR. THERIAULT:

17  Q.  Good afternoon, Dr. Walker.

18  A.  Good afternoon, Mr. Theriault.

19  Q.  This may be a little disjointed and I apologize, but we're

20  going to try to cover the rest of your testimony by topics.

21         Now, one of the first things that you talked about

22  with Ms. Kennedy was about errors in the punch data.  You

23  generally recall that testimony?

24  A.  I do.

25  Q.  All right.  And what you saw, for instance, in the punch

240

1   data was simultaneous punches.  Punch in followed by a punch

2   out at the same time.  Correct?

3   A.  That was one of the types, yes.

4   Q.  And why do you presume that was an error?

5   A.  Because I don't think there could be two simultaneous

6   punches.

7   Q.  All right.  I mean, you've never heard of a situation

8   where an employee comes to work and is told, immediately upon

9   punching in, to go home?

10  A.  I suppose that could happen.

11  Q.  Now, again, you might have misspoke with this one and I

12  want to clarify.  Now, you indicated that there was a

13  statistically significant difference in the rate at which rest

14  breaks were offered.  Do you recall that testimony?

15  A.  I don't.

16  Q.  Okay.  I wrote it down as it was coming up.  Now, you're

17  not offering any opinion about whether breaks were actually

18  offered; correct?

19  A.  No, I'm not.

20  Q.  Okay.  And that you couldn't tell, by looking at the time

21  records, whether or not breaks were offered or not offered;

22  correct?

23  A.  Well, you can tell, but -- no, it's possible that the

24  recorded breaks didn't really happen.

25  Q.  Right.  And it's also possible, isn't it, that a manager

1  could have punched somebody out while that person continues

2  working; correct?

3  A.  It's possible, yes.

4  Q.  Now, you also stated that rest is added via the auto-pay

5  system.  And I just want to sort of clear that up a little

6  bit.  Now, we've seen evidence in this case -- and I'm not

7  sure if you have, or if you saw the documents before you filed

8  your report.  But we've seen evidence in this case that from

9  the 2003 period to November of 2007 period, Taco Bell had this

10 auto-pay system.  Are you generally aware of that?

11 A.  Yes.

12 Q.  And under this auto-pay system, short meal breaks and

13 missing meal breaks, violations were paid for a

14 half -- by -- at the rate of a half an hour instead of the

15 full hour as required by the law.  Do you remember that?

16 A.  Well, again, this is the issue of violations versus what

17 shows up in the data.  Yeah, when the data showed less than 30

18 minutes of paid -- I'm sorry, a 30-minute meal break, that the

19 auto-pay system would pay a half hour of wages.  I don't

20 understand that that means it was actually a violation, but

21 rather there's the potential for violation and the auto-pay

22 system paid a half hour wages.

23 Q.  Right.  So you don't have an opinion about whether or not

24 it's a violation or not; right?

25 A.  That's correct.

1    MR. THERIAULT:  Your Honor, may I publish Exhibit 23,

2  please?

3    THE COURT:  You may.

4    MR. THERIAULT:  I'm sorry.  Joint 43.

5    THE COURT:  Yes.  43?

6    MR. THERIAULT:  Yes.  All right.  And could you bold

7  that first bullet point under example one, please, or blow it

8  up.

9  Q.  Okay.  Now, I don't know if you -- have you seen this

10  document before?

11  A.  If you back up again and let me look at the whole thing.

12  I think I have, yes.

13  Q.  Okay.  Would you blow up that one section again, please.

14    All right.  So I understand that you wouldn't call it

15  a violation, but do you see here the meal period and rest

16  break violations -- Taco Bell called those violations.  Do you

17  see that?

18  A.  Yes, for purposes of this document, whoever wrote it

19  called it a violation, yes.

20  Q.  Well, Taco Bell wrote this document.  You understand that,

21  right?

22  A.  A person wrote this document and that person was a Taco

23  Bell employee, I wouldn't say Taco Bell wrote this document.

24  That's the distinction I was drawing.

25  Q.  All right.  You understand that this is a document that

1   Taco Bell claims to be a policy or a procedure?

2              MS. KENNEDY:  Objection.  Misstates the testimony.

3   Lacks foundation.

4              THE COURT:  Sustained.

5   BY MR. THERIAULT:

6   Q.  All right.  Let's just call it what Taco Bell calls it.

7   Now, do you see anything in here about -- and so I just wanted

8   to clarify that one point.  You said rest is added via the

9   auto-pay system.  Have you seen any documents suggesting that

10  Taco Bell actually paid an additional hour for missing rest

11  breaks?

12  A.  An additional hour for missing rest breaks?

13  Q.  Right.

14  A.  No, I didn't say that.

15  Q.  Okay.

16  A.  What I said was there are other documents that show

17  certainly in the new system -- and I don't recall whether this

18  applied before this change.  When the auto-pay system

19  identifies the absence of a full 30-minute meal period that

20  begins with a TO and ends with a TI, that they not only pay

21  the one hour wage, but they also look at the TO, TI period

22  that's there and they convert it to a BK TI and they pay that

23  as rest -- as paid rest time.

24  Q.  All right.

25  A.  So that you can't look at the raw punch data and calculate

Walker - RD

244

1    out the amount of net paid rest time that people actually got.

2    Q.  All right.  And just so I make sure.  You didn't see

3    anything in the documents that Taco Bell's lawyers gave you,

4    or Taco Bell gave you, that stated that they paid the

5    additional hour of premium pay required under law for rest

6    break violations?

7    A.  I'm not aware of that, no.

8    Q.  All right.  Now, you believe you've done a good job with

9    the assignments that were provided to you by Taco Bell's

10   counsel; right?

11   A.  Yes, I do.

12   Q.  And it was Taco Bell's lawyers that provided you with the

13   assignments; correct?

14   A.  Yes.

15   Q.  And you provided testimony about your analyses of

16   those -- as they relate to those assignments today.  Right?

17   A.  Yes.

18   Q.  Now, sort of yes or no, do you believe that it's

19   important, when conducting analyses of the type that you

20   normally do and the type that you did in this case, that they

21   be accurate and precise?

22   A.  There's a lot of predicate, so the answer is maybe.

23   Q.  Do you believe that you conducted an accurate and precise

24   analysis in this case?  Based on the assignments that were

25   given to you.

1  A.  Yes.

2  Q.  Okay.  Now, you also testified that there were errors in

3  the raw punch data that were corrected by the PVR.  Do you

4  recall that testimony?

5  A.  I don't recall being asked that, but it is my

6  understanding that that's the case.

7  Q.  Okay.  All right.  And what's the basis of your

8  understanding that the PVRs correct errors in the raw punch

9  data?

10  A.  Well, my recollection is that yesterday I sat here for

11  testimony from Ms. Hardiman, where she identified shifts that

12  were missing from her paycheck and that they were corrections

13  that were made after that and she was paid for them.  My

14  recollection is there's deposition testimony from other people

15  that talk about corrections that were made.

16        I thought that another gentleman who testified talked

17  about there being errors that he complained about that were

18  fixed.  So it's deposition testimony from plaintiffs and from

19  other -- named plaintiffs and from other people, deposition

20  and trial testimony.

21  Q.  All right.  So you've seen evidence, you've actually

22  witnessed evidence that the PVRs may be more accurate than the

23  raw punch data; correct?

24  A.  Yes.  And I also have talked to people from Taco Bell --

25  actually it's Sheppard Mullin and also people on the phone,

1  I'm not sure that they were from Taco Bell -- who discussed

2  the differences between the PVRs and the raw punch data.

3         I also read the testimony from someone who testified

4  before I got here, who was sort of a custodian of records who

5  talked about the raw punch data and what Taco Bell uses it for

6  and what the infirmities are with it.

7         So, yes, there's discussions with them and deposition

8  testimony I've read and trial testimony I've read, yes.

9  Q.   So in your opinion, you know, you're not -- you're not the

10 judge or the jury, but in your opinion, you've seen evidence

11 which would suggest to you that the PVRs are more accurate?

12 A.   Yes.

13 Q.   Okay.  Now, you and your firm reviewed some PVRs; right?

14 A.   Yes.

15 Q.   How many people?  How many people's PVRs did you review?

16 How many class members' PVRs did you review?

17 A.   I recall four.  The four named plaintiffs at the time.  We

18 may have also looked at some others in less of a systematic

19 way, but certainly those four.

20 Q.   All right.  But you didn't review all of the PVRs for all

21 of the class members?

22 A.   No.

23 Q.   All right.  So now, there's lots of questions, you know,

24 about as an economist, what you would do, what you would rely

25 on.  And you just told me that you relied on something -- that

1  a PVR is more accurate.  And I take it you pride yourself on

2  giving accurate analysis; correct?

3  A.  I try to avoid inaccuracies, yes.

4  Q.  All right.

5  A.  Even with good stringent quality controls there are bound

6  to be errors.  But yes, I do my best to eliminate them, to

7  minimize them.

8  Q.  Right.  And Taco Bell's lawyers never asked you to review

9  and provide analysis of the allegedly more accurate PVRs; did

10  they?

11  A.  That's correct.  That wasn't part of my assignment.

12  Q.  Did that seem strange to you?

13  A.  No, it did not.

14  Q.  Even though they could have been more accurate and they

15  could have given people in this Court a more accurate

16  assessment of what was going on, you didn't review them?

17  A.  I did not review them.  I don't know that it would have

18  made the assessment of things that I've looked at any more

19  accurate.  My task was responsive, to respond to what you had

20  done.  Your analysis was not based on PVRs.  If your analysis

21  had been based on PVRs, I suspect that I would have done an

22  analysis based on PVRs.

23          But, you know, I'm a rebuttal expert.  I was here to

24  look at what you guys have done and see whether or not that's

25  a valid basis to come to the conclusions that I understand

1  that you've come to.

2  Q.  All right.  So Taco Bell has the PVRs, they know the

3  answers, they don't ask you to review them.

4            MS. KENNEDY:  Objection.  Argumentative.

5            THE COURT:  Overruled.

6            THE WITNESS:  They did not ask me to review them,

7  that's right.

8  BY MR. THERIAULT:

9  Q.  Now, did you sit -- I know you've been here for a couple

10  of days.  But you haven't been here for the testimony of all

11  the witnesses that have, you know, walked up to the podium and

12  taken the oath and gotten off; right?

13  A.  That's correct.

14  Q.  All right.  And you weren't sitting here when you heard

15  the testimony of Taco Bell's representatives that walked up to

16  the podium, took the oath, provide testimony and walked off;

17  right?

18  A.  Not everyone.  I've sat here and I've heard witnesses from

19  both sides, but there are many witnesses I've not heard.

20  Q.  Right.  While you were here.

21  A.  While I was here I heard what I heard.

22  Q.  All right.

23  A.  When I was not here, there was also testimony, some of

24  which I've read.

25  Q.  Okay.  Now, you're aware that there are witnesses who

1   testified that they weren't actually scheduled meal and rest

2   periods, according to the law.  Are you aware of that?

3   A.   I don't recall either hearing or seeing transcripts of

4   witnesses who said that they weren't scheduled rest periods

5   according to the law.  I don't recall that.

6   Q.   Okay.  And do you recall any testimony that class members

7   are required to work through their breaks?

8   A.   I do recall testimony from people saying that they were

9   told to continue working through scheduled breaks.  Yeah, I do

10  recall that.

11  Q.   All right.  And did you understand that there's some

12  evidence presented by a survey suggesting that there was

13  manipulation of the time records in order to make breaks

14  appear compliant when, in fact, they weren't?

15  A.   I assume you're talking about Dr. Moore's survey.  And my

16  recollection is that there were lots of different handwritten

17  answers to the survey.  I don't recall whether any of those

18  said that the records were manipulated in order to make it

19  seem as though there was compliance with rest break periods.

20  I don't remember exactly what those were.

21  Q.   You don't really know what's going on at the stores at

22  Taco Bell during the class period; do you?

23  A.   I don't have any personal knowledge of what was going on

24  at the stores of Taco Bell during the class period, other than

25  isolated incidents I may have seen totally unrelated to this

1    having walked into a Taco Bell, but, no, I don't know.

2    Q.   Sure, aside from anecdotal experience walking into Taco

3    Bell.  They're pretty busy places; right?

4    A.   Sometimes Taco Bell is a pretty busy place, yes.

5    Q.   All right.  I want to talk about what you referred to as

6    an on-duty meal period agreement.  Now, you know, you

7    excluded -- in part of your analysis, you excluded certain

8    individuals who you believed had something called an on-duty

9    meal period agreement; right?

10   A.   In certain analyses I did, yes.

11   Q.   All right.  Now, you remember when I took your deposition

12   back in September of last year?

13   A.   Yes.

14   Q.   Now, as of that time, you had never seen any on-duty meal

15   period agreement signed by any of these individuals; correct?

16   A.   I know I don't recall having seen them now.  I don't

17   remember whether I've seen them at all, so I don't remember

18   whether I had seen them then.  I know that I don't recall,

19   sitting here today, having seen one.

20   Q.   All right.  And you made no determination about whether or

21   not, in fact, it was true that the people you excluded

22   actually had on-duty meal period agreements?

23   A.   That's right.

24   Q.   You don't know.

25   A.   I don't know.  As I said, I've looked at these analyses

1  that are consistent with that, but, no, I don't know for a

2  fact.  That's for someone else to determine.

3  Q.  Did you ask for the on-duty meal period agreements from

4  Taco Bell's counsel?

5  A.  I did not.

6  Q.  Yet in your report you're going to exclude people who you

7  think may or -- may have these on-duty meal period agreements

8  but you didn't do any verification to see if they actually had

9  them?

10  A.  No, I did not.

11  Q.  Okay.  You didn't think to ask Taco Bell's lawyers, hey,

12  you know, you want me to exclude hundreds of thousands of

13  shifts based on the fact that you claim there's an on-duty

14  meal period agreement, maybe I should take a look at an

15  on-duty meal period agreement?

16  A.  I didn't think to ask that.  Well, no, it was clear to me

17  that that was not an interesting question or relevant question

18  to ask.  Because I didn't have any expectation that I was

19  going to be the fact witness that was going to demonstrate

20  that there actually are on-duty meal period agreements.  I'm

21  not a percipient witness.  Ultimately that's something that

22  Taco Bell was going to have to demonstrate.  And I gave

23  analyses that showed what happens if you take those out.

24          It was my understanding that the reason you would

25  want to take them out is because of these on-duty meal period

1    agreements.  But it was clear to me that if there aren't any,

2    then you wouldn't want to take them out and I showed what

3    would happen if you did and did not.

4           I mean, the first step of what I did was just to show

5    that leaving aside on-duty meal period agreements, the vast

6    majority of relevant shifts had timely meal periods.  That's

7    whether you look at on-duty meal period agreements or de

8    minimus differences in timeliness of meal periods or any of

9    those other things.  The very first step has none of that in

10   it and it demonstrates to my -- a high degree of certainty to

11   me that there's no such policy.

12          If Taco Bell is going to come in and say that on-duty

13   meal period agreements are responsible for a large number of

14   these untimely or missing meal periods or rest breaks, fine.

15   I can show what happens when you exclude graveyard shifts,

16   when you exclude managers.  But it's not for me to make that

17   determination.  So it really wouldn't move the ball forward

18   for me to go and examine on-duty meal period agreements,

19   particularly since there's legal issues that I'm not competent

20   as a lawyer to determine.

21   Q.  Okay.  And you don't have any idea or not whether even the

22   existence -- let's assume for a moment they did exist.  All

23   right?  Let's assume these things are actually real.  You have

24   no idea whether or not the mere fact that someone has an

25   on-duty meal period means that somehow Taco Bell escapes

1 | liability for providing late meal breaks or no meal breaks at
2 | all?
3 |       MS. KENNEDY:  Objection.  Calling for a legal
4 | conclusion.
5 |       THE COURT:  Overruled.  If you can answer it.
6 |       THE WITNESS:  Could you repeat that, Mr. Theriault?
7 | BY MR. THERIAULT:
8 | Q.  You have no idea whether -- assuming that these on-duty
9 | meal period agreements exist, whether that would mean that
10 | Taco Bell -- whether that means that Taco Bell would somehow
11 | escape liability if it didn't provide meal periods?
12 | A.  To people that have these agreements?
13 | Q.  Yeah.
14 | A.  I do have an idea.  I'm not a lawyer.  I don't know
15 | whether it's true or not.  But it's my understanding, from
16 | talking to Sheppard Mullin, that these on-duty meal period
17 | agreements mean that the absence of recorded meal periods
18 | is -- means that there is no violation.  This is my
19 | understanding from talking to Sheppard Mullin and I found them
20 | to be credible before.  But, no, I'm not a lawyer.  I can't
21 | opine what the law is and I didn't try to do that in my
22 | report.
23 | Q.  You found defense counsel to be credible before; correct?
24 | A.  Yes, I did.
25 | Q.  All right.  Did you ask to see, "Hey, maybe you should

1  show me that law."  If I'm going to exclude people based on

2  these on-duty meal period agreements, maybe you should show me

3  something saying that that's a permissible thing to do in

4  counting up whether or not there are violations?

5  A.  I don't know why I would do that.  You asked me do I have

6  any idea.  I told you why.  I don't think that I would be

7  allowed to get up here and testify what the law is, so I

8  didn't try to testify about what the law is.  I never opine

9  about what the law is.  So I can't think of any reason why I

10 would do what you're saying.

11 Q.  All right.

12 A.  No, I didn't do it.

13 Q.  Are you aware that the existence -- assuming these

14 agreements exist, that on-duty meal period agreements, that

15 doesn't mean that you can't -- you're not supposed to record

16 your meal break.  You still have to record your meal break.

17 You're aware of that, right?

18       MS. KENNEDY:  Objection.  That calls for a legal

19 conclusion.

20       THE COURT:  Sustained.

21 BY MR. THERIAULT:

22 Q.  Well, you excluded people based on the assumption that a

23 missing meal break was because of a signed on-duty meal

24 period; correct?

25 A.  Well, again, did I exclude them?  No.  The first thing

1   that I did is I looked at all shifts.  And then I looked at

2   all the shifts, how many of them include timely meal periods?

3   How many of them don't include timely meal periods?  Without

4   regard to whether there are on-duty meal period agreements or

5   not.  Without regard to all the other things or not.

6          But I also showed, well, how many of these shifts

7   that are -- that don't have timely meal periods, how many of

8   them are made up of people who Taco Bell, through Sheppard

9   Mullin, told me are subject to on-duty meal agreements.  But I

10  didn't exclude them from the analysis.  They're there.

11  They're there for anybody to add in if they want to.  That's

12  not for me to determine.

13         But if it's true -- and I believe that it is -- that

14  employees who are working late at night at Taco Bell are

15  subject to on-duty meal period agreements and that Taco Bell

16  employees or managers are subject to on-duty meal period

17  agreements, I've believe -- I've been told and I have no

18  reason to believe that it's not true.  That it isn't a

19  violation for them not to have recorded a 30 minute unpaid

20  meal.  But I don't know that.  And you can argue it, but I

21  don't think that I've precluded you from making the argument

22  that it doesn't count.  I'm not a lawyer.  That's not for me.

23  Q.  All right.  Who wrote this statement?  "Out of the

24         2,511,475 shifts lacking a timely recorded unpaid

25         meal period, 888,694 were worked by managers who were

1        parties to on-duty meal period agreements.  After

2        deducting these shifts, 1,622,781 shifts remain."

3   A.  I imagine that I did, but I'm not looking at the exact

4   page you got.  But I would imagine that's in my report.

5   Q.  Now, you excluded graveyard shift employees as well for

6   the same reasons; right?  And I keep saying "graveyard shift

7   employees."  Graveyard shifts.

8   A.  I thought that's part of what we were talking about before

9   was graveyard shifts and managers.  I don't know if it's "as

10  well," I thought that's what we were talking about before.

11  Q.  But in part of your analyses, you excluded -- I was

12  limiting it to managers, now I'm talking about graveyard

13  shifts.  You excluded graveyard shifts from part of your

14  analysis as well; right?

15  A.  Yes.  In part of the analysis, I deducted shifts that were

16  graveyard shifts.

17  Q.  And likewise, you have no idea whether or not an on-duty

18  meal period agreement would somehow mean that Taco Bell is

19  -- can just run rampant over the meal period laws?

20        MS. KENNEDY:  Objection to the form of the question.

21  Argumentative.

22        THE COURT:  Sustained as to the form of the question.

23        MR. THERIAULT:  Thank you, Your Honor.

24  Q.  You did some other analyses.  And some of these

25  analyses -- I'm going to say it in my terms and you'll have an

1    opportunity to correct me.  But in a nutshell, basically you

2    divided up the data in certain ways and you isolated shifts by

3    manager, by particular employee, by particular store, when the

4    shifts started.  You recall that?

5    A.   I do.

6    Q.   And the general idea is that, I think in your words, you

7    want to show the variation based on various factors, for

8    instance, the identity of the manager.  You talked about the

9    worst managers and the best managers, and the worst stores and

10   the best stores.  You remember that?

11   A.   I wanted to see if there was variation, yes, and then

12   measure it.

13   Q.   Right.  Okay.  Now, you indicated that you didn't know why

14   some store managers were the worst and why some were the best;

15   right?  You couldn't tell.  We just know that, based on the

16   data, some managers were better at compliance, some were not.

17   A.   Well, in terms of re-creation at the raw punch data stage.

18   And part of it is I don't even really know whether at the end

19   of the day, these managers are the worst or the best in terms

20   of PVRs.  But yeah, there were variations.

21   Q.   You broke it down by manager and looked at data based on

22   which manager was in charge of that particular shift; right?

23   A.   Yes.

24   Q.   Now, you know, is it possible that some of the managers

25   with the lowest violation rights, the best managers, were

1    simply ignoring Taco Bell's violative policy to give meal

2    periods after the fifth hour, which would explain why --

3           MS. KENNEDY:  Objection.

4    BY MR. THERIAULT:

5    Q.  -- the violation rate was lower?

6           MS. KENNEDY:  Apologize.  Objection to the form of

7    the question.  Excuse me, Your Honor.

8           THE COURT:  That is sustained.

9    BY MR. THERIAULT:

10   Q.  Assuming that Taco Bell had a policy to provide meal

11   periods after the end of the fifth hour and not before, isn't

12   it possible that one of the explanations why some managers had

13   such low violation rates is because they ignored that policy

14   and they tried to give breaks on time?

15   A.  I don't know how to answer the question because it

16   includes what I consider to be a false hypothetical.  Assuming

17   they had a policy.  Given that not just the top ten, but, you

18   know, virtually all other managers were handing out or

19   scheduling breaks before the completion of the fifth hour of

20   work, I don't know how to answer the hypothetical.  If you're

21   asking is it possible for a manager to ignore a policy,

22   absolutely.  If you're asking whether that explains the

23   empirical results, absolutely not.

24   Q.  Now, another part of your testimony had to do with

25   something that you've been referred to in your report and

1    today as de minimus.  You understand what I'm talking about?

2    A.  Yes.

3    Q.  All right.  Now, you have a basic understanding of what

4    the California's meal period law is; right?

5    A.  Yes.

6    Q.  I mean, you wrote it in your report, I think.  I'm looking

7    at page 8, paragraph 21.  And this is what you write:

8            "I understand that the California Labor Code mandates

9            that no employer shall employee any person for a work

10           period of more than five hours without a meal period

11           of not less than 30 minutes."

12           And then you go on to write:  "And that, absent

13           waiver, California Labor Code requires a first meal

14           period no later than the end of the employee's fifth

15           hour of work."

16           So you have an understanding what the law is.

17           Now, part of your calculations -- and I sort of want

18   to figure this out.  Part of your calculations is that you

19   actually deducted a whole bunch of shifts because in your

20   mind -- well, let me back up.

21           Part of your calculations, you deducted a whole bunch

22   of shifts because -- not because they were -- they didn't

23   start before the end of the fifth hour, but because they went

24   over.  Right?  In other words, some of the shifts that you

25   deducted were meal periods that started after the end of the

1    fifth hour.

2    A.  I identified shifts that commenced within the five and

3    five hours and 10 minutes.  I identified those shifts, counted

4    them up and showed what would happen if you deducted that

5    total of shifts from the total of shifts that was standing

6    before such a deduction.  Yes.

7    Q.  All right.  So have a big clock here.  Right?  12.  Here's

8    the first hour.  It goes to one o'clock.  Second hour, two

9    o'clock.  Third hour.  Four, the fourth hour.  Right here, you

10   can't see the five down here, right?

11   A.  That's right, I can't.

12   Q.  All right.  Let me -- Your Honor, may I move it over here?

13            THE COURT:  You may.

14            MR. THERIAULT:  Thank you.

15   Q.  All right.  Here's the fifth hour?

16            THE COURT:  That's my zone, Mr. Theriault.  Remember,

17   I told you.  That's the area I told you to move it to.

18            MR. THERIAULT:  Oh, okay, I can move it here?

19            THE COURT:  I know where it is from sitting up here

20   all these times, what the witness can see and everybody else

21   can see.

22            MR. THERIAULT:  You need little -- little marks on

23   the floor.

24            THE COURT:  I should.  I'll do that next time.  I'll

25   put some tape down.

1          MR. THERIAULT:  All right.  Standing in the well is

2     not okay.

3     Q.  All right.  So the fifth hour.  Right?  Five p.m.  So in

4     your analysis, you counted up a bunch of shifts.  And let me

5     just give you a hypothetical.  Let's just say all these shifts

6     you counted up started at 12.  All right?

7          So you acknowledge in your report that the meal

8     period is supposed to start before the end of the fifth hour,

9     i.e., it's supposed to start by five p.m.  Yet -- and this is

10     Labor Code.  Right?  This is the California Labor Code.  But

11     you want to deduct shifts right here, this 10 minutes here.

12     What law is that?

13          MS. KENNEDY:  Objection.  Argumentative.

14          THE COURT:  Overruled.

15          THE WITNESS:  I don't want to deduct anything, Mr.

16     Theriault.  I identified shifts in the raw punch data that

17     showed recorded meal periods that began between five hours and

18     five hours and 10 minutes.  The reason for that is because

19     those may not be as indicative of a policy of late meal

20     periods as meal periods that start much later.

21          I conducted an analysis that identified all of the

22     shifts and showed that over two-thirds of the time, those

23     shifts included a meal period that began prior to the

24     commencement of the fifth hour of work.  And in my mind, those

25     overwhelming percentages were proof positive that there was no

such policy for meal periods to begin after the completion of the fifth hour of work.

I conducted lots of other analyses to show that even that two-thirds was overstated or appeared to be overstated if Taco Bell ends up proving the things that they say they're going to prove.  That there are on-duty meal period agreements that would result in either missing or untimely meal periods.  That there are auto-pay, such that there's no additional money that needs to be paid for some of these shifts.

And that some of them are late by a very small period of time, which could be consistent with somebody tripping on their way to time out or somebody forgetting, as opposed to having be part of a policy, to give somebody notice to time out.  A small amount of time.  I'm not saying deduct anything at all.  I'm showing what the numbers are if you want to know how many of these late meal periods are late by a small amount of time.

But I'm not -- I'm not trying to deduct anything.  And I'm not saying what the law is.  I don't know what the law states about whether you're entitled to a meal premium for a very small amount of lateness or whether there needs to be more evidence of intent.  I don't know.  I don't know whether this is going to be used as evidence that there was actually an offer made and it just happened to be it didn't get punched in on time.  Because my understanding is it's the offer and

1   not the actual recordation.

2          But, no, Mr. Theriault, as I said, I'm not here to

3   talk about the law.  I'm not a lawyer, don't have a law

4   degree.  Never been to law school.  I don't purport to be an

5   expert on the law.  So when you ask me what kind of law is

6   that, I really don't have an answer for you other than to tell

7   you what I did and why I did it.

8   BY MR. THERIAULT:

9   Q.  It's not the law, right?

10          MS. KENNEDY:  Objection.  Argumentative.

11          THE COURT:  Sustained.

12   BY MR. THERIAULT:

13   Q.  Now, you say you don't want to deduct anything, but who

14   wrote this statement?  "Deducting these 114,496 shifts that

15   were late by 10 minutes or less, 998,992 shifts remain."

16   A.  I'm sure that I did.  I'm not looking at that exact

17   sentence, but you know, I'm sure that I wrote that sentence.

18   Q.  Now, did Taco Bell say, "Hey, you know something, here's

19   another 60 grand.  Why don't you tell us the counts -- make

20   the law, instead of five hours, make it to five hours and 10

21   minutes?"

22          MS. KENNEDY:  Objection.  Argumentative.

23          THE COURT:  Sustained.

24   BY MR. THERIAULT:

25   Q.  Dr. Walker, do you agree that if Taco Bell broke the law,

1    that -- and the law says that they should pay premiums, do

2    you -- you're not saying that Taco Bell should get off the

3    hook for actual violations; right?

4            MS. KENNEDY:  Objection.  Relevance.

5            THE COURT:  Sustained.

6    BY MR. THERIAULT:

7    Q.  Now -- and you're not saying, are you, that Taco Bell

8    should get off the hook for the 2.5 million shifts that you

9    found that lack a timely recorded unpaid meal period?

10           MS. KENNEDY:  Objection.  Relevance.

11           THE COURT:  Sustained.

12           MR. THERIAULT:  No more questions, Your Honor.

13           THE COURT:  Any recross?

14           MS. KENNEDY:  Just one question.

15           THE COURT:  All right.

16                         RECROSS-EXAMINATION

17   BY MS. KENNEDY:

18   Q.  Dr. Walker, do you have an understanding as to whether or

19   not, in this case, the PVRs have been turned over in discovery

20   to the plaintiffs' counsel?

21   A.  Yes.

22   Q.  And how do you know that?

23   A.  It's my understanding from what you've told me.  And what

24   Sheppard Mullin has told me, that it's been produced.

25           MS. KENNEDY:  I have no more questions, Your Honor.

265

1          THE COURT:  May this witness be excused?

2          MR. THERIAULT:  Yes, on our side.

3          MS. KENNEDY:  Yes, Your Honor.

4          THE COURT:  All right.  Thank you, doctor.  You're

5    excused.

6          (The testimony were concluded at 2:22 p.m.)

7

8          I, KAREN HOOVEN, Official Reporter, do hereby certify

9    that the foregoing transcript as true and correct.

10

11   DATED:  12th of March, 2016          /s/  Karen Hooven
                                          KAREN HOOVEN, RMR-CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25